# EXHIBIT E

IN THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT,
IN AND FOR JEFFERSON COUNTY, FLORIDA

CASE NO. 2017-CA-0162

J.D. JAMES, INC., D/B/A NATURE
BRIDGES,

    Plaintiff/Counter-Defendant,

vs.

SAKET CHAUDHARI,

    Defendant/Counter-Plaintiff.

| | |
|---|---|
| DEPOSITION OF: | MATTHEW PARKER |
| TAKEN AT INSTANCE OF: | The Defendant |
| DATE: | February 21, 2018 |
| TIME: | Commenced at 1:02 p.m.<br>Concluded at 2:42 p.m. |
| LOCATION: | 2894 A. Remington Green Lane<br>Tallahassee, Florida 32308 |
| REPORTED BY: | KATRISA J. MAGEE<br>Professional Court Reporter<br>kjmcourtreporter@gmail.com |

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL 32308   850.878.2221
www.accuratestenotype.com

---

                              3

```
 1                          INDEX
 2   WITNESS                                      PAGE
 3   MATTHEW PARKER                                 4
       Direct Examination by MR. HARPER            4
 4
 5                    INDEX OF EXHIBITS
 6          (Exhibits are attached to transcript.)
 7   NO.             DESCRIPTION                    ID
 8
 9                   (NO EXHIBITS MARKED)
10
11
12
13
14
15
16
17
18
19
20
21
22   CERTIFICATE OF OATH                           61
     CERTIFICATE OF REPORTER                       62
23   LETTER TO READ/SIGN TRANSCRIPT                63
     ERRATA SHEET                                  64
24
25
```

ACCURATE STENOTYPE REPORTERS, INC.

---

                              2

```
 1   APPEARANCES:
 2
 3        REPRESENTING PLAINTIFF/COUNTER-DEFENDANT:
 4
 5        S. ELYSHA LUKEN, ESQUIRE
          sluken@smithcurrie.com
 6        SMITH, CURRIE & HANCOCK, LLP (FORT LAUDERDALE)
          101 NE Third Avenue, #1910
 7        Ft. Lauderdale, FL 33301
          954.761.8700
 8
 9        REPRESENTING DEFENDANT/COUNTER-PLAINTIFF:
10
11        GUS HARPER, ESQUIRE
          gus@harperlawyer.com
11        HARPER LAW FIRM, P.A.
          1725 Capital Circle NE, Ste 304
12        Tallahassee, FL 32308
          850.523.0930
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ACCURATE STENOTYPE REPORTERS, INC.

---

                              4

```
 1                    STIPULATIONS
 2        The following deposition of MATTHEW PARKER
 3   was taken on oral examination, pursuant to notice, for
 4   purposes of discovery, and for use as evidence, and for
 5   other uses and purposes as may be permitted by the
 6   applicable and governing rules.  Reading and signing is
 7   not waived.
 8                        * * *
 9        THE COURT REPORTER:  Do you solemnly swear or
10   affirm that the testimony you're about to give in
11   this cause will be the truth, the whole truth, and
12   nothing but the truth so help you God?
13        THE WITNESS:  I do.
14   Thereupon,
15                    MATTHEW PARKER
16   was called as a witness, having been first duly sworn,
17   was examined and testified as follows:
18                    DIRECT EXAMINATION
19   BY MR. HARPER:
20        Q    Sir, could you please state and spell your
21   name for the record?
22        A    Matthew Parker, M-A-T-T-H-E-W, Parker,
23   P-A-R-K-E-R.
24        Q    All right.  Mr. Parker, have you ever had your
25   deposition taken?
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 5**

```
1        A    In this matter?
2        A    No, just --
3        A    I've been in depositions before, yes.
4        Q    Okay.  Do you have a general understanding as
5   to how they -- they typically work?
6        A    Yes.
7        Q    Okay.  If I -- if you don't understand a
8   question that I ask, feel free to, you know, ask me to
9   rephrase or, you know, let me know you don't understand
10  and I'll -- I'll do my best to accommodate you.
11            In preparation for today's deposition, did you
12  review any documents or records?
13       A    I located the file to the project that we had.
14  I haven't gone through much causative or anything, no.
15       Q    Is that -- that file that you're referring to,
16  is that your file or -- or your company's file?
17       A    Yes, sir.  It's the only one I have, yes.
18       Q    Okay.  What do you do for a living?
19       A    I'm a professional engineer.
20       Q    And what type of engineer?
21       A    We do civil constructional work.
22       Q    Where did you attend your schooling or your
23  training?
24       A    Florida State.
25       Q    Did you -- did you obtain an engineering
```

**Page 6**

```
1   degree?
2        A    Yes.
3        Q    Okay.
4        A    I have a bachelor's in civil engineering.
5        Q    Now, I -- I believe I recall having come
6   across some information about you that references storm
7   water management; is that correct?
8             Is that within the purview of your experience?
9        A    In the work that I've done?
10       Q    Yes, sir.
11       A    On this project?
12       Q    No, sir.
13       A    Just in general?
14       Q    Correct.
15       A    Yes.
16       Q    What does that entail?
17       Q    What does what entail?
18       Q    Storm water drainage maintenance or -- I
19  believe the phrase I came across was storm water
20  management officer or, you know, my apologizes.
21       A    I have the state license of a certified
22  management control officer, yes.
23       Q    Okay.
24       A    But that is required for most engineers who do
25  design in Florida.  Also I was one in Georgia.  I think
```

**Page 7**

```
1   they're the only other state that requires one.
2        Q    Where are you licensed?  In what -- in what
3   states are you licensed?
4        A    I personally am currently licensed in Florida,
5   Georgia, Alabama, I think, in Tennessee.  I will have to
6   check.  But we have an associate Zeyn Uzoman who's
7   licensed in all 50 states.
8             THE COURT REPORTER:  Can you spell that name
9        for me?
10            THE WITNESS:  Yes.  Zeyn, Z-E-Y-N.  Uzoman,
11       U-Z-O-M-A-N.
12            THE COURT REPORTER:  Thank you.
13  BY MR. HARPER:
14       Q    I appreciate you spelling that.  That was -- I
15  would not have guessed that.
16       A    Like it sounds.
17       Q    Do you have any -- strike that.
18            How many bridges have you designed in your
19  career approximately?
20       A    I couldn't tell you.  It's over a thousand.  I
21  mean, if not a thousand, a lot of bridges.
22       Q    Is that by and large your specialty or your
23  niche, or do you also design other structures?
24       A    We do design other structures, but we do a lot
25  of light vehicular pedestrian bridges.
```

**Page 8**

```
1        Q    And -- and with regards to a light vehicular
2   bridge, what is the --
3        A    Not an interstate bridge.
4        Q    Anything other than an interstate bridge?
5        A    It would not be what you would typically -- we
6   would not do the Sunshine Skyway or an I-10 overpass.
7   Light vehicular bridge means small or light, not low,
8   but light in traffic.  So we've done plenty vehicular
9   bridges that's heavy traffic but not heavyweight
10  traffic, not heavy volume of traffic.  That's the
11  differentiation.
12       Q    Is there any particular reason why you -- you
13  focus more on the -- the light vehicular bridges than
14  the interstate-type bridge?
15       A    It's a differentiation within the industry.
16  Firms that -- heavy vehicular bridges are something
17  unique to the Department of Transportation regarding any
18  one -- whatever state.
19            You are, for instance, I'm sure, like the
20  practice of law, it's either something -- you work with
21  those people or you don't.  You either work for the DOT
22  and you do all the DOT firm because they have extensive
23  requirements for auditing your books and all the
24  paperwork associated with that.
25            So we are not a DOT.  We do not do all of the
```

9

```
 1    DOT for a client.  We work for them as a sub-consultant
 2    from time-to-time but not a primary consultant.
 3         Q    I understood.  Thank you.
 4              Do you have any independent recollection or a
 5    familiarity with this particular project that we are
 6    here on today?
 7         A    Yes.  I designed it; so I have recollection of
 8    it, yes.
 9         Q    Yes, sir.
10              What is your relationship with JD James
11    Incorporated or Nature Bridges?
12         A    They're a client.  They have been a client for
13    a while, probably more than 10 years.
14         Q    Are you -- is there any sort of exclusivity?
15         A    No.
16         Q    Okay.
17         A    No.  They're a client.  They probably
18    represent maybe 15 percent of our annual billing.  I
19    mean, they're not -- they're -- they're a larger client
20    in the world of clients, in our firm, but not -- they're
21    not as big as -- there are several others that are much
22    larger.
23         Q    Is it fair to say that the -- well, I guess a
24    better way to word it -- are the majority of the -- the
25    matters or the projects that you take on from Nature
```

ACCURATE STENOTYPE REPORTERS, INC.

11

```
 1    I'm -- I'm wrong.
 2         Q    Do you know of any state whose licensing
 3    committee, for lack of a better word, is contained
 4    within the Department of Environmental Protection for
 5    that state?
 6         A    No.  It's a separate entity.  The -- the board
 7    of professional engineers is a board, every state has
 8    their own board.  They're totally independent of the DEP
 9    or any other department.  You don't go to the DEP to get
10    licensed as an engineer.
11         Q    With respect to this particular bridge that
12    you designed for Nature Bridges and Mr. Chaudhari, as
13    best you can, could you explain the circumstances
14    surrounding your initial engagement?
15              And I know I'm butchering this question, but
16    what I'm getting at is, if you recall who from Nature
17    Bridges first reached out to you and when.
18         A    It's likely Brian Green from Nature Bridges,
19    and he had sent me a -- I don't know exactly who sent
20    the e-mail, but somebody sent the document that said,
21    "Matt, we're requesting that you design this bridge."
22              And in this case, it was a 12-foot wide by
23    20-foot concrete bridge.  And we discussed the
24    foundation and the means and methods of construction and
25    how they wanted to do things.
```

ACCURATE STENOTYPE REPORTERS, INC.

10

```
 1    Bridges located in the State of Florida?
 2         A    No.  They're located across the country.  I've
 3    worked on projects with them from New York, Michigan,
 4    Texas, Florida, Alabama, Tennessee, the Carolinas.  We
 5    have one in Virginia right now.  Yeah.  I mean, it's --
 6         Q    There's no -- or is there a requirement, a
 7    licensing requirement to design a bridge that is to
 8    be -- erected in another state?
 9         A    No.  Yes, a registered professional engineer.
10    We don't have to be exclusively in that state.  It's up
11    to the local jurisdiction, but if they will accept a
12    local across state lines, I can work in that state.
13              I've worked on projects in Alabama, and local
14    officials do not require.  I've sealed it with my
15    Florida seal.  They do not require an Alabama license.
16    I've worked in Georgia and Tennessee, and they don't
17    require any engineer from that -- that holds a license
18    in that state to work there.
19         Q    By in large, who is it that you work -- when
20    you say "they" ...
21         A    The reviewing entity from the government,
22    whether it be a building department or --
23         Q    Is that ever the DEP, a state DEP?
24         A    I'm not sure I follow the question.
25         Q    Okay.  And -- and please correct me if -- if
```

ACCURATE STENOTYPE REPORTERS, INC.

12

```
 1         Q    And what is your understanding about Brian
 2    Green's role at Nature Bridges?
 3         A    He's the project manager for Nature Bridges.
 4         Q    As you are preparing your design, what sort of
 5    information do you -- do you need to have?
 6         A    We need to know the size and structure.  We
 7    need to know the anticipated loads and the soil
 8    conditions, where the foundation is going to go.
 9         Q    How are soil conditions determined?
10         A    There's several ways.  You can have borings
11    completed at the location, where you want to build the
12    structure, or you can use regional maps that are
13    provided by the USDA soil conservation area that have
14    completed -- previously completed studies in the areas
15    and have profiles of soils in a discrete area.
16              So they have a map of the area and you can
17    look at that map and see what the predominant soil type
18    is in that area.
19         Q    Is there ever -- has there ever been an
20    occasion in which you have needed to reach out to an
21    environmental engineer or a local government to
22    ascertain information that wouldn't otherwise be
23    necessary -- necessarily reflect -- reflective on a map
24    or, you know, otherwise just easily available?
25         A    I'm not sure I follow the question.
```

ACCURATE STENOTYPE REPORTERS, INC.

13

```
 1      Q    Okay.  Have you ever felt the need or -- or
 2  had the need to -- to reach out and confirm various
 3  findings or unique aspects of a particular property with
 4  individuals outside of your -- your client?
 5      A    On this particular project or in general?
 6      Q    In general.
 7      A    In general, sure.  I mean, you -- we'll ask
 8  other people other questions about a project, but, yeah.
 9      Q    What about this particular project?
10      A    Well, the parameters are pretty well set as
11  far as the size of the bridge and where it was going to,
12  you know, where it was going to be.  So that -- we had a
13  handle on that.
14          We were given what the loads would be, what
15  the materials would be, the size of the bridge, the DEP
16  permit for construction in wetlands was complete.  We
17  received a one-page drawing from Lan and Associates
18  depicting it, and that's it.
19      Q    That one-page drawing from Lan and Associates,
20  what did it depict to -- to the best of your
21  recollection?
22      A    It showed a -- the bridge, a driveway, a
23  house, a drain field built on a residential lot or a
24  lot, a building lot.
25      Q    Do you recall whether or not that drawing
```

ACCURATE STENOTYPE REPORTERS, INC.

14

```
 1  provided for a particular location for the bridge?
 2      A    Uh-huh.  It had a location and size.  It's
 3  size, which was different from what he had discussed or
 4  what I was told the bridge would be.        with whom
 5      Q    And then, who did you discuss the size of the
 6  bridge with?
 7      A    I had e-mailed Brian and I talked to him.
 8  And I said, "You realize you want a 12 by 20 bridge but
 9  the drawings show something about a 32-foot bridge."
10          And he said, "The clients requested a 20-foot
11  bridge.  That's what we're building."
12          So that's what I designed.
13      Q    Is there -- in your experience, does the
14  dimension that an owner is requesting, does that serve
15  as the -- the compass or the gospel for what is to be
16  designed by you?
17      A    Oh, sure.  I mean, they're the ones paying the
18  bill.  It's not uncommon to have drawings that have been
19  drawn and permitted, and then when they come to me and
20  they say, "Well, the bridge is -- shows 174 feet, but I
21  want the bridge to build a 144-foot bridge," or, "The abutment
22  was going to go here but it's going to go here," or,
23  "The plans showed 10-foot wide, but we want to build an
24  8-foot wide because there are budget issues."
25          So it's -- it's -- there was cost overrun.
```

ACCURATE STENOTYPE REPORTERS, INC.

15

```
 1  There was something like that, and things changed.
 2      Q    Are there ever -- does that sort of phenomenon
 3  ever occur in your experience because of matters of
 4  compliance?
 5      A    It can be.  Changes in site condition are
 6  usually the biggest, and cost.
 7      Q    Have you ever encountered a scenario whereby
 8  you determined the dimensions that an owner was
 9  requesting would not comply with the -- the property's
10  site or permits?
11      A    No -- we're just talking in generalities?
12      Q    Yes, sir.
13      A    Yeah, sure.  People tell me all the time they
14  want to build a 10,000 square foot house, and it won't
15  fit on the set backs or things like that.  So you have
16  to make changes.  I mean, they may have a house that's
17  too long and it doesn't fit or something; so you say,
18  "Your house doesn't fit in the set backs."
19      Q    And -- and in general, how does that process
20  look?  I understand you to say there are conversations
21  you've got to, you know, inform the -- the owner, This
22  is, you know, I recognize this is what you want, but
23  this is not going to work.  Here's why.
24          How do you, yourself --
25      A    You change the house, or you would request a
```

ACCURATE STENOTYPE REPORTERS, INC.

16

```
 1  deviation for set backs.  I mean, those are your two
 2  options.
 3      Q    So do you, yourself, ever request those
 4  deviations?
 5      A    Sure.
 6      Q    To the set backs?
 7      A    Yeah.  It depends on the modifications.  And a
 8  lot of things are handled in as-built.  I mean, because
 9  the site condition's are always different than what was
10  in the drawings; so there is always a change.
11          So you prepare typically record drawings or
12  as-built drawings of what we actually built.  This is
13  what was originally proposed and this is what we built.
14  And it's always different.
15      Q    Why is it always different?
16      A    Because the physical conditions of the site
17  are always different.  They're never exact.  There is
18  no -- the survey has allowable errors within it.
19  Things -- surface typography changes.  Things vary,
20  things change.  That's not uncommon that there's
21  something, you know, in the process that wouldn't work.
22  So something has to be changed.
23      Q    Do you recall in your participation or
24  involvement in this -- this project at some point
25  determining that a change was necessary that -- a change
```

ACCURATE STENOTYPE REPORTERS, INC.

17

1 from that initial land sketch?

2 A   Well, I know the bridge that was requested

3 wouldn't work in the place that it was originally

4 located because of grading issues because they'd been

5 grading off site, and the -- the shape of the creek

6 where they would put the foundations in the creek, which

7 was not allowed.  So it had to be located somewhere

8 else.

9 Q   And would -- to the best of your recollection,

10 was that something that you were able to identify, or

11 was that something that Brian noticed?

12 (A)  I was never on the site; so that was something

13 Mc. Green had relayed to me.

14 Q   In -- in other words this is what -- these are

15 the dimensions this owner ... this owner wants.  It's

16 not going to work here, you know, can you please draw up

17 something that does?

18 A   Draw up something or is something acceptable.

19 "Matt, we're building the boardwalk, and there is a

20 large tree that didn't get picked up on the survey."

21 And the owner wants to say that, "We want to

22 skew the boardwalk this way, and we want to curve around

23 the tree."

24 We have a boardwalk that's a -- that has no

25 handrail, and to have a handrail you -- you're required

ACCURATE STENOTYPE REPORTERS, INC.

18

1 to have handrails on a boardwalk that's 30 inches -- or

2 above off grade.  Well, the whole plan was to keep the

3 boardwalk at 29 inches off the ground and -- but the

4 site conditions -- there is a dip.  And we're going to

5 have locations that are going to be greater than 30

6 inches off the ground; so we have to install a handrail.

7 So we need to change the slope of the boardwalk.  We

8 need to go up or down or do something.  There is

9 variations.

10 Q   I understand.

11 A   So I got a phone call.  I evaluate the

12 drawings.  Can this change be made with the drawings as

13 they are?  Yes or no, you know?

14 Q   Do you recall ever receiving any modified or

15 change -- changed drawings from that original Las and

16 Associates' site plan?

17 A   Well, the only people who generate -- we don't

18 usually do drawings, typically; so, no.  We didn't do

19 anything.  I don't know if anything else exists or -- I

20 mean, I never received anything from Nature Bridges

21 or ... I'm not sure I'm following the question, so ...

22 Q   I was taking, as best I could, your

23 explanation of how, you know, these necessary changes as

24 they evolve are addressed and how those are reported

25 back to you so that you've got the information you need

ACCURATE STENOTYPE REPORTERS, INC.

19

1 to, you know, design accordingly.

2 So my question was:  Do you recall ever having

3 received any modified or second drawings to give you an

4 idea or -- or otherwise reflected necessary changes to

5 the -- the site plan that you needed to account for?

6 A   I don't recall a drawing.  I recall a

7 conversation that the -- the grades as shown wouldn't

8 work, and it would require replacement of fill on an

9 adjacent property, and that's not allowed.  I told him,

10 "You can't grade on the adjacent owner's property.

11 That's not allowed."  I recall that.

12 Q   Do you know either specifically or just by

13 experience, what then is to happen in -- in light of

14 that revelation that you just explained, meaning --

15 A   Well, adjustments would be made so you don't

16 grade on the adjacent property.

17 Q   Yes, sir.

18 And -- and what are some examples of those

19 types of adjustments?

20 A   Well, it depends on the grade.  You can change

21 the -- specific to this item, you could have changed the

22 elevation of the bridge.  You could change the location

23 of the bridge.  But the elevation of the bridge would

24 not be wise to change because of the flow way of the

25 water under it.

ACCURATE STENOTYPE REPORTERS, INC.

20

1 Q   Is it uncommon in your practice or your

2 experience to identify a need to change a bridge's

3 location from the -- for lack of a better word, as

4 intended or originally anticipated location?

5 A   Am I aware of a need to change the bridge's

6 location?

7 Q   No, sir.  Do you -- is that -- do you

8 regularly encounter a scenario whereby you are provided

9 some initial drawings and it is later determined that

10 your particular scope of work or your -- the bridge that

11 you are to be -- design will not work at the location?

12 A   Sure, yes.

13 Q   Is there -- are they more often or not modest

14 changes or substantial changes with regards to the

15 location?

16 A   Modest changes are not an engineering term.

17 You know, what's modest to one person is not modest to

18 another.  So you know --

19 Q   I understand.

20 A   -- there is -- things change.  Whether -- you

21 know, someone may consider it dire that it's two inches

22 to the left; some may not.  That's, you know ... so I

23 mean, changes are normal.  What the -- the magnitude of

24 the change or the cornification of the change is -- is

25 subjective.

ACCURATE STENOTYPE REPORTERS, INC.

21

```
1    Q    I understand.
2         Do you by and large — let me rephrase that.
3         Is it common for you to speak directly to your
4    clients' owner?
5    A    Typically my client -- in this particular
6    case, my client was Nature Bridges.
7    Q    Yes, sir.
8    A    That's who I communicated directly with.
9    That's who I was contracted to provide structural design
10   services for.  So that's who we communicated with.  In
11   some cases we will communicate with the client, but
12   those are also cases where we have other relations with
13   the client.
14   Q    In this matter here, involving this bridge
15   that you built -- or excuse me -- that you designed for
16   Nature Bridges, do you recall having direct -- at any
17   time having direct communications with the property's
18   owner?
19   A    I believe I had called -- I think we spoke
20   once.  We e-mailed.  I know we've had contact, yes.
21   Q    Do you recall the nature of that contact or
22   what purpose or why that contact was needed or --
23   A    My first contact started when a letter from
24   New Jersey DEP arrived about violations of the DEP
25   permit.  There was some -- there were four or five
```

22

```
1    items.  And I had -- I think -- Mr. Chaudhari is it?  Is
2    that right?
3         MR. CHAUDHARI:  Yes, sir.
4         THE WITNESS:  Had received it.  They forwarded
5         it to me.  I reviewed it.  I contacted them, and
6         they said, "Would you please contact him as well
7         and explain what's going on?"
8         So we did.  And I think I explained to them,
9         and I think I wrote an e-mail that went to
10        everybody.
11   BY MR. HARPER:
12   Q    Do you -- do you have involvement with matters
13   of -- involving silt or fill or not necessarily
14   designed, you know, bridge design, but the surrounding
15   relevant components to that bridge?  And that's a poor
16   question.  Let me rephrase that.
17        Do you have -- ordinarily, do you have any
18   involvement with permitting matters?
19   A    Yes.
20   Q    And what sort of permitting matters would --
21   are those commonly?  Are those building permitting
22   matters that you're referring to?
23   A    They could be any number.  They can be
24   building permit matters.  There could be any number of
25   matters.  They could be anything.
```

23

```
1    Q    What --
2    A    Any matters that pertain to whatever was --
3    that I'm designing that's being built.
4    Q    What is the distinction between building
5    permitting issues and civil engineering permitting?
6    A    Building permit is a defined process with a
7    local municipality or governing entity.  Civil
8    engineering is a broader term.  There is no civil
9    engineers permitting 'cause there is no entity that just
10   reviews civil engineering.
11        Civil engineering encompasses everything from
12   changes in typography to grading to structural work,
13   transportation.  So the reviewing entity could be
14   anyone.  Could be a building department, could be the
15   state, DOT.  Could be the state DEP.  It could be the
16   feds.  It could be anybody.
17   Q    Is there any palpable overlap between civil
18   engineering and structural engineering?
19   A    Civil engineering — structural engineering is
20   a subset of civil engineering.  There's civil
21   engineering.  There's transportation, hydrology,
22   hydraulics, structures, transportation.  They all come
23   under the civil engineering umbrella.
24   Q    In furtherance of your designs, do you have to
25   take into consideration geological matters?
```

24

```
1    A    We take in the geology as it pertains to the
2    bearing of the structure.
3    Q    In -- in what respect?
4    A    Does the -- do the soils have adequate
5    capacity to support the structure?
6    Q    With respect to Mr. Chaudhari's property,
7    absent an on-site visit or inspection, how are you able
8    to determine what the soil needs to ensure structural --
9    A    You mean like soil capacity of the site so I
10   can design the foundation?
11   Q    Yeah, sure.
12   A    Okay.  We -- because of the conditions that
13   were there, Mr. Chaudhari's bridge is going in what are
14   called loessial soils.  Loessial soils are carry down
15   material.  They're wash out.  There are deposits from
16   the stream.  They're erosion from the stream.  These are
17   loessial deposits.
18        The variability and geological formation on
19   soil horizon is wildly variable in lieu of those
20   deposits.  So you have to be very careful in your
21   foundation design.  We pick -- the choice for his design
22   of piles.  It's the obvious choice, because they
23   present -- they provide scour -- it's called scour
24   protection from any swift water that can remove the
25   soils under the foundation.
```

**25**

1    You would not place the foundation directly on
2  top of the soils adjacent to the creek, 'cause they will
3  be washed away.  So you use piles -- piles to be driven.
4  Piles can be [indiscernible] cast.  We chose helical
5  piles.  The advantage of helical piles is that they
6  provide an instant load capacity rating, independent of
7  soil type.  Because of the way the soil -- they're
8  installed, you will -- it can correlate the torque that
9  it takes to screw the helical into the ground to it's
10 ultimate load capacity.
11    So this gives us both -- covers wildly
12 variable soils.  We don't have to worry that -- that if
13 we get there and the soils don't match the geotechnical
14 port -- a common problem, especially in loessial soil.
15 We have automatic confirmation at installation that the
16 piles are screwed into the appropriate torque and will
17 provide the capacity required.
18    They also work well in the hydraulic situation
19 like this because we are -- we're adjacent to the creek,
20 minimal disturbance of soils, all the other advantages
21 in that.  So that was the process in which that -- his
22 specific site was -- was evaluated and how a specific
23 foundation was evaluated.
24    Q    Does that particular type of bridge or that
25 particular type of foundation have any susceptibility to

**26**

1  what us laypeople know to be settling or any sort of
2  movement as a result of erosion or, you know, changes in
3  the soil?
4    A    That's why we use the piles because of the
5  scour.  Scour is the process where the water erodes that
6  soil around the foundation.  As that soil erodes, then
7  the pile -- then the foundation could become unstable.
8    To prevent at that, we use what's called a
9  deep foundation, which is the piles.  So as helical are
10 shredding, there is a 3-foot concrete footer that
11 encases the helical.  The 3-foot is required by the DRP
12 to -- to be below the channel depth.  So that 3-foot is
13 there, and then you have the piles below that and the
14 bridge on top of it.
15    Q    Do you recall or do you know whether the
16 bridge that you designed for Mr. Chaudhari included what
17 I know to refer to as the approach or the approaches to and
18 from the bridge on either side?
19    A    I'm only contracted to design a bridge.
20    Q    And what is the bridge?  How would you
21 characterize what a bridge is?
22    A    The deep foundations of the piles, the
23 abutment, and the bridge deck.
24    Q    What -- what is everything else considered?
25 Meaning, those -- those additional construction matters

**27**

1  that are required to turn a structure, a bridge into a
2  useable overpass?
3    A    Uh-huh.
4    Q    What are those additional components
5  comprised -- comprised of?
6    A    There is either abutment wing walls, which are
7  walls that would come off the abutment and silt is
8  placed in it.  And that's part of the site grading
9  activity as far as bringing the fill in and filling and
10 placing the fill around it.  It's not -- it's a bridge
11 approach.  It's a -- you know.  It's not the bridge.
12    Q    Is the bridge approach within the purview of
13 your expertise?
14    A    Uh-huh.  We design them.
15    Q    Is that something that you design regularly?
16    A    We have, yeah.  I mean, there's -- it just
17 depends on the project.  Sometimes the engineering
18 breaks at the abutment, and I design the bridge.
19 Sometimes I design the whole thing.  It varies on the
20 project.
21    Q    Do your designs themselves, your renderings or
22 sketches --
23    A    They're designs.  They're drawings.
24    Q    Thank you.
25    Do your drawings always include matters in

**28**

1  addition to the bridge itself such as fill and
2  approaches?
3    A    Well, it depends on what we're contracted to
4  do.  I mean, this particular project, we are contracted
5  to design a bridge.  We did one for Grant County, and
6  again I was contracted to design a bridge.  And all I
7  designed was the bridge, and I didn't design the
8  abutments or the deadmen that held up the suspension
9  bridges.
10    Engineering specializes in certain components
11 which are broken up to specialist tasks.  If I were to
12 design you a building, I would not design the air
13 condition system or the electrical or the fire safety,
14 but I may design the structure of the building and the
15 foundation.  So it's very compartmentalized.
16    Q    I understand.
17    I'm going to show you a document that has --
18 for purposes of discovery, been previously identified as
19 Section B, No. 18 Chaudhari 00109.
20    MS. LUKEN:  Okay.  You can.
21    THE WITNESS:  Uh-huh.
22 BY MR. HARPER:
23    Q    Do you recall having reviewed or received that
24 document?
25    A    It's a silt fence detail.  I don't know if

**Page 29**

```
 1   it's mine or if it's someone else's --
 2            MS. LUKEN:  For the record, this is a --
 3            THE WITNESS:  Doesn't appear to be mine.
 4            MS. LUKEN:  I'm sorry.  I didn't mean to
 5   interrupt you.
 6            For the record, this appears to be a blowup of
 7   a portion of a plan sheet page, but it does not
 8   have identifying markings on it with respect to
 9   where it came from.
10            MR. HARPER:  You're right.
11   BY MR. HARPER:
12       Q    Do you recall ever having received that or --
13   or seen that before?
14       A    I couldn't -- I -- I may have.  I have no idea
15   if I've ever seen that.  I mean, it's a silt fence.  It's
16   pretty generic.  It's not, you know, it's not specific
17   to anything, it's a, you know, it's nothing that -- it's
18   a boilerplate detail.  It's nothing that exciting.
19       Q    Up at the top of this document, it has
20   "Underlined Sequence of Construction."  Do you see that?
21       A    Uh-huh.
22       Q    And No. 1 is -- well, I guess the better
23   question is:  Does this document that I've shown you in
24   any way incorporate or -- or reference the bridge itself
25   that you designed?
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 31**

```
 1            "Build a bridge.  Strip and stock pile dirt, rough
 2   grade, construct a drawing, septic system drain
 3   field, finish grading, site restoration."
 4   BY MR. HARPER:
 5       Q    Is -- is that particular enhanced drawing so
 6   generic that it's something you yourself have ever
 7   included in your design of any bridge?
 8       A    Well, sequence of construction is -- how do I
 9   explain this?  If you have a set of plans to build a
10   bridge on a site, you will have a sequence of
11   construction somewhere in that so that you will explain
12   to the contractor what has to be done first.
13            Whether you are building a house, a bridge,
14   what do we do first?  The sequence of construction is
15   you put in your silt fence.  You build a bridge.  Then
16   you want to strip and grade.  Then we're going to do
17   this, and then we're going to do this.  That was how it
18   was permitted to the entity, to explain the entity that
19   we're going to -- we're not going to build a house
20   first.  We're going to build a bridge first.  Whoever
21   the reviewer is.
22            This sequence of construction would cover
23   multiple contractors.  I mean, the guy who built the
24   house wouldn't install the septic.  You know, the guy
25   who built the bridge might not -- he may or may not do
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 30**

```
 1            MS. LUKEN:  Objection.  Predicate.
 2            THE WITNESS:  Can you ask me that question
 3   again?
 4            (Simultaneous speaking.)
 5   BY MR. HARPER:
 6       Q    Yes, sir.  The question -- it's not going to
 7   clarify things for you.
 8            Are you able to, in your review of that
 9   document, identify any sort of detail or information
10   that leads you to believe or confirms that this is even
11   related to the bridge that you designed?
12       A    Well, this sequence of constructions, there's
13   a sequence of -- sequence of construction could be on
14   any set of drawings.  It does say, "Construct a bridge."
15   It could be any bridge.  It's a generic sequence of
16   construction that you -- that's obviously been developed
17   for this project, whatever this project is.
18       Q    Yes, sir.  Is that --
19            MS. LUKEN:  For the record, the reference that
20   the witness was making was to the plan sheet
21   itself, whatever project the plan sheet pertains
22   to.
23            THE WITNESS:  Yeah.  I mean this -- this could
24   be to a house in Tallahassee.  It could be
25   Mr. Chaudhari's.  It could be anything.  It says,
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 32**

```
 1   whatever.  They're, you know, it's an overall sequence
 2   of construction for some construction activity that
 3   needs a silt fence and this is probably a tree
 4   protection barrier.
 5       Q    I understand.  Thank you.
 6            Now, I -- I may have previous -- previously
 7   asked this question, and if I did I'm -- I'm sure
 8   Counsel next to you will object.
 9            But did you make any effort or did you take
10   any action to determine if any additional permit to the
11   environmental permits would be required of this project?
12       A    When I received the project, I was told that
13   the environmental permits were in place.  I contacted
14   the town building department to see if any building
15   permit would be required for the bridge.
16       Q    Can you confirm that there was no building
17   permit required?
18       A    We spoke without a phone log but we had spoke
19   with Kathy, I think it it was Kathy, at the building
20   department.  They have a part-time planner and building
21   inspector, and they said there would be no permit
22   required for the bridge.  They don't permit bridges,
23   apartment dwellings.  And when the house gets permitted,
24   then they will look at the bridge.
25            I did talk to the engineer up there, either by
```

ACCURATE STENOTYPE REPORTERS, INC.

---

**33**

1  e-mail or verbally.  I don't recall.  And I explained to
2  him that we were building a bridge and there's things he
3  might not be able to see when they come do the
4  inspection of the house.  And I told him if he needed me
5  to do a letter certifying that it was built at the time
6  or something, we could do that.
7      Q   Do I -- did I interpret your recital of that
8  conversation to mean the folks you spoke with locally
9  advised you that bridges in that area did not have to be
10 permitted?
11     A   We asked if they needed a building permit, and
12 we explained it was a bridge on a residential piece of
13 property.  And they said they would not require a
14 building permit.
15     Q   Other than an environmental permit and a
16 building permit, what other types of relevant permits do
17 you frequently encounter?
18     A   For bridges, for --
19     Q   Yes, sir.  I'm sorry.  Yes, sir.
20     A   So in the construction of a bridge, what
21 permits are typically required --
22     Q   Yes, sir.
23     A   -- is that the question?
24     Q   Yes, sir.
25     A   All right.  There's usually some type of site

ACCURATE STENOTYPE REPORTERS, INC.

---

**34**

1  plan, an environmental permit, and a building permit,
2  but it's variable.  It's not -- there have been plenty
3  of places I've been where they didn't require a building
4  permit.  It's -- there is no nationwide standard for
5  what gets a permit and what doesn't.  It's all up to
6  local jurisdiction.
7      Q   Who ordinarily creates or drafts the site
8  plan?
9      A   I -- usually.  Well ...
10     Q   If there -- even if a -- a usually?
11     A   Yeah, yeah.  I mean, civil engineers draft
12 site plans, but, I mean, it depends on -- on the overall
13 world on this project.
14     Q   How about for a -- a light vehicular bridge?
15     A   It depends on the -- it depends on where we
16 are, the entity what -- what jurisdiction you're under,
17 it would be varied.  If you were, say -- well, it's
18 variable.  I don't know.  I don't know how to answer
19 that question really.
20     Q   How many bridges have you designed for
21 construction or erection in the state of New Jersey?
22     A   How many have we done in New Jersey?
23     Q   Yes, sir.
24     A   I want to say half a dozen or so.  It might be
25 more.  We did for a lot of hurricane Sandy work.  I'm

ACCURATE STENOTYPE REPORTERS, INC.

---

**35**

1  not sure where exactly -- how far that went from Jersey
2  into New York.  It was both areas; so I'm not sure.
3      Q   Is there anything that you believe to be
4  particularly unique or distinct about New Jersey's
5  operations or requirements as it relates to the
6  construction of a bridge?
7      A   All states.  All jurisdictions are unique.
8  You know, there, they are all different.  They all have
9  their nuances.
10     Q   Do you recall, during your involvement in this
11 project for Mr. Chaudhari, ever having communications
12 with anyone from the New Jersey Department of
13 Environmental Protection?
14     A   Uh-huh.  I spoke with -- I've got his number,
15 his name and number.  We spoke with a couple -- a couple
16 of different people the -- trying to remember if it's
17 Chris or Eric.  I can't remember the name, but it's the
18 person who wrote the letter of violation.  I spoke with
19 them, and I spoke with the field inspector from DEP.
20     Q   Do you know whether or not Mr. Chaudhari ever
21 was notified of the determination that the change in
22 location was necessary for the bridge?
23     A   I don't know what Mr. Chaudhari has been
24 notified of.  I don't know.
25     Q   Do you know whether or not a change in the

ACCURATE STENOTYPE REPORTERS, INC.

---

**36**

1  location of a bridge impacts any environmental permit?
2      A   Does the change in the location of a bridge
3  affect an environmental permit?
4      Q   Yes, sir.  Are there any sort of ramifications
5  that may result from the change of location?
6      A   We would note it to the agency, yes.
7      Q   Okay.  Is that only required if a building
8  permit is required, noting it to the agency?
9      A   It may be required of the DEP's permit.  I
10 don't know specifically what DEP's permit requires.  I
11 don't have it in front of me, but it would have a list
12 of -- if you have the DEP, it will have a list of
13 items required that they want.  This is the process.
14 Here's the permit, and you do these 10 things, and then
15 you're done.
16     Q   I'm going to show you what has been previously
17 marked for identification as Section B, No. 12
18 Chaudhari 000058.  And this appears to be the New
19 Jersey Department of Environment Protection original
20 permit.
21     MS. LUKEN:  Counsel, when you say "previously
22 marked for identification," what -- what are you
23 talking about?
24     MR. HARPER:  For -- just internal discovery.
25     MS. LUKEN:  Oh, okay.  Just as baseline, but

ACCURATE STENOTYPE REPORTERS, INC.

37

1   you're not stating that was identified in some
2   other deposition --
3           MR. HARPER:  Oh, no, ma'am.  No, ma'am.
4           MS. LUKEN:  Okay.  That's fine.  I just wanted
5   to clarify that.  Thank you.
6   BY MR. HARPER:
7       Q   Do you recall or have any familiarity with
8   that -- that document?
9       A   I've seen the first page.
10      Q   Is there -- is there any -- well, I guess I
11  should ask you, Do you not recall having seen the
12  subsequent pages?
13      A   I didn't do the environmental permitting; so I
14  never received the permit.  I never applied for -- that
15  wasn't my area.
16      Q   Correct.  I understand, but is there no need
17  whatsoever as the structural engineer to have a copy of
18  the environmental permit?
19      A   I did.  I had the first page.
20      Q   And that's all that you --
21      A   It was good enough for me.
22      Q   Okay.  And could -- could you explain why that
23  is or ...,
24      A   Because another professional had handled it.
25      Q   What on the front page, if anything,

ACCURATE STENOTYPE REPORTERS, INC.

39

1       Q   I understand.
2       A   -- what you're relying on --
3       Q   Yes, sir.
4       A   You're relying on the fact that another
5   engineer has come in and gotten all the relevant permits
6   for this project.
7           And it's not germane to my design, but it's
8   just something that you'll ask.  "Do you have all the
9   permits?"
10          "Yes."
11          "Does the person own the property?"
12          "Yes."
13          Things like that.
14      Q   Okay.  With respect to any sort of change in
15  the -- the location of a bridge -- and please correct me
16  if I'm wrong, but prior to -- to showing you this
17  document, I -- I understood you to say the permit itself
18  will have the information everyone needs to know.  What
19  impact, if any, a change in a bridge's location would or
20  may have to an environment permit?  Is that accurate --
21      A   No.  The permit is issued to the owner or the
22  contractor, the property owner, and then they execute
23  the permit.  So this permit covers construction of the
24  bridge, placement of the fill, all those components.
25      Q   Is there anything in that permit that stands

ACCURATE STENOTYPE REPORTERS, INC.

38

1   represents the information you needed that's good enough
2   for you?
3       A   There was a plan sheet and this first page
4   that came from Lan and Associates.  They're a
5   professional engineering firm.
6       Q   Yes, sir.
7       A   I've never spoken with Mr. Westerbrook.  I
8   left him plenty of messages, but --
9           THE COURT REPORTER:  With who?
10          THE WITNESS:  Westerbrook.  W -- I'm going to
11  butcher this -- W-O-S-T-E-R-B-R-O-C-K.  Close.
12  Where was I?
13          They were the ones who secured the permit; so
14  they would know all of the particulars of the
15  requirements of the permit as far as if there was
16  anything.
17  BY MR. HARPER:
18      Q   Okay.  So when -- when you were saying that
19  you had -- you remember seeing the first page, that's
20  all you needed.  Are you saying that because all you
21  need to know is that there is a permit?
22      A   That -- it was another professional who came
23  in and said, "We've secured all the necessary permits."
24      Q   Okay.
25      A   That's -- that's --

ACCURATE STENOTYPE REPORTERS, INC.

40

1   out to you that speaks to or mandates a particular
2   location in which the bridge must be built?
3       A   The next pages appear to be boilerplate
4   language from the DEP.  I don't know this form.  I don't
5   have enough time to read and digest all of it.
6       Q   That's okay.  I -- I'm not asking you to do
7   that.  I'm just -- in general, I was wanting to know if
8   there is anything obvious to you that stood out that,
9   you know, perhaps you were familiar with.
10      A   They do have a drawing with a proposal
11  location bridge, which is part of the permit.
12      Q   Okay.  And the bridge that was designed and
13  ultimately erected was not placed at the location
14  identified in that document attached to the permit;
15  correct?
16      A   No, no.  It wasn't.
17      Q   Okay.  Do you recall having a conversation
18  with Brian Green or anyone at Nature Bridges letting
19  them know that the bridge that the owner is asking for
20  won't fit at the location identified in the -- the
21  drawing provided?
22      A   I notified them when I looked at these plan,
23  that sheet, and I looked at this dimension, I said,
24  "This dimension of the bridge length was different than
25  what they requested I design."

ACCURATE STENOTYPE REPORTERS, INC.

**Page 41**

```
 1          Specifically location at the time of design,
 2   no.  I had no idea where it was going.  It was going to
 3   go on that location or if it was going to go somewhere
 4   else.
 5          Q    Okay.  So you have that conversation.  What
 6   are your instructions from Nature Bridges thereafter?
 7          A    That the client requested a 20-foot bridge and
 8   that's what they wanted me to design.
 9          Q    And so that's what you did?
10          A    Yes.
11          Q    That design, once complete, what do you do
12   with your -- your draft design?
13          A    We forwarded it on to Nature Bridges for
14   construction.
15          Q    And in terms of location, is it then up to the
16   contractor to determine the location in which that --
17   that size bridge fits?
18          A    I don't think I understand the question.
19          Q    Okay.  I'll rephrase.
20               Do you know or have reason to know how the
21   location of the bridge as built was ultimately
22   determined?
23          A    'cause that was the only place it would fit
24   and not be in the creek.
25          Q    And who determined that?
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 42**

```
 1          A    I don't know.  I don't know.  I believe it
 2   would be Brian Green or Mr. Chaudhari, or I don't know.
 3   I mean, I was not privy.  I can't answer that question
 4   'cause I wasn't privy to that.  I wasn't there --
 5          Q    Yes, sir.
 6          A    -- to determine where it was going to go.
 7          Q    Do you know whether or not the bridge as built
 8   was made of steal or wood or concrete?
 9          A    It was concrete.
10          Q    Okay.
11          A    It's steel, steel piles or concrete abutments,
12   and a precast concrete deck.
13          Q    What is your understanding of the -- the
14   circumstance -- excuse me, the circumstances surrounding
15   noncompliance with the environmental permitting?
16          MS. LUKEN:  Objection to form.  Predicate.
17          MR. HARPER:  Yes, ma'am.  Let me rephrase.
18   BY MR. HARPER:
19          Q    At some point, did you receive or get wind of
20   a notice of violation?
21          A    Yes.
22          Q    And that notice of violation was disseminated
23   by who?
24          A    I believe it was forwarded to me by April
25   James.  I don't recall.  It was e-mailed to me.
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 41**

```
 1          Specifically location at the time of design,
 2   no.  I had no idea where it was going.  It was going to
 3   go on that location or if it was going to go somewhere
 4   else.
 5          Q    Okay.  So you have that conversation.  What
 6   are your instructions from Nature Bridges thereafter?
 7          A    That the client requested a 20-foot bridge and
 8   that's what they wanted me to design.
 9          Q    And so that's what you did?
10          A    Yes.
11          Q    That design, once complete, what do you do
12   with your -- your draft design?
13          A    We forwarded it on to Nature Bridges for
14   construction.
15          Q    And in terms of location, is it then up to the
16   contractor to determine the location in which that --
17   that size bridge fits?
18          A    I don't think I understand the question.
19          Q    Okay.  I'll rephrase.
20               Do you know or have reason to know how the
21   location of the bridge as built was ultimately
22   determined?
23          A    'cause that was the only place it would fit
24   and not be in the creek.
25          Q    And who determined that?
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 43**

```
 1          Q    Do you know or have an idea of what the -- the
 2   substance or the impetus of that notice of violation
 3   was?
 4          A    Oh, yes.  There were five items, I believe.
 5   The permit -- they requested the permit to be recorded
 6   at the clerk's office.  They required a silt fence be
 7   reinstalled.  Some of it I had been falling over.  There
 8   were five items.  They were minor, a silt fence, record
 9   the permit.  That was pretty much it.  Oh.  Post the
10   permit on-site.  It's, you know, I'm sure you have that
11   letter somewhere.
12          Q    Do you know or not whether a determination was
13   made that the as-built location complies with the
14   environmental permit?
15          A    Do I -- do I know if the as-built location
16   complies with the permit?
17          Q    Yes, sir.
18          A    I don't -- I don't -- the permit is a permit
19   to construct a bridge in the wetland over a creek.  The
20   drawings are not for construction.  They're stamped "not
21   for construction."  They're for permitting.  They're
22   there to show intent that we're going to cross this
23   creek to get to this property --
24          Q    At a particular location; correct?
25          MS. LUKEN:  No.  Please, do not interrupt the.
```

ACCURATE STENOTYPE REPORTERS, INC.

44

1    witness when he's answering the question.
2         THE WITNESS:  The location is going to vary
3    like all things vary that we build versus what we
4    propose.
5  BY MR. HARPER:
6    Q    Understood.
7    A    So I don't know that I follow the question.
8  Is it -- I'm sorry.  Would you repeat the question?  Is
9  it ...
10   Q    I -- I -- let me -- I could, but I'm not going
11 to, 'cause it's only going to confuse you.
12        Do you know whether or not Lan and Associates
13 was notified of any -- any change to their original
14 drawing?
15   A    The only contact I had with Lan was in the
16 very beginning to try and get these drawings
17 electronically, which we never got.  We never respond
18 they never responded.  And I remember talking to one of
19 them about completing an as-built survey.  The dates of
20 that, I don't recall off the top of my head.
21   Q    Is that customarily your obligation or
22 responsibility as the structural engineer?
23   A    No.  I don't typically call for the -- the
24 as-built drawing.  That's usually the contractor or the
25 owner that handles that.

ACCURATE STENOTYPE REPORTERS, INC.

45

1    Q    So my -- my original question was:  Do you
2  know whether Lan and Associates was -- was contacted or
3  notified that a determination has been made, that the as
4  planned location wasn't going to work, and therefore the
5  as-built location was --
6    A    I don't know what Lan was notified of or not
7  notified of.  I did not do it.
8    Q    Yes, sir.
9         Do you know of an individual by the name of
10 Santiago Garcia?
11   A    Uh-huh.
12   Q    It's -- it's inorganic, I recognize, but
13 because our court reporter has to, you know, type out
14 everything we're saying, so normally a verbal --
15   A    Yes.
16   Q    Thank you.
17        Who -- who do you know Santiago to be?
18   A    Santiago was an estimator for Nature Bridges.
19   Q    And recognizing this is not your necessary --
20 necessarily your field of expertise, what is your
21 understanding of what an estimator does?
22   A    I don't know what he did at Nature Bridges,
23 but typically an estimator estimates cost of
24 construction.
25   Q    Do you -- do you know how or if an estimator

ACCURATE STENOTYPE REPORTERS, INC.

46

1    can determine a price of construction without having
2    received design drawings from an engineer?
3         MS. LUKEH:  I'm going to make an objection
4    here, and it's kind of along the lines as follows.
5    Mr. Parker is here as a fact witness.  The majority
6    of the questions that you have asked him have been
7    questions that you would ask of a professional with
8    respect to just generalized knowledge about
9    construction or engineering or other matters.
10        You know, I'm sure were -- were he not on this
11   side of the table, I'm sure he would be happy to
12   provide you with the benefit of his experience and
13   education.  You know, as a consultant-type
14   arrangement, but I guess my suggestion is, you
15   know, unless, there is some plan to compensate
16   Mr. Parker for his knowledge and experience, which
17   is how he makes his living, you know, I would
18   respectfully ask that you ask questions relative to
19   the facts of this case as opposed to just your own
20   interest in understanding how estimating works or
21   what the different fields of civil engineering are.
22 BY MR. HARPER:
23   Q    You can answer the question still.
24   A    Do I know what an estimator does?
25   Q    No, sir.

ACCURATE STENOTYPE REPORTERS, INC.

47

1         In your experience, is it common or uncommon
2    for an estimator to reach out to the -- a structural
3    engineer and obtain a design for purposes of
4    incorporating that and factoring it into an estimate?
5    A    No.  For the simple fact that we -- we get
6    paid to design.  You would -- you'd be asking if the
7    estimator called me up and said, "Matt, I need you to --
8    I've got to price this bridge, and I need you to design
9  it first."
10        Well, that's how I make a living.  So if --
11   Q    That's not happening?
12   A    -- if I need to design it, I'll be happy to do
13 it.  And there is fee attached to it.
14        If you want me to, you know, that's -- that's
15 not how it works.  Nobody calls me and says, "Matt, I'm
16 pricing this job.  What size beams do I need?"  That --
17 that -- that's not how it works.
18        Estimators will typically take standardized
19 costs from previous jobs or industry standards or
20 whatever estimators use, and they will figure out what
21 their -- their estimate is.  And there is always a
22 difference between the estimate and when the job
23 actually comes in under bid once it's been designed.
24   Q    Do you have a -- a universally recognized flat
25 fee for designing the type of bridge that you designed

ACCURATE STENOTYPE REPORTERS, INC.

---

## Page 48

1  for Mr. Chaudhari, or is it on a case-by-case basis?

2      A   Yeah. It's case-by-case, and we work hourly.

3  We estimate how many hours it would take to design and

4  prepare a proposal. Some proposals are purely hourly

5  depending on variability. A smaller defined scope, we

6  can give a lump sum.

7      Q   In your experiences with Nature Bridges, by

8  and large, who is your direct contact person?

9      A   Depends on the project. I have some projects

10 I've had direct contact with J.D. Sometimes it's April;

11 sometimes it's Brian. Sometimes it's a foreman on the

12 site. It all depends on the various stages.

13     If it's during construction, I will typically

14 deal with J.D. or Brian or Will or Rick. If it's in

15 design and construction, I may deal with J.D., April, or

16 Brian. It just depends on the phase of where the

17 project is.

18     Q   Yes, sir.

19     Do you recall having communications during the

20 construction of Mr. Chaudhari's bridge with Rick?

21     A   I believe we spoke. I don't know if it was

22 Brian I spoke with or Rick I spoke with, 'cause that's

23 when it came up about the placement of fill on the

24 adjacent property, the grading that would be required to

25 go on the adjacent property.

ACCURATE STENOTYPE REPORTERS, INC.

## Page 49

1      Q   Do you have or do you know whether you have

2  any sort of documentation in the file for this project

3  that would reflect or shed light on any tweaking to the

4  original proposed site plan or otherwise memorializes

5  the -- the various steps you took during your

6  involvement in this case?

7      A   The only thing I had to e-mail, to memorialize

8  it was an e-mail between Santiago and myself where I

9  sent him an e-mail and said that -- that the drawings

10 call for 32-foot bridge and you're requesting a 20-foot

11 bridge. Do you -- I said, you know, "Are you aware of

12 this?"

13     And that's when it was my understanding (Brian)

14 called me and said, "Yes, that's what we requested to

15 quote, and that's what we were requested to put in," and

16 so, that's about the only thing that I have.

17     Q   Just -- just so that I -- I am clear, did I

18 understand you to say that, as you recall, you sent an

19 e-mail to Santiago or you reached out to Santiago

20 about --

21     A   No. Santiago or Brian. I don't recall.

22     Q   Okay.

23     A   It was one of the two.

24     Q   But it was Brian that -- that reached back out

25 to you?

ACCURATE STENOTYPE REPORTERS, INC.

## Page 50

1      A   Uh-huh.

2      Q   Okay.

3      A   Yeah.

4      Q   Do you recall or do you know whether you

5  submitted any invoices to Mr. Chaudhari that were

6  unpaid?

7      A   When the notice of violation came out, we did

8  research on it, prepared an extension for DEP, and I

9  believe there was one invoice that went out and a

10 proposal for additional work to clear everything up on

11 the notice.

12     It was in e-mail form. I don't know whether

13 it was a formal proposal but it was in e-mail form

14 basically. This is what we spent to date and this is

15 what it's going to take to finish it.

16     Q   I understand.

17     A   And I don't know -- to date, I don't know if

18 that's ever been paid.

19     Q   Is that an -- an outstanding invoice for

20 services rendered or is that more akin to a proposal for

21 services to be rendered in the future?

22     A   It was two. There was an invoice for services

23 rendered and a proposal for services to render of

24 services. A proposal to render service.

25     Q   And your recollection is that that's in an

ACCURATE STENOTYPE REPORTERS, INC.

## Page 51

1  e-mail format?

2      A   Yes. I believe that is an e-mail.

3      Q   Do you recall if they were contained in the

4  same e-mail or if they were separate e-mails?

5      A   It's in the same e-mail.

6      Q   Okay.

7      A   I think somebody should have that.

8      Q   What was your scope of work as agreed to with

9  Nature Bridges?

10     A   Provide the structural design of a bridge.

11     Q   And nothing else?

12     A   Nothing else.

13     Q   The additional efforts you made, such as

14 reaching out to the engineers in New Jersey or the folks

15 with DEP, or the local township, were those within the

16 scope of your work, or did those exceed the scope of

17 your work with -- as agreed to with Nature Bridges?

18     A   The reaching out to the town to check on a

19 building permit is something we would do as a customary

20 thing. Reaching out to Lan and Associates is what we

21 typically do when we get a project once environmental

22 permits have been complete and we're doing structural

23 drawings. Contacting DEP was outside of my scope. It

24 was a result of the notice of violation.

25     Q   Do you recall Mr. Chaudhari ever requesting of

ACCURATE STENOTYPE REPORTERS, INC.

52

1  you to provide him with any additional design or any
2  services that exceeded the scope of work with -- that
3  you agreed to with Nature Bridges?
4      A     Yes.  That's why the proposal was provided.
5      Q     And as you recall, that proposal was to clear
6  up the notice of violation and the -- the various
7  permitting issues that were outstanding?
8      A     Yes.
9      Q     Do you recall ever having any communication to
10  or from Mr. Chaudhari pertaining to fill -- additional
11  fill or -- or abutments or approaches to the bridge he
12  designed?
13      A     No.  Our only conversation had to do with the
14  notice of violation.
15      Q     What measures need -- or corrective measures
16  needed to be taken to alleviate the violations
17  identified in the -- the notice of violation?
18      A     A letter in the file -- I don't recall
19  exactly, but to the best of my recollection, there were
20  four or five items.  They pertained to recording the
21  permit at the clerk's office, post the permit on-site,
22  stand-up silt fence, and install an additional silt
23  fence for turps [ph].  I think that was it.
24      Q     Do you have experience, or are you required to
25  account for silt fences and the like when you are hired

53

1  to design a -- a structure or a bridge?
2      A     It depends on the scope of services I'm
3  providing.
4      Q     Okay.  But what about in this case --
5      A     No.
6      Q     -- with Mr. Chaudhari?
7      A     No.  That was done.
8      Q     I'm sorry?
9      A     That was done by others.
10      Q     I -- I understand.
11           Who would -- who was responsible for the silt
12  fence?
13      A     Well, it's the permittee.  Whoever holds the
14  permit; so it's the owner or the contractor.
15      Q     Is the silt fence a -- a -- is that an
16  environmental matter, or is that a structural matter?
17      A     It's not a structural matter.  It's a permit
18  condition.  You also have to have a portable toilet, and
19  you have to post a permit.  Those are the conditions
20  that are placed on the permit, but they're not --
21  they're not germane to the structure.  And I'm also not
22  aware of whose responsible to do that on this particular
23  job, and it varies from job to job.  Could be them;
24  could be the contractor.  I don't know.
25           MR. HARPER:  Could we take a -- just a two or

54

1      three minute break just to use the restroom; is
2      that okay, Ms. Luken?
3           MS. LUKEN:  Yes.
4           (Recess from 2:21 p.m. to 2:33 p.m.)
5  BY MR. HARPER:
6      Q     I've just -- I'll be just a couple more
7  moments, if that -- Mr. Parker.
8           Do you recall having any conversations or
9  communications with -- with anyone as it relates to
10  Mr. Chaudhari's bridge between the time that you were
11  initially engaged to design this bridge by Nature
12  Bridges until the time that you were notified or learned
13  of this notice of violation?
14      A     Did I communicate with anyone from the time I
15  was contracted with 'till the time of the notification?
16      Q     Yes, sir or --
17      A     Communicated by whom?
18      Q     By -- by Mr. Chaudhari or anyone on behalf of
19  Nature Bridges regarding this project.
20      A     Well, yes.  I had spoken with Nature Bridges
21  during the design process, "When will it be done?"
22  "When it's done" --
23      Q     Okay.  Now -- how about from the time the
24  design process was complete?  Was your next
25  communication around the time that this notice of

55

1  violation was --
2      A     No.  We've communicated during construction.
3  So as I said before, we had the conversation about
4  bridge placement and the fill on adjacent property.
5  That fill it would -- that issue.  We had conversations
6  about installing helicals, torques that were achieved.
7  We had conversations about regular concrete and, you
8  know, reviewing some metals for concrete and-- and
9  rebar, normal construction review.
10      Q     I understand.
11           Do you ever have occasions in your practice
12  where you're hired and compensated for designing a
13  bridge, you complete that, you provide it to your
14  client, and then that's the end of things?
15      A     Oh, sure.  I mean, it all depends on what
16  we're contracted for.  We're contracted for design.  We
17  contract for design and construction management.  We
18  design for over-site.  Sometimes I've contracted just to
19  design a bridge.  Sometimes I'm contracted to observe
20  someone build a bridge.  So it's very compartmentalized.
21  There is usually a redundancy -- well, not usually, but
22  in certain large projects, there can be redundancy in
23  professionals.
24      Q     With this particular project, were you
25  contracted by Nature Bridges solely for the design of a

56

```
 1   bridge?
 2       A    Uh-huh.  Yes.
 3       Q    Okay.  You were not contracted to provide
 4   managerial support or any of these other matters that
 5   you just --
 6       A    No.
 7       Q    So anything that you may have done that --
 8   above and beyond the actual design that -- you just did
 9   as a favor for a lack of a better word or just ...
10       A    I don't know if it was a favor, but a
11   professional courtesy.  The notice of violation came in,
12   and my response was, "This a Lan issue.  Lan is
13   unresponsive.  Can you look at it and tell me what's
14   going on?"  And I did.
15       Q    I understand.
16            Your -- your communications to and from Nature
17   Bridges with regard to not just your drawing of a
18   design, but all of these design related matters
19   thereafter, would you characterize those efforts as
20   being something you were contracted for?
21            And if it will help, I'm certainly willing to
22   re-phrase.  I'm just trying to determine, when you
23   testified you were contracted to design a bridge --
24       A    Uh-huh.
25       Q    -- I envision writing -- sitting down and you
```

ACCURATE STENOTYPE REPORTERS, INC.

57

```
 1   having drafted a design.  Is -- is that accurate, or is
 2   that missing quite a bit of additional --
 3       A    No, that's accurate.  We prepared the drawings
 4   for them to build a bridge then them calling me during
 5   construction about -- there was an issue with fill that
 6   would be placed in the future that would -- to get a
 7   slope, they had called me and asked me what the slope --
 8   allowable slope and side slope for bringing the fill in.
 9            And I said, "Well, four to one would be ideal.
10   Two to one can be achieved with geotextile [ph] or
11   something like that.  Why -- while we only have so many
12   feet to the property line and we're going to be on that
13   property."
14            My response was, "You cannot put dirt on
15   someone else's property," and that was kind of the end
16   of that.
17            The other conversation was with respect to
18   helical and concrete I would consider, you know, typical
19   conversations regarding specific construction specifics
20   from the design spec.  "Matt, here you requested 3500PSI
21   concrete.  Here are the cut sheets from the people who
22   provided the concrete to prove that we've got that.  Is
23   this acceptable?  Yes, no?"
24       Q    And both of those areas are separate and apart
25   from any sort of conversations you may have had once the
```

ACCURATE STENOTYPE REPORTERS, INC.

58

```
 1   notice of violation came across your desk; is that
 2   correct?
 3       A    Chronologically, those occurred --
 4       Q    Yes, sir.
 5       A    -- prior to a notice of violation.  Yeah.  So
 6   the notice of violation showed up six months after
 7   construction was -- I don't know exactly, but sometime
 8   after construction was complete, months.  Maybe a year.
 9   I don't know.
10       Q    Absent a building permit requirement, is there
11   any final inspection that is performed by New Jersey or
12   any of their governing bodies therein to confirm
13   structural integrity of a bridge, this bridge?
14       A    This bridge?
15       Q    Yes, sir.
16       A    No.  A private bridge?  No.
17       Q    Do you know how long it took for Nature
18   Bridges to complete the construction of this bridge?
19       A    I have no idea.
20       Q    Do you know whether or not Nature Bridges
21   constructed the bridge off site and then transported it
22   to the particular property?
23       A    Well, the bridge -- the bridge planks, the
24   structure that stands between the upper abutments were
25   precast.  They were made in Jacksonville.  Those are the
```

ACCURATE STENOTYPE REPORTERS, INC.

59

```
 1   ones that I had communicated with about the bridge deck.
 2   We needed it, So that's the modular nature of the
 3   bridge.  The only part that was constructed on-site --
 4   well, it was all constructed on-site, but the piles were
 5   driven there.  They come in as raw piles.  Concrete
 6   comes in a truck, steel is -- comes in on a truck.  The
 7   bridge planks come in prebuilt.  They're precasted.
 8   They're what's called precast planks.  So they are cast
 9   somewhere else and trucked to the site.
10       Q    And your understanding is that they came from
11   Jacksonville?
12       A    The people that I -- I don't know where
13   Nature -- I don't know who Nature Bridges ultimately
14   purchased them from.  At the time of the design we had
15   communicated with Gate.  They're a large precaster in
16   Jacksonville.  We were coordinating logistics with Gate,
17   "Can you get something to New Jersey?  What's your lead
18   time on this, what's this" -- who they purchased from, I
19   don't know.
20       Q    Okay.
21       A    They did not tell me, but I -- there is
22   standards in the precast industry that are nationwide,
23   and that's how I inspect the planks.  They could have
24   gotten them from Gate.  They could have gotten them from
25   the gulf coast.  They could have gotten them locally, a
```

ACCURATE STENOTYPE REPORTERS, INC.

60

```
 1   precaster in New Jersey.  I just know the gentlemen in
 2   Jacksonville is who I call.
 3           MR. HARPER:  Yes, sir.  I understand.  Nothing
 4   further.
 5           MS. LUKEN:  You are not a witness to this --
 6   you are not a party to this case.  You have the
 7   ability to read your deposition if it is ordered,
 8   or you can waive that right.  The court reporters
 9   are very good, and they take down good notes.  But
10   it's still -- some people would like to read.
11   Would you like to read?
12           THE WITNESS:  No, ma'am.
13           MS. LUKEN:  You can read if you want.
14           MR. HARPER:  And for what it's worth, you
15   can't change anything anyways.
16           MS. LUKEN:  You can read if you want you.  You
17   can -- you can read if you want.
18           THE WITNESS:  Do I want to read?
19           MS. LUKEN:  I think it's -- you may want to
20   consider doing it, yes.
21           (Deposition concluded at 2:42 p.m.)
22
23
24
25
```

ACCURATE STENOTYPE REPORTERS, INC.

---

**In The Matter Of:**

*J.D. JAMES, INC. v*
*AUTOZONERS, LLC,*

---

*MATTHEW PARKER*
*February 21, 2018*

---

*Accurate Stenotype Reporters*
*2894-A Remington Green Lane*
*Tallahassee, Florida*