EXHIBIT F

**In The Matter Of:**

*J.D. JAMES, INC. v*
*AUTOZONERS, LLC,*

*SAKET CHAUDHARI*
*February 22, 2018*

*Accurate Stenotype Reporters*
*2894-A Remington Green Lane*
*Tallahassee, Florida*

Original File 022218 CHAUDHARI DEPS_SAKET CHAUDHARI COMPLETE.txt
Min-U-Script®

---

2

1   APPEARANCES:
2
3       REPRESENTING PLAINTIFF/COUNTER-DEFENDANT:
4
5       S. ELYSHA LUKEN, ESQUIRE
        sluken@smithcurrie.com
6       SMITH, CURRIE & HANCOCK, LLP
        101 NE Third Avenue, #1910
7       Ft. Lauderdale, FL  33301
        954.761.8700
8
9       REPRESENTING DEFENDANT/COUNTER-PLAINTIFF:
10
11      GUS HARPER, ESQUIRE
        gus@harperlawyer.com
12      HARPER LAW FIRM, P.A.
        1725 Capital Circle NE, Ste 304
13      Tallahassee, FL 32308
        850.523.0930
14
15
16
17
18
19
20
21
22
23
24
25

ACCURATE STENOTYPE REPORTERS, INC.

---

THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT,
IN AND FOR JEFFERSON COUNTY, FLORIDA

CASE NO. 2017-CA-0162

J.D. JAMES, INC. D/B/A NATURE
BRIDGES,

            Plaintiff/Counter-Defendant,

vs.

SAKET CHAUDHARI,

            Defendant/Counter-Plaintiff.

DEPOSITION OF:              SAKET CHAUDHARI

TAKEN AT INSTANCE OF:       The Plaintiff

DATE:                       February 22, 2018

TIME:                       Commenced at 11:14 a.m.
                            Concluded at 5:25 p.m.

LOCATION:                   2894 A. Remington Green Lane
                            Tallahassee, Florida 32308

REPORTED BY:                KAIRISA J. MAGEE
                            Professional Court Reporter
                            kjmcourtreporter@gmail.com

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL 32308   850.878.2221
www.accuratestenotype.com

---

3

1                   INDEX
2   WITNESS                                      PAGE
3   SAKET CHAUDHARI                               4
        Direct Examination by MS. LUKEN           4
4
5              INDEX OF EXHIBITS
6       (Exhibits are attached to transcript.)
7   NO.     DESCRIPTION                          ID
8   A    Notice of Taking Deposition Duces        5
         Tecum
9   B    Entire file presented by Mr.             6
         Chaudhari (Retained by Counsel)
10  B1   Invoices from Lan and Associates        19
         (Retained by Counsel)
11  B2   Contracts with Lan and Associates       20
         (Retained by Counsel)
12  C    Invoices from Lan and Associates        25
    D    Permit                                   29
13  D    NJDEP Permit with plans attached         31
    E    Contract                                 77
14  F    Proposal                                 86
    H    E-mail, dated 7/16/2014                 127
15  I    Photographs                             149
    J    Notice of Violation                     162
16  K    Proposal from Nature Bridges,           173
         dated 12/20/2012
17  B3   Proposal from Nature Bridges,           176
         dated 8/27/2012 (Retained by
18       Counsel)
    L    R & R Construction Preliminary          185
19       Budget
20
21
22
23  CERTIFICATE OF OATH                          205
    CERTIFICATE OF REPORTER                       206
24  LETTER TO READ/SIGN TRANSCRIPT               207
    ERRATA SHEET                                  208
25

ACCURATE STENOTYPE REPORTERS, INC.

4

STIPULATIONS

The following deposition of SAKET CHAUDHARI was taken on oral examination, pursuant to notice, for purposes of discovery, and for use as evidence, and for other uses and purposes as may be permitted by the applicable and governing rules.  Reading and signing is not waived.

* * *

THE COURT REPORTER:  Do you solemnly swear or affirm that the testimony you're about to give in this cause will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

Thereupon,

SAKET CHAUDHARI

was called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LUKEN:

Q    All right.  Good morning, Mr. Chaudhari.  My name, again, is Elysha Luken.  We met before.  I'm the attorney for J.D. James, Inc., doing business as Nature Bridges, the plaintiff in this lawsuit.  We're here today on a Notice of Taking Deposition Duces Tecum for your deposition in this case.

ACCURATE STENOTYPE REPORTERS, INC.

---

5

Just to start out with, I had issued a notice for your deposition here today that I'm actually -- can I --that's okay.  Go ahead.  You can have that one.  I've marked it as Exhibit A.

(Exhibit A was marked for identification.)

MS. LUKEN:  This is your copy, Counsel.

MR. HARPER:  Thank you.

BY MS. LUKEN:

Q    And have you seen this Notice of Taking Deposition Duces Tecum previously?

A    Yes.

Q    Okay.  And what documents have you brought here today in response to our request that you produce documents?

A    I believe we brought the entire file.

Q    Okay.  Where is it?

A    It's -- here we go, ma'am.

Q    Okay.  And that's what you brought with you in response to our notice?

A    Yes, ma'am.  I've --

Q    Let's set that right here for right now.  And I'm going to mark this as Exhibit B to your deposition, everything that's in that box.

MR. HARPER:  I'm going to -- just for the record, I've got some of my own work product in

ACCURATE STENOTYPE REPORTERS, INC.

---

6

there.

MS. LUKEN:  Could you take that out, please, then?

MR. HARPER:  Sure.  Are you going to be using this for -- in the deposition --

MS. LUKEN:  Yes.

MR. HARPER:  Okay.

MS. LUKEN:  All right.  While -- well, do you mind if I continue with my questioning while you do that?

MR. HARPER:  Go ahead.

(Exhibit B was marked for identification.)

MS. LUKEN:  Mr. Chaudhari, we're here today, kind of on two issues, and -- I guess before I get too deep into this, I do want to state on the record that there were interrogatories issued to the defendant, Mr. Chaudhari, in this case last year.

There was an amendment that was provided, I believe, in about July or August of last year, and there were further communications with Counsel wherein I, in a letter dated September 22nd, 2017, articulated certain concerns and problems with respect to the interrogatories not being fully responded to.  Since that time, I have been

ACCURATE STENOTYPE REPORTERS, INC.

---

7

continuously promised updated versions of those interrogatories up to and including our case management conference last week wherein Mr. Harper represented to me that I would have the supplemental responses that evening, which was February 12th of 2018.  I received at approximately 1 o'clock in the morning -- although I did not receive it, actually, because I was not awake at that time -- a supplemental version of the interrogatories.

We reserve the right to continue this deposition until a later date as well.  We're going to get through what we have the opportunity to get through today to the extent that this new information is something that needs to be further researched.  I believe that we would have the opportunity to redepose Mr. Chaudhari if necessary, particularly given the fact that it was not provided as promised or agreed.  So with that on the record --

MR. HARPER:  Ms. Luken, do you have that available for you today -- that the -- the one provided late last night?

MS. LUKEN:  I made a photocopy of it, yes.

MR. HARPER:  Okay.

ACCURATE STENOTYPE REPORTERS, INC.

8

```
1        MS. LUKEN:  Although I do state that that --
2    that the supplement that I received is materially
3    different than some of the other prior versions,
4    and certainly that is not something that can be
5    prepared for in the wee morning hours.
6        So we'll -- we're going to get through what we
7    can here today and obviously our reservation is on
8    the record.
9 BY MS. LUKEN:
10       Q    Mr. Chaudhari, let's just start out with what
11   is your -- what is your current occupation, sir?
12       A    I'm a nuclear pharmacist.
13       Q    And what is that?
14       A    We make radioactive medicine to diagnose and
15   treat all kind of conditions.
16       Q    Okay.  And do you work for yourself, or are
17   you employed?
18       A    I am employed.
19       Q    Okay.  And where are you employed?
20       A    In Rockaway, New Jersey.
21       Q    Do you own any real property in the state of
22   New Jersey?
23       A    Yes.
24       Q    And what -- what is that real property?
25       A    54 Quarry Road.
```

ACCURATE STENOTYPE REPORTERS, INC.

9

```
1        Q    And is that your home?
2        A    Yes, it is.
3        Q    Okay.  Do you own any other property in New
4    Jersey?
5        A    My father is the owner for 20 Stillwater
6    property.  He has title.
7        Q    Were you acting on your father's behalf with
8    respect to the contract that you entered into with
9    Nature Bridges?
10       A    On his behalf?  It's a little bit tricky for
11   me to answer, ma'am.  It's a lot of things happening in
12   my family.  I'm assuming the financial responsibility
13   for the project and the whatever may else become of it.
14   Yes.  I'm trying to help him out, to sum it up.
15       Q    Okay.  Well, let me -- let's make sure we're
16   all talking about the same thing here.  20 Stillwater
17   Road, that is the location where, ultimately, a bridge
18   was furnished to you by Nature Bridges; is that correct?
19       A    That is correct, yes.
20       Q    And why -- why were you undertaking this as
21   opposed to your father who is the real property owner?
22       A    I wanted to help.
23       Q    In what way?
24       A    Every way.
25       Q    Okay.  Well, explain to me the whole -- the
```

ACCURATE STENOTYPE REPORTERS, INC.

10

```
1    whole involvement that you had.  When did you first
2    become involved in doing something with your fathers'
3    property at 20 Stillwater Road?
4        A    I'm not sure, ma'am, how long we've had the
5    property and what is entailed as involvement.
6        Q    Okay.  Well, let me start at the beginning.
7    When was 20 Stillwater Road purchased by your father?
8        A    I'm not sure, ma'am.
9        Q    Okay.  Can you give me an estimate?
10       A    Estimate, maybe 2008.
11       Q    Okay.  And why was it purchased?
12       A    To build a home.
13       Q    Okay.  And what -- what preparatory work had
14   been done to build a home prior to purchasing the
15   property?
16       A    May I ask you to repeat that, ma'am?
17       Q    What preparatory work had been accomplished at
18   the time of the purchase of the property in 2008 or
19   thereabout with respect to building a house on the
20   property?
21       A    I'm not sure, ma'am.
22       Q    Were you involved in any prepurchase
23   investigation about building a home on this property?
24       A    Prepurchasing investigation?
25       Q    Yes.
```

ACCURATE STENOTYPE REPORTERS, INC.

11

```
1        A    Can you please define it a little bit more for
2    me?
3        Q    Did you do anything prior to your father
4    purchasing the property relative to determining whether
5    or not a house could be built on the property?
6        A    No, ma'am.  I didn't get involved.
7        Q    Did your father do anything?
8        A    Yes, ma'am.
9        Q    And what was that?
10       A    I'm not sure of the entire scope and details.
11       Q    Okay.  Can you share with me what you do know,
12   please?
13       A    We were looking to build a residential home on
14   the property.
15       Q    Uh-huh.
16       A    Beyond that, I am not sure specifically what
17   you're looking for.
18       Q    Did your father do any sort of review as to
19   whether or not the property was, for example, zoned for
20   a residential dwelling?
21       A    I'm not sure.
22       Q    Okay.  Were you involved at all in the
23   purchase in any way?
24       A    In any way?
25       Q    Yes.
```

ACCURATE STENOTYPE REPORTERS, INC.

<!-- Page 12 -->

12

1 A Opinion-wise included?

2 Q In any way at all.

3 A Yes.  I'd say I did provided him an opinion.

4 Q Okay.  What was that opinion that you
5 provided?

6 A It's nice.

7 Q That what?

8 A I'm sorry.  It's a good property.

9 Q Okay.  Did you personally conduct any
10 investigation other than the zoning, which I've already
11 asked you about, the suitability of the location for a
12 house; where a house should be placed; what kind of
13 house; anything like that?  I'm talking prepurchase.

14 A No, ma'am.  I personally did not.

15 Q Okay.  How did your father choose this
16 property?

17 A I'm not sure, ma'am.

18 Q What was the selling price of the property?

19 A What was his buying price, I believe, ma'am?
20 Is that what you asked?

21 Q Yes.

22 A Sorry.

23 Q Either the seller's selling price or the
24 buyer's buying price.

25 A I apologize.

ACCURATE STENOTYPE REPORTERS, INC.

<!-- Page 13 -->

13

1 Q Either one is fine.

2 A Okay.  If I remember correctly, ma'am, I would
3 say it's about 55,000 or so.

4 Q And how many acres is the property?

5 A 2.6.

6 Q Okay.  So the property is purchased around
7 2008?

8 A Yes.

9 Q What was your next involvement with the
10 property?

11 A Ma'am, the really big thing that only sticks
12 out these days is the bridge project.

13 Q Okay.  What -- well, tell me what you first
14 did -- well, let me ask you this:  Your father purchased
15 it in 2008.  How did you become involved in it?  Did
16 your father ask you to assist with something?

17 A No, ma'am.  I volunteered.

18 Q Okay.  And what did you volunteer to do?

19 A To build a bridge.

20 Q To do what?

21 A To build a bridge.

22 Q Why?  Why would you want to build a bridge?

23 A I wanted to help him in terms of furthering
24 his process to volunteer to -- to assist.

25 Q Okay.  Help him further what process?  What

ACCURATE STENOTYPE REPORTERS, INC.

<!-- Page 14 -->

14

1 did he want to do?

2 A To set up a residential dwelling.

3 Q Okay.  And so what -- what steps did you take
4 to assist him further with that process?

5 A I did research.  I looked into the process.  I
6 found what I identified to be the expert bridge company,
7 Nature Bridges.  They far surpassed any other website
8 that I encountered at the time, and I initiated to look
9 into it further.  What struck me most about it at the
10 time was how versatile they were in terms of all the
11 states they worked.  So that was one thing that did
12 catch my attention.

13 Q Who hired Lan & Associates?

14 A My father.

15 Q Okay.  And when -- when were they hired?

16 A I'm not entirely sure, ma'am.

17 Q Okay.  What did they do?

18 A They obtained the permits.

19 Q And what -- what was -- what were the permits
20 that they obtained for?

21 A What did they obtain it for?

22 Q What were the permits that they obtained for?
23 What work were they for?

24 A I'm not entirely sure of the -- of the entire
25 scope of what the permits entailed.

ACCURATE STENOTYPE REPORTERS, INC.

<!-- Page 15 -->

15

1 Q And even here today, as we sit here, you don't
2 know?

3 A Ma'am, I've only been focusing on the case
4 itself.  I'm --

5 Q Yeah, I'm not -- I'm just asking you.  Even as
6 you sit here today --

7 A Oh, yes --

8 Q -- even today, you have no idea what the
9 permits that were obtained by Lan were for?

10 A Correct.  And for instance, with the
11 components of the bridge at the driveway and the sizing
12 of the development, but I'd say that's all I can
13 recollect at this time.

14 Q Okay.  Who paid Lan?

15 A My father.  I paid Lan.

16 Q Okay.  What parts did you pay for, and what
17 parts did your father pay for?

18 A I can't really differentiate.  I know this
19 process of lawsuit, I've been paying them as we go.

20 Q Okay.  Well, we'll get to that in a moment,
21 but I'm trying to go back to the time when Lan was first
22 engaged.

23 A Understood.

24 Q So let's kind of put that on a shelf there.

25 A I can't say for sure which parts.

ACCURATE STENOTYPE REPORTERS, INC.

16

1     Q   Okay. One of the documents that we asked for
2 you to bring here today was any contracts with Lan. Do
3 you have any of those contracts here with you today?
4     A   No, ma'am.
5     Q   Okay. Can you go to Page 5 of Exhibit A?
6 Exhibit A -- here. Don't let these Exhibits get messed
7 up with your own papers, if you don't mind. It will be
8 very confusing later on if we -- if we get these
9 confused.
10     So I'm opening up to Page 5 of Exhibit A.
11 This is the Notice of Taking Deposition, and this is the
12 listing of the documents that we had requested to you
13 bring with you today. Under No. 9, we're asking for,
14 "Any contracts, agreements, or scope of work description
15 between and Lan Associates or any related Lan New Jersey
16 or Lan Associates EPA as relating to the project."
17     A   Okay.
18     Q   Do you have any of those documents?
19     A   I -- yes, ma'am.
20     Q   Can I make a suggestion, sir? I see you have
21 another stack of documents there. I'm going to suggest
22 maybe just set those aside for a moment. If you want to
23 refer to those during the course of this, that's fine,
24 but just let's keep them separate so that we have the
25 items that we've marked as Exhibit B.

ACCURATE STENOTYPE REPORTERS, INC.

17

1     MR. HARPER: Is that the folder that contains
2 all that stuff?
3     THE WITNESS: Yes, but the pages are all
4 scrambled up at this point.
5     MR. HARPER: What would be more helpful for
6 Ms. Luken? You -- in your opinion? Sorting
7 through the box or going through your binder if
8 it's got the same materials in it?
9     THE WITNESS: Maybe -- I'm not sure actually.
10 It's up to Ms. Luken. Sorry, ma'am.
11     MS. LUKEN: Yeah. That's fine. We'll just --
12 we'll take it as it comes. I mean, if you want to
13 add stuff to the box later, that's fine. I don't
14 really have a problem with that.
15     MR. HARPER: I actually, in all honesty, think
16 there is more in his binder than is even in the
17 box.
18     MS. LUKEN: That's fine. We'll check the
19 binder if you want. I mean, it doesn't matter.
20 I'm just interested in the contracts right now.
21 BY MS. LUKEN:
22     Q   Okay. You've handed me a stack of documents
23 which I'm now going through.
24     MR. HARPER: And just for the record, I'd like
25 to object to an improper predicate. I think

ACCURATE STENOTYPE REPORTERS, INC.

18

1 perhaps you asked Mr. Chaudhari if there -- if a
2 contract even exists.
3     MS. LUKEN: Yeah. I'm going to get there.
4     MR. HARPER: Thank you.
5 BY MS. LUKEN:
6     Q   All right. What you've handed me is a stack
7 of documents which all appear to be invoices from Lan.
8 Do you agree with me that these are invoice from Lan?
9     A   Yes, ma'am. I agree with you.
10     Q   Do you have any contracts with Lan?
11     A   Any contracts with Lan? I have -- let's see.
12 Trying to recall history, ma'am. I apologize.
13     Q   That's okay. Take your time. I don't want to
14 rush you.
15     A   Yes.
16     Q   Okay.
17     A   I have contracts for the -- for the as-built
18 drawing, I believe.
19     MS. LUKEN: Mr. Harper, do you mind if I put
20 sticker actually on these documents, or do you want
21 me to put a sheet in front?
22     MR. HARPER: Could we -- yeah, could we please
23 do that?
24     (Short pause.)
25

ACCURATE STENOTYPE REPORTERS, INC.

19

1 BY MS. LUKEN:
2     Q   There's a few more?
3     A   There is a few more items.
4     Q   Okay. All right. Thank you.
5     And I tell you what. I've just done this
6 while you were going through. I've marked as Exhibit B1
7 to your deposition, and that's 'cause it came from the
8 box that I've already marked B. And I've just been
9 separating this out. Is Exhibit B1 all of the invoices
10 from La --
11     A   All of the invoices?
12     Q   -- that are in your possession?
13     (Exhibit B1 was marked for
14 identification.)
15     THE WITNESS: Ma'am, is this what I provided
16 in the discovery? Oh, so this is in that folder;
17 right?
18 BY MS. LUKEN:
19     Q   That was in your box right here that you
20 brought with you to your deposition today, yes.
21     A   Ma'am, without confirming without
22 Bates-numbered pages --
23     Q   Uh-huh?
24     A   -- I'll just -- it's hard for me to eyeball
25 ma'am, but these certainly are Lan invoices. But I

ACCURATE STENOTYPE REPORTERS, INC.

---

20

```
1   would really need to defer to the Bates pages to see if
2   they're complete or not.  I can't recall off the top of
3   my head.
4       Q    Okay.  And did you bring those with you today?
5       A    The Bates-numbered pages?
6       Q    Yes.
7       A    Yes.  I have -- I have a folder.
8       Q    I just want to make sure that we have the
9   whole universe of documents in one place, yeah so ...
10      A    Okay.
11      Q    So I -- I tell you what.  We'll set that aside
12  for the moment.  We'll make that comparison a little bit
13  later.
14      A    Okay.
15      Q    So I think we can put that back in here.  For
16  right now, let me mark what you've just handed me.  I'm
17  going to mark this as B2.  All right.  I'm going to show
18  you what I've marked at B2.  It is what you've handed to
19  me.
20           (Exhibit B2 was marked for
21  identification.)
22           THE WITNESS:  Okay.
23  BY MS. LUKEN:
24      Q    So are these all of the contracts with Lan
25  that you brought with you today?
```

ACCURATE STENOTYPE REPORTERS, INC.

---

22

```
1       Q    Okay.  So is it your understanding that this
2   $800 is for Lan to prepare an as-built drawing?
3       A    That is my understanding, ma'am, yes.
4       Q    Okay.  Very good.  Why did you contract with
5   Lan in July of 2015 to prepare an as-built drawing?
6       A    So if I recollect, we were issued the notice
7   of violation.
8       Q    Uh-huh.
9       A    And I had spoke to my project manager, Brian.
10      Q    Uh-huh.
11      A    And I believe he had contacted the engineer,
12  his engineer, Matt Parker, to address some of the
13  issues.  And through that communication, if I remember
14  correctly, Matt Parker was diligently trying to reach
15  Lan and was unable to get access to them.
16      Q    Uh-huh.
17      A    And somehow, they ended up asking me to see if
18  I could help them.
19      Q    Uh-huh.
20      A    So I contacted Lan, and all the interactions
21  happened between Matt, Lan, and somehow this was needed
22  to be done at some point.  So through the interactions,
23  this was one of the steps that we needed to do.
24      Q    Who told you that this was a step that you
25  needed to do?
```

ACCURATE STENOTYPE REPORTERS, INC.

---

21

```
1       A    This is what I brought with me today, ma'am,
2   yes.
3       Q    Okay.  Are there other contracts with Lan that
4   you have not brought with you today?
5       A    Ma'am, I'm -- I apologize for being
6   disorganized.  I thought we had the entire Bates file
7   here, and I thought I've included what had in the
8   submission.  So having said that, I thought these would
9   be here already, so ...
10      Q    Okay.  Well -- all right.  Is -- can you read
11  back my question, please?
12           (Record read.)
13           THE WITNESS:  I'm not sure.
14  BY MS. LUKEN:
15      Q    Okay.  Looking at Exhibit B2, those appear to
16  be amendments to a prior agreement for approximately
17  $800 that appear to have been entered into sometime
18  around July of 2015; is that accurate?
19      A    That is accurate.
20      Q    All right.  And what -- what is -- what is
21  this amendment for?  What work is it comprising?
22      A    Okay, ma'am.  It says in the description of
23  change and specification, "Lan shall visit the site and
24  perform an as-built survey of the built structure
25  located on the subject property."
```

ACCURATE STENOTYPE REPORTERS, INC.

---

23

```
1       A    If I remember the e-mails correctly, ma'am, I
2   think Lan had called Matt Parker and asked if he has the
3   as-built done drawings or if he -- something along those
4   lines.  And we were unable to either get a hold of him
5   or get an answer from him.  And this was needed to be
6   done, and that's how we proceeded to -- to do.
7       Q    Again, who told you that this needed to be
8   done?
9       A    It was through a common interaction between
10  Lan, Matt Parker -- it was a chain of e-mails.  So I'm
11  just trying to identify -- I believe it was Lan,
12  actually.  Lan.
13      Q    Okay.  Who at Lan told you to get an as-built?
14      A    Ma'am, I would request to refer to my e-mail.
15  That information is there.
16      Q    Go ahead and refer to whatever you would like.
17           I do get to look at whatever you're referring.
18      A    Okay.  I understand.
19      Q    If it's something that's privileged or if you
20  have concerns about, why don't you consult with your
21  lawyer before you show it to me?
22      A    I understand.
23      Q    Okay.  Thank you.
24           (Short pause.)
25           MR. HARPER:  I think Ms. Luken's question was:
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 24**

```
 1        Who stated that we needed to do the as-built
 2   drawing?
 3             THE WITNESS:  I have that now.
 4             MS. LUKEN:  Are you ready?
 5             THE WITNESS:  Yes, ma'am.
 6             MS. LUKEN:  All right.  Great.
 7             THE WITNESS:  Here you go, ma'am.
 8   BY MS. LUKEN:
 9        Q    All right.  So does this document refresh your
10   recollection in any way --
11        A    Yes, ma'am.
12        Q    -- as to who told you that you need to have an
13   as-built drawing?
14        A    Yes, it is Chris Guddemi.  Chris, last name
15   spelled G-U-D-D-E-M-I.
16        Q    All right.  While you were going through that,
17   I went through some things myself and let me just show
18   you what I'm going to mark as Exhibit B3, because I
19   think it's something that needs to go in our box,
20   perhaps.  Actually, you know what?  I'm going to mark
21   this separately.  Let's do that.  All right.
22             I'm marking Exhibit C, and let me ask you what
23   Exhibit C is.  Is that the Bates-labeled documents that
24   you were referencing?
25        A    Yes, ma'am.  To describe -- would you like me
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 25**

```
 1   to describe what it is?
 2        Q    Yes, please.
 3        A    So I'm seeing here a preliminary budget R & R
 4   Construction, a preliminary budget with Contech
 5   Engineered Solutions, Lan invoices.
 6        Q    I'm going to make an adjustment to this
 7   exhibit, then, based on what you just told me because
 8   what I would like is an exhibit that just has the Lan
 9   invoices in it.
10        A    I understand.
11        Q    Okay.  So here's what I'm going to do.  And I
12   think I'm doing this correctly, but I would like for you
13   to ultimately tell me that answer.  And we'll deal with
14   these letter.
15        A    Understood.
16        Q    So I'm going to remark Exhibit C.
17             (Exhibit C was marked for identification.)
18   BY MS. LUKEN:
19        Q    What I have now shown you is Exhibit C.  To
20   your knowledge, is that all of the invoices from Lan?
21        A    Ma'am, to my knowledge, this is all the
22   invoices from Lan, assuming that it is all from the
23   Bates documents.
24        Q    Okay.  And again, I'm not trying to trick you
25   here.
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 26**

```
 1        A    I apologize, ma'am.
 2        Q    I'm not trying to trick you here, but I
 3   actually just realized when I was looking at my own
 4   documents, that probably is not all of the Lan
 5   invoices.  I think this is what we got in a first batch.
 6             Can you confirm for me, then, based on what I
 7   just said, that these are all the Lan invoices from 2008
 8   to 2010?
 9        A    Ma'am, I apologize for the redundancy.  If
10   these here -- if this is what was submitted, ma'am, then
11   this is it.  If you're sure of that, then, yes.
12        Q    Well, are all the invoices that are within my
13   new Exhibit C from 2008 to 2010?
14        A    Okay.  Now I understand.
15        Q    Yes.  Because I -- there are some more, and
16   again, I'm not trying to trick you here.  I just want to
17   make sure our record is clean.
18        A    Yes, ma'am.  These are dated from 2008 to
19   2010.
20        Q    Okay.  So here's my question --
21        A    Okay.
22        Q    -- we just went to an $800 addendum from
23   July 2015 for an as-built, right, for $800?  So this
24   work that's here in Exhibit C from Lan -- this is from
25   2008 to 2010 -- where is the contract for this work?
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 27**

```
 1        A    I am not sure, ma'am.  I could find out for
 2   you.
 3        Q    What -- who would you contact to find out the
 4   answer to my question?
 5        A    My father.
 6        Q    And is your father residing in New Jersey?
 7        A    Yes.
 8        Q    Okay.  I am not asking this to pry or be
 9   overly personal, but is he available to give a
10   deposition like you're doing here today?
11        A    I would request to see if he can -- if a
12   deposition is needed, he'll help the case -- the party,
13   if he could possibly do something over the phone.  My
14   mom is terminally ill.
15        Q    I'm terribly sorry to hear that, and I'm
16   sorry -- your mother or your father?
17        A    My mother is terminally ill.
18        Q    I'm very sorry to hear that.
19        A    Thank you.
20        Q    Okay, yeah.  And I'm not suggesting -- I'm not
21   aware of any obligation that he would have to come
22   travel here or anything like that.  I'm just asking.
23   And again, I'm not trying to pry into your personal
24   affairs, but, I mean, is he able to give truthful
25   testimony the same way that you are right now?
```

ACCURATE STENOTYPE REPORTERS, INC.

28

```
1        A    Probably depressed, but I believe so.
2        Q    All right.  Very good.  Very good.  I'm just
3   asking.
4             And I suppose as a nuclear pharmacist, you
5   would probably understand where I'm coming from.  Just,
6   you know, is he capable and understanding of things
7   around him and et cetera --
8        A    Yes, he is.
9        Q    -- that sort of thing.  All right.  Very good.
10  Very good.  Okay.  Well, we'll address that later.
11            Do you -- you do not have any idea, though,
12  what the agreement was?  I mean, what -- let
13  me -- strike that.
14            With respect to the invoices that are in
15  Exhibit C, do you have an understanding of what Lan was
16  tasked to do with respect to that work?
17       A    Ma'am, I request the opportunity to look into
18  it further, and I will get back to you.  I do not know
19  off the top of my head.
20       Q    Okay.
21       A    Yeah.
22       Q    And do you know if any final work product was
23  prepared and delivered by Lan as a result of these
24  invoices that are in Exhibit C?
25       A    No, ma'am.  I'm not sure.
```

ACCURATE STENOTYPE REPORTERS, INC.

30

```
1        Q    Okay.  Do you independently recollect any
2   communications that you had with Lan during the 2008 to
3   2010 time period?
4        A    Nothing is striking out at this time, ma'am.
5        Q    Okay.  And if you did have communications with
6   Lan during that time frame other than verbal
7   communications by telephone, what would have been the
8   manner of those communications?
9        A    Again, ma'am, I'm not entirely sure at this
10  time.
11       Q    Okay.  Would it have been an e-mail, for
12  example?
13       A    I don't think it would be e-mail.
14       Q    Okay.  You don't think that you would have
15  e-mailed Lan from between 2008 to 2010?
16       A    I would assume not, ma'am.
17       Q    I'm sorry?
18       A    I would assume not, ma'am.
19       Q    Okay.  Any reason why you would assume not?
20       A    Just -- just looking at the time frame, ma'am.
21       Q    You didn't use e-mail in 2008 to 2010?
22       A    No.  Just -- you know, just I don't recollect
23  e-mailing.
24       Q    Okay.  Let me show you -- let me show what I'm
25  marking as Exhibit D.
```

ACCURATE STENOTYPE REPORTERS, INC.

29

```
1        Q    Okay.  Did you receive anything from Lan in
2   2010, for example, that they provided to you pursuant to
3   these invoices?
4        A    I am not certain, ma'am.
5        Q    Okay.  Your not aware of any drawings that
6   they might have prepared, any work they might have done?
7        A    I'm not certain, ma'am.
8        Q    Okay.  Let me show you -- show you what I'm
9   going to mark as Exhibit D.
10            (Exhibit D was marked for identification.)
11  BY MS. LUKEN:
12       Q    And just before we leave Exhibit C, were you
13  involved at all in any of the work that Lan was doing
14  from 2008 to 2010?
15       A    Involved at all ...
16       Q    Yeah.  Any communications?
17       A    Yes.
18       Q    Okay.  And what were the substance of those
19  communications?
20       A    I may have.  Just communications or payments?
21       Q    Sure.  Okay.  Well, we'll talk about both of
22  them.  Let's do communications first.
23       A    Ma'am, I'd like to say yes, but given the time
24  frame, I can't recollect, neither am I sure, what kind
25  of information would be at this time.
```

ACCURATE STENOTYPE REPORTERS, INC.

31

```
1             (Exhibit D was marked for identification.)
2   BY MS. LUKEN:
3        Q    And what is Exhibit D?
4        A    It is the NJDEP permit with the plans
5   attached.
6        Q    And how did you come to have this document?
7        A    I asked for the document.
8        Q    From whom?
9        A    From Chris Guddemi.  Guddemi.
10       Q    Okay.  Mr. Guddemi of Lan?
11       A    Correct.
12       Q    Okay.  And when did you ask him for this?
13       A    I am not sure of the exact date.
14       Q    Okay.  When was this permit issued?
15       A    In February 19, 2010.
16       Q    Okay.  And did you obtain a copy of this ss
17  soon as it was issued?
18       A    Not to my recollection, ma'am.
19       Q    The name of the applicant here is -- I'm going
20  to butcher this -- can you tell me the name of the
21  applicant on this permit?
22       A    It is my father.  First name is Satyendra,
23  S-A-T-Y-E-N-D-R-A.
24       Q    Okay.  And how did your father come to be the
25  applicant on this permit?
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 32**

```
 1      A    How did he come to be the applicant?  He was
 2  the one applying for it, ma'am.
 3      Q    Okay.  So he -- he was the owner of the real
 4  property?
 5      A    I understand, yes.
 6      Q    Is that correct?
 7      A    Yes, it is.
 8      Q    And so, therefore, he has to be the one to
 9  apply for the permit; correct?
10      A    Those are the rules, ma'am.
11      Q    Okay.  Well, let me ask you this:  Lan was
12  hired to procure this permit; right?
13      A    Yes.
14      Q    Okay.  So Lan is the one that's filled all
15  this out; is that correct?
16      A    Yes.  That was with Ms. -- Lan.
17      Q    Okay.  So if Lan said that your father had to
18  be the applicant because he owned the property, is that
19  correct?
20      A    Yes, yes.  Applied for that, and that's what
21  would need to be done.
22      Q    And so what is your understanding of the
23  permits that are issued here pursuant to Exhibit D?
24      A    So, ma'am, I have read this permit.  I have
25  understood this permit to the best of my ability and --
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 34**

```
 1  should respond to anything we know is a violation of
 2  what we're doing.
 3      Q    Okay.  What -- so do you have an understanding
 4  of what a flood hazard area individual permit is?  For
 5  example, I'm looking at the first permit number that's
 6  identified on this permit.
 7      A    Do I have -- I wouldn't say profound
 8  understanding, ma'am.
 9      Q    I'm sorry?  You do or do not --
10      A    I would say I do not have a profound
11  understanding.
12      Q    Okay.
13      A    I'm not sure exactly what -- how you measure
14  the level of understanding either.
15      Q    Do you know what that is, is my question, and
16  again, if you don't know the answer, just tell me that.
17  I'm not -- this is not a test or a quiz, necessarily.
18  I'm just trying to figure out what you know.
19      A    Okay.  At this time, ma'am, I'd say --
20  probably nervous too.  It's not helping.  But at this
21  time, yeah, I'd say my knowledge is not profound in what
22  exactly flood hazard area individual permit is.
23      Q    Okay.  Do you have any understanding at all,
24  and, if so, would you please share it with me?
25      A    I think my understanding is more combined,
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 33**

```
 1  could you just repeat the question one more time, ma'am?
 2  I'm sorry.
 3      Q    What is your understanding of the permits that
 4  are issued pursuant to Exhibit D?
 5      A    Understanding of the permits?
 6      Q    Permits.
 7      A    My understanding, my overall understanding --
 8      Q    Uh-huh.
 9      A    -- is that this construction is illegal.
10      Q    I'm sorry.  What?
11      A    That this construction is illegal.
12      Q    Okay.
13      A    That is my understanding, ma'am.
14      Q    I don't know that you're understanding my
15  question; so let me try to reframe it.
16      A    Yes.
17      Q    There are permits that are issued within this
18  document; correct?
19      A    Right.  Yes.
20      Q    What are these permits for, is my question.
21      A    These are the guidelines as to how any work by
22  the stream needs to be constructed.  It's informative
23  information to the permittee, to the entire team, to
24  everyone who is involved, and gives us guidelines as to
25  what we should do, how we should do it, and how we
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 35**

```
 1  collective.  I don't think I can individually give
 2  information about the permit.  If there's questions,
 3  perhaps I can identify what the answer would be
 4  regarding the specific question without having to resort
 5  to the permit, but I can't individually explain the
 6  nature of the permits.
 7      Q    Okay.  So if -- if I'm understanding your
 8  answer correctly, you do not have any knowledge about
 9  what is involved, for example, in the first permit
10  issued here, this flood hazard area individual permit.
11      Is that a fair statement?
12      A    Ma'am, can you repeat the statement one more
13  time, please?  You said, I do not have any knowledge.
14      Q    Do you have any knowledge about what is being
15  permitted in this flood hazard area individual permit,
16  the first permit that is listed on Exhibit D?
17      A    Again, ma'am, I don't think I can
18  differentiate within the permits at this time.
19      Q    Okay.  So you're telling me that you have an
20  understanding, generally, of what all three of those
21  together are being permitted; is that correct?
22      A    Yes, ma'am.
23      Q    Okay.  But in terms of what each individual
24  one of these is allowing, you cannot say?
25      A    Not at this time, ma'am.
```

ACCURATE STENOTYPE REPORTERS, INC.

36

```
1       Q    Okay.
2       A    I know I've -- not at this time.
3       Q    Okay.  Was there any other time in the past
4   where you did have some such knowledge and have
5   forgotten or --
6       A    Yeah.  I think I've forgotten, ma'am.  I think
7   it's been a long time.  It's been a few years at this
8   point.  At the -- at some point, I did look into it
9   further, but at this time, it wasn't one of the things
10  that I was prepared to discuss at this moment.  So it's
11  not something I utilize every single day.  I don't
12  recall it at this very moment.
13      Q    Okay.  Has someone explained that to you at
14  some point, what each one of those permits allow?
15      A    I think Walter Reese [ph], my attorney, at
16  some point has --
17      Q    Okay.  Don't tell me anything you've talked
18  about with your attorney.
19      A    I apologize.
20      Q    I don't want to hear that --
21      A    Sorry about that.
22      Q    -- and I'm sure that your attorney does not
23  want you to share that with me either.  So it's okay for
24  you to say, you know, it may have been through my
25  attorney, but don't tell me substance of those
```

ACCURATE STENOTYPE REPORTERS, INC.

37

```
1   discussions.  Okay?
2       A    Yes, yes, yes.  Sorry.  Sorry.
3       Q    Thank you.  All right.
4            So other than -- other than your attorney
5   discussions, did any discussions with anybody else
6   explaining to you what each one of these three
7   individual permits does?
8       A    Ma'am, I can't recollect at this time.
9       Q    Okay.
10      A    I can't confirm or deny.
11      Q    All right.  Anybody at Lan who may have
12  explained to you what these three permits individually
13  provide?
14      A    Nothing is striking out at this time, ma'am.
15      Q    Okay.  All right.
16           So when did you first receive this permit?
17      A    A few years ago, ma'am.
18      Q    Okay.  Can you -- is there any way you can
19  narrow that down a little bit using, for example, the
20  date on the permit, February 19th, 2010?  Can you give
21  me any kind of estimate when you first would have seen
22  this permit, ever?
23      A    This is certainly prior to the project.
24      Q    Okay.
25      A    Yeah.
```

ACCURATE STENOTYPE REPORTERS, INC.

38

```
1       Q    So -- and again, I don't want to put words in
2   your mouth here, but I was showing the prior witness an
3   e-mail from July of 2012.  Would it have been before or
4   after that time?
5       A    I don't recall specifically at this time,
6   ma'am.
7       Q    Okay.  Is there any documents that you could
8   look at that might assist you in recalling when you
9   first saw this permit?
10           (Short pause.)
11      A    Ma'am, June of 2013, I believe.
12  BY MS. LUKEN:
13      Q    June of 2013 would have been the first time
14  you saw this permit?
15      A    As per my best recollection at this time.
16      Q    And can I just ask -- you don't necessarily
17  need to show it to me, but what did you look at that
18  refreshed your recollection on that?
19      A    There is Bates number 000046.
20      Q    Okay.  And I can certainly look at that, but
21  what is that?  Is there -- actually, hold on.  I'll just
22  look at it, and that will be easier.
23      A    Okay.
24      Q    All right.  And so you have looked at an
25  e-mail from Chris Guddemi of Lan --
```

ACCURATE STENOTYPE REPORTERS, INC.

39

```
1       A    Yes.
2       Q    -- dated June 2013 to you attaching the
3   permits; is that correct?
4       A    Correct.  That is correct.
5       Q    Okay.  So to the best of your knowledge,
6   that's the first time you've received this permit?
7       A    To the best of my knowledge, ma'am.
8       Q    Okay.  Very good.  All right.
9            Let's -- and when is the first time you spoke
10  with anybody from Nature Bridges?
11      A    I believe it was dated 2012, if I remember
12  correctly.
13      Q    Okay.  Do you remember when in 2012?
14      A    Ma'am, the date is noted on my e-mail.  Would
15  you like me to find it?
16      Q    Well, if we got to --
17      A    I'm sorry.
18      Q    That's okay.  Hold on one second.
19      A    That's a lot of years.
20      Q    Let me just show you -- I want to show you
21  Exhibit 1 from Mr. Garcia's deposition.  That is an
22  e-mail from you to Mr. Garcia that he spoke about.  Is
23  that the first communication, to the best of your
24  knowledge?
25      A    First communication?  There was a phone call.
```

ACCURATE STENOTYPE REPORTERS, INC.

40

```
1              (Reading to himself.)
2              Ma'am, I'm not -- in the very preliminary
3    interaction with him, I can tell from my language that
4    there was some prior interaction.
5         Q    Uh-huh.
6         A    Unfortunately, I don't remember what that may
7    have entailed at this time.
8         Q    Okay.  From looking at that e-mail and the
9    context of it, as you indicated, does it indicate to you
10   that your prior communication or your earliest
11   communication with Mr. Garcia from Nature Bridges would
12   be have been close in time to that e-mail?
13        A    Yes, yes.  I would say so.
14        Q    Okay.  So I mean, would it be fair to say,
15   then, you may have had a phone call with him a couple
16   days or a week or so before?
17        A    Ma'am, that would be a fair assessment.
18        Q    I'm sorry.  What?
19        A    That would be a fair assessment.
20        Q    Okay, okay.  And are you aware of any e-mails
21   between you and anybody at Nature Bridges prior to that
22   July 2012 e-mail?
23        A    As long as it's consistent with my Bates
24   number, ma'am, then this is it.
25        Q    Okay.  All right.
```

ACCURATE STENOTYPE REPORTERS, INC.

41

```
1              Well, we'll -- I -- I'd like to have a
2    starting point for us to go from.
3         A    I apologize, ma'am.  This is as good as any.
4    I don't think they've communicated anything profound.  I
5    would say, on my end.
6         Q    Okay.  Then what -- I think you indicated
7    probably the answer to this question, but let me just
8    ask it so it's clean.  Was your first communication with
9    anybody from Nature Bridges by phone?
10        A    Yes.
11        Q    Okay.  And what -- how did that occur and who
12   did you speak with?
13        A    I only recall speaking to Santiago.
14        Q    Okay.  Mr. Garcia?
15        A    Mr. Garcia.
16        Q    Okay.  And as far as we know, as we sit here
17   right now, that phone conversation would have been
18   sometime around July of 2012; is that correct?
19        A    I'd say so, ma'am.  That is fair.
20        Q    Okay.  And based on our prior discussion about
21   the permit, that you did not receive that from Lan until
22   June of 2013, is it safe to say then, when you first
23   were having discussions with Nature Bridges, you did not
24   have a copy of the permit?
25        A    Yes, ma'am.
```

ACCURATE STENOTYPE REPORTERS, INC.

42

```
1         Q    Okay.  All right.
2         A    Actually, ma'am, may I just retract for a
3    second?
4         Q    Sure.  Go ahead.  What do you want to do?
5         A    Just trying to think.  I'm sorry.  So many
6    years.  It's a little bit -- no, ma'am, I'll -- I -- I
7    continue.  I can't recall for sure.
8         Q    And I mean, again, if during the course of
9    this, you know, we come across a document or something
10   that you think changes something or that you want to
11   make a clarification, feel free to do so.
12        A    I appreciate it.
13        Q    It may prompt me to ask you more questions.
14        A    Okay.
15        Q    But that's something I've no problem with you
16   doing.
17        A    Thank you.
18        Q    Okay?  All right.
19             Can I ask you to please open up the permit,
20   and then on the very last page of the permit there is a
21   site development plan.
22        A    Yes.
23        Q    Do you see that there?
24        A    Yes.
25        Q    Okay.  And is it safe to say, sir, that the
```

ACCURATE STENOTYPE REPORTERS, INC.

43

```
1    first time you would have seen this site development
2    plan would also have been about June 2013 when you
3    received it from Mr. Guddemi?
4         A    Yes.
5         Q    Okay.  And this site plan depicts a number of
6    different items on it, doesn't it?
7         A    Yes, ma'am.
8         Q    Okay.  It looks to me as though there is an --
9    let me ask you this:  Do you have any understanding of
10   what a site development plan is?
11        A    I have an understanding, ma'am.
12        Q    Okay.  What is that?
13        A    Sorry, ma'am.  It's a little bit vague for me.
14   Okay.  So for instance, this particular one, I will try
15   to explain what I can depict.
16        Q    Yeah.  I'm not necessarily asking you at this
17   time for you to explain to me what's on this particular
18   drawing.  I'm asking a somewhat broader question.  I
19   will get to that.
20        A    Okay.
21        Q    But my first question is:  What is your
22   understanding of what a site development plan is?
23        A    It has a lot of information, too much
24   information, and it really is -- are you asking
25   specifically what I get out of, right, ma'am?  That's
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 44**

1  the question?

2  Q  Do you have an understanding in the world of

3  construction, engineering, project planning, what the

4  site development plan is?

5  A  Yes, ma'am. Yes, ma'am. I have an

6  understanding of this particular documentation. At this

7  time, I can explain -- well, you're not asking me to

8  explain. I'm sorry.

9  Yes, ma'am. So I have an understanding. I

10  don't know --

11  Q  What is that understanding that you have?

12  A  My understanding is that there is -- and I'm

13  giving you my understanding at this time, ma'am.

14  Q  Sure.

15  A  So this is suggesting that there is a proposed

16  bridge at a location, a proposed driveway, proposed

17  dwelling. And it shows the stream, which is s -- and

18  about the stream, it has a lot of information which is

19  substantial.

20  Q  Okay. That wasn't exactly my question.

21  A  I apologize, ma'am. Can you --

22  Q  That's okay. That's okay. We'll -- do you

23  know what the purpose of this document is?

24  A  Yes, ma'am.

25  Q  What is the purpose of this document?

ACCURATE STENOTYPE REPORTERS, INC.

**Page 46**

1  journey.

2  Q  Yes. What is -- and what is that? And again,

3  keep in mind my question. My question is: What is the

4  purpose of this document?

5  A  What is the purpose? What is the purpose of

6  this document?

7  Q  Yeah.

8  A  And, ma'am, when you say -- there's just so

9  much information here. I'm just not sure exactly what

10  you would like me to cater that information to. I just

11  don't know exactly what you're looking for.

12  Q  Why was this document prepared?

13  A  Okay. So what information is on here that an

14  engineer would need? Is that the question?

15  Q  No. The question is --

16  MR. HARPER: The question is: Why was it

17  prepared?

18  THE WITNESS: It's prepared to locate the

19  bridge -- site of the bridge, locate the dwelling,

20  the driveway, amongst anything else that might be

21  present on here.

22  BY MS. LUKEN:

23  Q  Okay. And I think you indicated in your prior

24  statement that these are all proposed locations;

25  correct? You do see that on the document?

ACCURATE STENOTYPE REPORTERS, INC.

**Page 45**

1  A  It shows the stream flow, and it shows the

2  location of the bridge. It shows the driveway. It

3  shows where the dwelling is.

4  Q  Do you have any understanding of what this

5  document is used for from an engineering perspective?

6  A  Yes, ma'am.

7  Q  And what is that?

8  A  And are you referring only to a bridge, ma'am,

9  or are we just --

10  Q  I'm talking about an engineering perspective.

11  What is a site development plan for?

12  A  Engineering perspective. If it's from an

13  engineering perspective, ma'am, I wouldn't really have

14  an understanding of what an engineer gets out of it. If

15  you're asking me for my perspective, I can only convey

16  that information from you.

17  Q  Yes. And I'm -- I understand that you're not

18  an engineer.

19  A  Yes.

20  Q  All I'm asking you is: You know, during the

21  course of your travails on this particular matter, has

22  any engineer explained to you what the purpose of this

23  document is, or anybody else, for that matter?

24  A  Ma'am, yes. I have learned quite a bit about

25  this particular document over these -- over this

ACCURATE STENOTYPE REPORTERS, INC.

**Page 47**

1  A  Proposed location. Let me see that. Where

2  are we looking at, ma'am?

3  Q  I'm asking -- you used the word "proposed."

4  You used "Proposed location for a house, proposed

5  driveway, proposed bridge."

6  Is it your understanding that these are

7  proposed locations?

8  A  Oh, I see, ma'am. Yes, ma'am. I see now what

9  your referring to. Yes, ma'am.

10  Q  Okay. Because if you look in the document --

11  and your eyesight's better than mine -- you will see

12  that there is a proposed bridge?

13  A  I understand, ma'am.

14  Q  A proposed dwelling footprint; right?

15  MS. LUKEN: Mr. Harper.

16  MR. HARPER: You guys can keep going. I just

17  need to use the restroom.

18  MS. LUKEN: Okay. We're going to take a

19  break. I don't ask questions without counsel

20  present.

21  MR. HARPER: I don't mind.

22  (Recess from 12:16 p.m. to 12:22 p.m.)

23  BY MS. LUKEN:

24  Q  Mr. Chaudhari, before we went on break, I

25  think we were discussing that these are all proposed

ACCURATE STENOTYPE REPORTERS, INC.

**Page 48**

1  locations; is that correct?

2  　　A　Yes, ma'am.

3  　　Q　All right. And this document is not intended

4  as a construction document; is that correct?

5  　　A　I'm not sure, ma'am.

6  　　Q　Okay. If you look in the right-hand corner

7  under "plan notes," the last paragraph there. Do you

8  see that there?

9  　　A　I am reading what you just mentioned, ma'am.

10 I am not sure why that's there or how it needs to be

11 interpreted.

12 　　Q　Okay. So you don't have the ability to

13 interpret those words there, under the "plan notes"

14 section?

15 　　A　I recite it, ma'am, but I --

16 　　Q　You don't have to recite it.

17 　　A　I'm sorry.

18 　　Q　I'm just asking you, do you have an

19 understanding of what that means?

20 　　A　I have an understanding of what it says. I

21 don't have an understanding of what of it means.

22 　　Q　Okay. Well, what is your understanding of

23 what whatever it is?

24 　　A　Well, ma'am, I'll just tell you what it is.

25 It required engineer to really grasp that, why it's

ACCURATE STENOTYPE REPORTERS, INC.

**Page 50**

1  been signed by Mr. Westbrook in April of 2008.

2  　　　　What happened with this plan? Was this plan

3  sent to contractors for pricing of any sort?

4  　　A　I'm not sure, ma'am.

5  　　Q　Okay. If you go back to the exhibit with the

6  Lan document, which I believe is Exhibit C. If I could

7  have you turn to Page 265. Okay.

8  　　　　And do you recognize this as an invoice from

9  Lan and Associates dated April 30th of 2010?

10 　　A　Yes, ma'am. I do see that date.

11 　　Q　I'm sorry?

12 　　A　I do see that date.

13 　　Q　Okay. And this is among the documents that

14 you brought with you today to respond to our requests;

15 right?

16 　　A　Yes, ma'am.

17 　　Q　Okay. If you look under the "Professional

18 services for this period."

19 　　A　Okay.

20 　　Q　Do you see that under C and D, "Forward plans

21 to contractors per client request. Discuss plans with

22 contractors to obtain estimates."

23 　　　　Do you see that there?

24 　　A　I see that there, ma'am, yes.

25 　　Q　Okay. And so what was that all about?

ACCURATE STENOTYPE REPORTERS, INC.

**Page 49**

1  there, what it is intended or needed to do.

2  　　Q　Okay. So just for clarity, the sentence that

3  says, "They are not construction plans and should not be

4  used for that purpose."

5  　　　　Do you think that needs to be interpreted by

6  an engineer is what that means?

7  　　A　Yes.

8  　　Q　Would you agree that contractor would also be

9  able to interpret what that means?

10 　　A　Ma'am, I'm not sure what a contractor knows.

11 　　Q　Okay. So -- but you don't know one way or the

12 other; right? You just know you can't interpret it; is

13 that right?

14 　　　　MR. HARPER: Objection.

15 　　　　THE WITNESS: I am not sure how an engineer

16 　　needs to interpret this as an engineer. I am not

17 　　sure contractor needs to interpret this as a

18 　　contractor.

19 BY MS. LUKEN:

20 　　Q　And you are not either an engineer or a

21 contractor; right?

22 　　A　Nuclear pharmacist, ma'am, correct.

23 　　Q　Okay. Very good. Very good.

24 　　　　Okay. So this is prepared. And I'm looking

25 at the site development plan, and it appears to have

ACCURATE STENOTYPE REPORTERS, INC.

**Page 51**

1  　　A　Ma'am, I am not sure at this time.

2  　　Q　So you have no idea what Lan was doing with

3  respect to Line C and D of their invoice from April of

4  2010?

5  　　A　Ma'am, I can't comment on what was ongoing on

6  April 30th, 2010.

7  　　Q　So who would be the best person to ask that

8  question to?

9  　　A　I am not sure.

10 　　Q　Well, who -- when they say, "Per client

11 request," would that have been a request that your

12 father made?

13 　　A　It would be a possibility, ma'am.

14 　　Q　Who else could it have been?

15 　　A　I would -- (reading to himself.) Yeah, ma'am.

16 I'm not sure of who else it could have been, who it was.

17 　　Q　So I mean --

18 　　A　I just don't feel comfortable answering

19 because I wasn't there, and I'm interpreting something

20 that I just wasn't there to witness; so just -- that's

21 all.

22 　　Q　That's fair. And I'm not -- I do not want you

23 to guess or speculate.

24 　　A　Thank you, ma'am.

25 　　Q　However, you are the one who's here claiming

ACCURATE STENOTYPE REPORTERS, INC.

52

1  that my client breached the contract. So I'm asking you
2  questions that I need to know the answer to. If you do
3  not know the answer, that's fine. Just tell me that.
4       A   I understand.
5       Q   I am going to kind of press you at times to
6  see if maybe you know a little more than you think you
7  do, but, you know, if your answer is you don't know,
8  then that's fine and that's acceptable.
9       A   I understand. Yes.
10      Q   In this time frame, though, April of 2010,
11 were you involved at all in your father's efforts to
12 develop this raw land that he purchased in 2008?
13          MR. HARPER: I'm going to object. That was
14      asked and answered.
15          THE WITNESS: Ma'am, I -- involvement, it
16      could mean just giving opinions. I don't
17      understand exactly.
18 BY MS. LUKEN:
19      Q   Any involvement at all. Did you know that
20 your father was doing this?
21      A   Yes, ma'am.
22      Q   Okay. And did he speak with you about it?
23      A   Again, ma'am, not recollecting to -- just
24 given the time frame, ma'am, I just can't really
25 differentiate what we were talking about and which year,

ACCURATE STENOTYPE REPORTERS, INC.

54

1  years. So I'm trying, to the best of my ability, ma'am.
2  But I just think with the vast -- the time frame that's
3  part of the issue.
4       Q   Okay. Let me maybe ask the question a little
5  differently and see if this may -- may assist at all.
6           Your father purchases this property in 2008?
7       A   Yes.
8       Q   Lan is hired at some point, it's doing work in
9  2008, 2009, 2010. We've got a permit in 2010. You did
10 not start speaking with Nature Bridges until the summer
11 of 2012, let's just say.
12      A   Yes, yes.
13      Q   Okay. So prior to your discussions with
14 Nature Bridges, did you have any involvement in this --
15 this effort on the part of your father to build a house
16 on this property he purchased?
17      A   Ma'am, again, when you speak with any
18 involvement and it confuses what that entails.
19      Q   Uh-huh. Okay. Let me give you some examples.
20 Did you ever --
21          MR. HARPER: I'm going to object, having asked
22      and answered. I'm sorry.
23          MS. LUKEN: That's fine. Your objection is
24      noted for the record, sir.
25

ACCURATE STENOTYPE REPORTERS, INC.

53

1  to the best of my ability.
2       Q   Was your father living with you at this time?
3       A   Yes, ma'am.
4       Q   Okay. And was your father living with you in
5  2008 when he purchased this property?
6       A   Yes, ma'am.
7       Q   Okay. And so I mean -- and again, I'm not
8  trying to put words in your mouth here, but I would
9  presume that if your father purchased a piece of
10 property in 2008, were you aware that he had hired Lan
11 to do some work for him?
12      A   Yes, ma'am.
13      Q   Okay. And did he ever discuss the work that
14 they were doing or the process --
15          MR. HARPER: I'm going to object. That has
16      been asked and answered. I can -- he has testified
17      he doesn't recall.
18          MS. LUKEN: Okay. Well, I'm -- hold on one
19      second.
20          (Short interruption.)
21 BY MS. LUKEN:
22      Q   I'm sorry about that.
23      A   Ma'am, I'm -- it's honestly just very
24 difficult to differentiate what was ongoing at which
25 intervals in the years, over the span of this many

ACCURATE STENOTYPE REPORTERS, INC.

55

1  BY MS. LUKEN:
2       Q   Did you ever attend any meetings at Lan's
3  office prior to the summer of 2012 when you first
4  contacted Nature Bridges?
5       A   Not that I can recall, ma'am.
6       Q   Okay. Did your father ever ask you to review
7  any estimates that had been received for this project
8  prior to the summer of 2012 when you contacted Nature
9  Bridges?
10      A   Ma'am, again, we were -- I can't say for sure.
11      Q   Do you know if your father obtained any
12 estimates from contractors prior to your discussions
13 with Nature Bridges?
14      A   I can't say for sure.
15      Q   And your father would be the best one to ask
16 that question to?
17      A   Possibly, ma'am.
18      Q   Okay. Or to Lan, themselves, 'cause this is
19 their invoice and they did the work?
20      A   Possibly, ma'am.
21      Q   Who at Lan was the contact person at this
22 time? And I'm talking about prior to your contacting
23 Nature Bridges.
24      A   I'm not sure, ma'am.
25      Q   Have you personally ever seen any estimates

ACCURATE STENOTYPE REPORTERS, INC.

---

**56**

1  that were obtained by Lan for any work on your father's

2  property?

3      A   I'm not sure, ma'am.

4      Q   Okay.  Have you -- I mean, I'm assuming for

5  the purposes of responding to our discovery questions,

6  preparing for today, have you exhausted your file or

7  your documents on this -- on anything related to this

8  property?

9      A   Yes, ma'am.

10     Q   Okay.  And you have not located anything that

11  indicates that you were involved in this at all until

12  your reaching out to Nature Bridges?

13     A   Yes, ma'am.

14     Q   Okay.

15     A   Again, ma'am, you talked about "involved at

16  all."  And when you use these kind of words, again, I'm

17  not sure exactly what that does and does not entail.

18     Q   Okay.

19     A   I just want to be as honest as possible,

20  that's all, ma'am.

21     Q   You did have conversations with your father,

22  then, at some point between 2008 and the summer of 2012?

23     A   Yes, ma'am.

24     Q   Okay.  You just don't recall the specifics of

25  what those are?

---

**58**

1  but that's fine.  The record will reflect whatever

2  has been said here.  That's the good thing about

3  writing it down.

4         MR. HARPER:  Yes, ma'am.

5  BY MS. LUKEN:

6     Q   All right.  You saw these e-mails, I think,

7  when I was asking Mr. Garcia -- Mr. Garcia about them.

8  And again, let's go to this one.  This actually looks

9  like the second one.  This is Exhibit 2.

10     A   Yes, ma'am.

11     Q   And this is from August of 2012.  And therein

12  you are referencing a 12 x 12 bridge.  Do you recall

13  that Mr. Garcia gave you an estimate on a 12 x 12 bridge

14  for $25,000?

15     A   No, ma'am.  If I can recall correctly, it had

16  to do with something on the their website at that time.

17     Q   Uh-huh.

18     A   I'm not sure exactly how the website was on

19  there, but I do know that they had a structure that was

20  12 x 12.  And that just gave me an idea of what this

21  company is, what it does, and just opened up a line of

22  discussion just by seeing how this entire process works.

23     Q   Okay.  And so if you look at this one, No. 1,

24  this is the July 2012 e-mail.  And you're asking for an

25  estimate on a 20 x 12 bridge; correct?

---

**57**

1     A   Correct, ma'am.

2     Q   But just so we're clear too, you don't think

3  you had any contact with Lan during that time frame?

4     A   No.  I did not say that, ma'am.

5     Q   Okay.  So you just -- you don't recall if you

6  did or you didn't?  Or you recall that you did, but you

7  don't recall what it was?

8     A   Ma'am, it's again a combination of both.

9  You're talking about eight, 10 years out.

10     Q   All right.  I'm also seeing on the following

11  page, Page 266 of our Exhibit C, there is another entry

12  there.  And this is an invoice from May of 2010 where

13  Lan is indicating that they obtained estimates per

14  client request.

15         Same question as before.  Did you have any

16  involvement in that?

17         MR. HARPER:  I'm going to object.  Asked and

18  answered.

19         MS. LUKEN:  Okay.  This is a different invoice

20  here.

21         MR. HARPER:  Same question, basically.

22         MS. LUKEN:  It's a different time frame, sir.

23         MR. HARPER:  Madam, I believe he testified

24  that he couldn't recall anything prior to 2012.

25         MS. LUKEN:  I don't think that's what he said,

---

**59**

1     A   Correct.

2     Q   Okay.  And how -- how did you -- what steps

3  did you take to determine that?

4     A   The sizing?

5     Q   Yes.

6     A   Ma'am, the width is actually what the width of

7  our lanes are in U.S.  The sizing is something that I

8  had asked Santiago to see if it was sound.  If we have,

9  like, a 12-foot stream, then what -- just to kind of

10  just go over the process of how things work.

11     Q   Okay.  And so I mean, just can you relate to

12  me what you believe that conversation was then?  You

13  pick up, you go to a website, you see Nature Bridges --

14     A   Yes, ma'am.  I do remember the website.  It

15  was -- it was a very nice website, and it drew my

16  attention for multiple reasons.  I would -- I do

17  remember having the ability to go through all these

18  states.  It's something that drew my -- the most

19  attention, especially being based out of Florida.  And

20  that is something that kind of struck me as how this

21  company -- it told me this company is really big.  It

22  told me that their standard operating procedures must be

23  very well-refined, that they are -- as they say on the

24  website, they are one of the leading bridge companies in

25  the nation.

60

```
 1      Q    Okay.
 2      A    They -- I do remember just really, really very
 3  well experienced, ma'am.  That's what I get out of it,
 4  and that's why I initiated my first phone call, because
 5  they really just stood out amongst anything else I may
 6  have come across.
 7      Q    Okay.  So when you decided to make the phone
 8  call, who did you speak with?
 9      A    I -- my best knowledge, ma'am, I remember my
10  first contact discussion being with Santiago.
11      Q    Okay.  And how long was that phone call?
12      A    I can't recall, ma'am.
13      Q    Okay.  But the -- and I think we've narrowed
14  down the phone call sometime in July of 2012?
15      A    Yes, ma'am.  Yes.
16      Q    Okay.  And what -- what was this -- what did
17  you say during that phone call?
18      A    Ma'am, I apologize.  I can't -- we were just
19  discussing, just kind of asking him, like, how -- just
20  trying to get an idea of the process.
21      Q    The process for what?
22      A    Just how things work.
23      Q    For what?
24      A    The bridge construction.  I know they had a
25  couple different structures.  I do see here in this
```

ACCURATE STENOTYPE REPORTERS, INC.

62

```
 1  BY MS. LUKEN:
 2      Q    Okay.  All right.
 3           What happened after the phone call?
 4      A    Just kept moving forward, and he was just
 5  explaining --
 6      Q    Okay.  Wait, wait.  Don't -- I'm not trying to
 7  interrupt you here, but I'm saying, what did you do next
 8  after the phone call?
 9      A    What did I do next, ma'am?
10      Q    Yes.  What was the next step in your process
11  of moving forward with respect to helping your father
12  out with this property?
13      A    Ma'am, if I remember correctly, we ended up
14  listing the property.
15      Q    For sale?
16      A    Yes, ma'am.
17      Q    Okay.  And that would have been around the
18  summer of 2012; is that --
19      A    Yes, ma'am.
20      Q    Okay.  And why did you do that?
21      A    Bunch of family reasons, ma'am.
22      Q    Okay.
23      A    A bunch.
24      Q    All right.  That's fine.
25           Okay.  What about with respect to Nature
```

ACCURATE STENOTYPE REPORTERS, INC.

61

```
 1  e-mail is wood.  So, again, just -- trying to just see
 2  how -- if he can guide me into -- into how -- how this
 3  actually does work.
 4      Q    Okay.  Do you specifically recall what you
 5  asked for?
 6      A    No, ma'am.  I do not specifically recall at
 7  this time what we spoke about in 2012 --
 8      Q    Okay.
 9      A    -- beyond what's noted.
10      Q    And what -- what would -- how did the -- what
11  did he tell you during the phone call, that you
12  remember?
13      A    About that particular phone call, I --
14      Q    Yes.  We're talking about the very first phone
15  call that you had.  That's the only one I want to --
16      A    Ma'am, I can't differentiate --
17      Q    -- talk about.
18      A    What we spoke about on the very first phone
19  call at this time, but I know it instilled a lot of
20  confidence in me to go forward.
21      Q    What -- okay.  Do you remember any specifics
22  at all from this phone call?
23           MR. HARPER:  Objection.  Asked and answered.
24           THE WITNESS:  I do not, ma'am.
25
```

ACCURATE STENOTYPE REPORTERS, INC.

63

```
 1  Bridges?  What was your next communication with anybody
 2  from that company?
 3      A    So after some time, I wanted to help my
 4  parents, and I went back to Santiago.  And we continued
 5  ongoing discussions, continued discussions.
 6      Q    All right.  When you were saying to me before,
 7  I asked you how you arrived at the 12 x 20 size that you
 8  were asking for Nature Bridges to quote for you.  And
 9  you mentioned something about the width of the lanes.
10  What are you referring to there?
11      A    The -- I know the width is -- is -- I'm trying
12  to remember.  I can't remember exactly the time frame,
13  ma'am, but -- and exactly what we were discussing at
14  that time either.  We've had some very, very unique
15  conversations, ma'am.  I -- I don't know how else to --
16      Q    Are you talking about our conversation here
17  today or your conversation --
18      A    Not at all, ma'am.  Not at all, ma'am.
19  Somewhere else with --
20      Q    I'm just asking you, is the 12 feet the width
21  of a normal lane of traffic in the United States that
22  you were referencing?
23      A    Yes, ma'am.  I think that was what it was.
24      Q    Okay.  And then what about the -- who told you
25  about that width dimension?  Was that something that an
```

ACCURATE STENOTYPE REPORTERS, INC.

64

```
1    engineer told you?  Is that -- where did you get that
2    information from?
3         A    No, ma'am.  I think I just remembered -- I
4    know there is a tale like that.  You have to be -- there
5    is an expression that you have to be the width of two
6    horses to be able to facilitate in Europe, and I think
7    in U.S. it's 12 feet.  So that's something that just was
8    a starting point to kind of figure out how the process
9    works.
10        Q    And so -- I mean, I guess, just to summarize
11   that, that was something that you independently, you
12   know, just understood to be what was needed for the
13   12 feet?
14        A    Yeah, ma'am.  I don't know exactly what that
15   first conversation was entailed.  I do know at this
16   point, especially after going through these deposition
17   processes, that we weren't exactly all on the same page.
18   So I have had some pretty unique conversations, ma'am,
19   I don't know how else to explain it at this time.
20        Q    I don't understand what you mean by "unique
21   conversations."  Can you explain that?
22             Do you have something in mind?
23        A    I'm asking him --
24        Q    Who?  Asking who?
25        A    I apologize.  Let me rephrase.  So I'm talking
```

ACCURATE STENOTYPE REPORTERS, INC.

66

```
1             MR. HARPER:  I'm going to object as having
2    been asked and answered.
3             MS. LUKEN:  That's a stretch, Counsel.
4             Go ahead.
5             MR. HARPER:  No, it isn't.
6             THE WITNESS:  So I'm basically trying to
7    describe my property and just trying to get an idea
8    of what it entailed, and so I'm asking him how it
9    works.  And so, again, it just opened up a forum to
10   really just speak and kind of just get an idea of
11   how much does it cost, what is the process?  And
12   really just kind of just wanting to just speak to
13   him about how to initiate.
14   BY MS. LUKEN:
15        Q    Right.  My question is:  How did you come to
16   ask for a 20-foot bridge?  Where did that number come
17   from?
18        A    I'm not exactly sure why that was the number.
19   I just know in my conversations, I'm asking him, the
20   best of my ability, if we have something that's like a
21   waterways -- so is this here.  Like, how does it --
22   like, what is the cost or what is the -- again, just
23   trying to just get an idea of what is entailed.  What is
24   pricing.  What is the project?  And just trying to
25   understand from the company exactly what it is.  I
```

ACCURATE STENOTYPE REPORTERS, INC.

65

```
1    about to Santiago to try to figure out the process,
2    like, how things work.
3         Q    Okay.  And was this in your first conversation
4    with him?
5         A    Again, ma'am, not to differentiate, but just
6    to just kind of explain.  Like, I'm speaking to
7    Santiago, and we're just going over how -- just trying
8    to get a grasp of what is entailed in this process.  So
9    I'm asking him things about his website.  I'm asking him
10   questions.  I'm asking him how it works.  And again,
11   ma'am, we just had some pretty interesting
12   conversations.  I don't know how else to explain it at
13   this time.
14        Q    What about the conversations were interesting
15   or unique?
16        A    Ma'am, at this point what we have as a final
17   product with what we have discussed, I just don't know
18   how else to --
19        Q    That's not my question, sir.  My question is:
20   What about your conversations with Mr. Garcia were
21   "unique," as you referenced?
22        A    Why are we talking about square footage of a
23   bridge?  That's something that's standing out right now.
24        Q    Why were you asking for a 20-foot bridge?
25        A    I was.
```

ACCURATE STENOTYPE REPORTERS, INC.

67

```
1    understand this.
2         Q    Again, my question is:  How -- your e-mail
3    says, "I want an estimate for a 20 x 12 foot bridge."
4             We talked about the 12 feet.
5         A    Yes.
6         Q    You told me this issue with the two horses
7    and, you know, your understanding that that was a normal
8    width.  My question is:  How did you come up with the
9    20 feet?
10        A    Again, I just know that we had -- I wouldn't
11   say "came up with" it.  I know we spoke about -- and I
12   can't recall exactly what we spoke about, ma'am, but it
13   was just -- I don't -- maybe trying to describe my
14   property.  And then, I don't know exactly how that
15   conversation really entailed, but ...
16        Q    Okay.  What do you -- what did you tell him --
17   okay.  The question that I really would like to get an
18   answer to is:  How you came up with asking for a 20 foot
19   bridge?  If you don't know or you don't remember, just
20   say so.
21        A    Okay.
22        Q    So how did you come up with the 20 feet?
23        A    I don't remember for sure.
24        Q    Okay, okay.  Let's look back at this site plan
25   again for a moment, please.  Okay.  And again, this --
```

ACCURATE STENOTYPE REPORTERS, INC.

68

```
 1   to your knowledge, the first time you got this was in
 2   June of 2013; correct?
 3        A    The first time I got this?
 4        Q    Remember, we went through the e-mail with --
 5        A    I understand, ma'am, but again, it's the years
 6   that confuses me.
 7        Q    I asked you the first time you saw this
 8   permit.  This document is attached to the permit.
 9        A    Right.
10        Q    We went through the e-mails.  You showed me
11   Mr. Guddemi's to you, e-mailing it, I believe, in June
12   of 2013?
13        A    Uh-huh.
14        Q    So just for clarity, the first time you saw
15   this document, this site development plan, was June of
16   2013?
17        A    Ma'am, then you were also asking me questions
18   about -- I'm also thinking of other possibilities if I
19   saw it before with my father or not.  I just can't claim
20   one way or another at this time.  I -- again, I'm sorry,
21   but the number of years is --
22        Q    Okay.  But, we -- again --
23        A    I just don't want to be committed to a time
24   frame, unfortunately.
25        Q    Well, I understand why you would not want to
```

ACCURATE STENOTYPE REPORTERS, INC.

70

```
 1   don't believe he's ever committed to anything.  I
 2   think he's trying to commit -- he's trying to
 3   answer questions.
 4        MS. LUKEN:  No.  He's actually being
 5   nonresponsive, Counsel.
 6        MR. HARPER:  Would you adjust or adapt around
 7   that?  I don't disagree, necessarily, with what
 8   you're saying, but he's not being obstructive or
 9   intentionally nonresponsive, in my opinion.  I
10   think there's a disconnect that --
11        MS. LUKEN:  Well, I -- I'm not sure what that
12   disconnect is because I think that I'm being fairly
13   clear in what I'm asking.
14   BY MS. LUKEN:
15        Q    And again, if your -- if your answer is, you
16   don't know, that's fine, but you can't have it both
17   ways.  You can't have it be, I'm not sure; it could have
18   been; it might have been; or I don't know.  I mean,
19   those are --
20        A    Ma'am -- I apologize, ma'am.
21        Q    -- the two options here.  You've either got to
22   answer the question or you say you don't know, and I
23   don't really care what the answer is.  I just need an
24   answer.
25        A    I understand, ma'am.  I'm sorry.
```

ACCURATE STENOTYPE REPORTERS, INC.

69

```
 1   be.  I do want to commit to a time frame.  So if your
 2   answer is -- your answer is, I don't know; I have no
 3   idea; whatever, that's different than what you told me
 4   before.  Because I asked you, when is the first time you
 5   saw this permit, which is our Exhibit D.  And you went
 6   through all your e-mails, and you found that e-mail from
 7   Chris Guddemi at Lan when he e-mailed it to you and when
 8   you said that's the first time.  So I'm just trying to
 9   clarify.
10        A    Okay, ma'am.  I apologize, but when you're
11   asking me about father, I just -- there is a possibility
12   I may have seen it before as well.
13        Q    Okay.  In what context would you have seen it
14   before?
15        A    Again, ma'am, I'm not certain.
16        Q    Okay.  So you do not know when you first got
17   this document, basically, is your answer now?
18        A    Yes, ma'am.
19        Q    Okay.  And so do you want to change any of
20   your other answers about whether or not you were
21   involved in obtaining estimates for construction on this
22   property back in 2010 --
23        A    No, ma'am.
24        Q    -- as Lan invoices indicate?
25        MR. HARPER:  I'm going to object to that.  I
```

ACCURATE STENOTYPE REPORTERS, INC.

71

```
 1        Q    Okay.  So the first time you saw this permit.
 2   What is the answer to that question?
 3        A    Sorry.  I'm not sure.
 4        Q    You're not sure.  Okay.
 5             The first time you saw this site plan?
 6        A    Same, ma'am.
 7        Q    You're not sure.  Okay.
 8             The -- have you ever seen -- ever seen any
 9   estimates for the driveway that is shown on this site
10   development plan?
11        A    Okay.  Not that I can recall, ma'am.
12        Q    Okay.  Have you ever seen any estimates for
13   the house that is shown on this site development plan?
14        A    Not that I can recall, ma'am.
15        Q    Okay.  Have you ever discussed any estimates
16   for the driveway with your father?
17        A    No, ma'am.
18        Q    Have you ever discussed any estimates for the
19   driveway with Lan?
20        A    Yes, ma'am.
21        Q    Okay.  When was that?
22        A    It was -- I believe it would be -- notice
23   the -- I was -- just trying to think.
24             Yes, ma'am.  When the bridge was constructed
25   and the team had left, we had spoken about the driveway.
```

ACCURATE STENOTYPE REPORTERS, INC.

72

```
1   And when I'm saying "we," I'm talking about Santiago,
2   Brian Green, and I, about why the fill-in driveway was
3   not completed at that time.  And at some point I was
4   needing to provide them with some information, and I had
5   contacted Lan to provide with some assistance.  And I
6   believe it was through that process we noticed the
7   bridge was located to be in the incorrect spot, ma'am.
8       Q    Okay.  You've got a whole bunch of stuff in
9   there; so let's just --
10      A    I'm sorry.
11      Q    Let's start.  My question to you was:  Have
12  you ever seen or talked about with anybody an estimate
13  for the driveway work that's shown on the site
14  development plan?
15      A    No, ma'am. I've not received any estimates of
16  a driveway plan prior -- I'm sorry.  Is the question
17  prior?  Is there a time frame question?  I'm --
18      Q    At this point, any time is fine.
19      A    Sorry.
20      Q    You just -- you tell me what you -- what you
21  have.
22      A    Okay.  Have I -- what's the question again?
23  I'm sorry.
24      Q    Have you ever seen or talked about, with
25  anybody, estimates for the cost of constructing a
```

ACCURATE STENOTYPE REPORTERS, INC.

73

```
1   driveway, the proposed location of which is shown on
2   this site development plan?
3       A    The proposed location?
4       A    Uh-huh.
5       A    So I have spoken to Nature Bridges about the
6   construction of the driveway.
7       Q    Okay.  And what did that entail?
8       A    What did the conversation and the e-mails
9   entail?  That entailed the price of the fill, the --
10  there was a proposal.  If I can refer to the proposal to
11  give the entire scope of what was --
12      Q    Yeah.  And I'm willing to do that, but we're
13  going to do that in a minute.
14      A    Sure.
15      Q    I want to get through the narrative first.
16      A    Okay.  All right.
17      Q    Okay.  What was -- okay.  Continue with your
18  description of the response to my question, which was:
19  Have you ever discussed with anybody an estimate for
20  constructing the driveway, the proposed location of
21  which is shown on this site development plan?
22      A    The proposed location?  Oh, I'm sorry, ma'am.
23  If I may retract.  I apologize.
24      Q    Okay.
25      A    The proposed location?  Ma'am, I believe -- I
```

ACCURATE STENOTYPE REPORTERS, INC.

74

```
1   would need to -- I received a preliminary budget from
2   R & R Construction, ma'am; so I'm not possibly sure if
3   that's one of the things you maybe referring to or not.
4       Q    Okay.
5       A    But if it's a proposed location, ma'am, I --
6       Q    Other than -- other than that preliminary
7   budget from whoever this is -- Contech or R & R or
8   whatever it is -- other than that --
9       A    Not that I can recall, ma'am.
10      Q    Okay.  And so when you ended up entering into
11  a contract with Nature Bridges, you had no idea what a
12  driveway was going to cost?
13      A    No, ma'am.  I don't think I recall what a
14  driveway would cost before the contract.
15      Q    Okay.  And again, I just want to make sure
16  this is clear here.  Is it that you do not remember how
17  much the driveway was going to cost, or you do not
18  remember ever knowing the answer to that question?
19      A    At this time, ma'am, I don't recall knowing
20  what the driveway would cost.
21      Q    Okay.  What about the house?  Did you ever
22  have any idea how much the house was going to cost?
23      A    No, ma'am.  I don't know for sure what the
24  house would cost.
25      Q    Why did you choose to start with the bridge?
```

ACCURATE STENOTYPE REPORTERS, INC.

75

```
1       A    To get access to the house.
2       Q    Okay.  What was the plan for access -- well,
3   okay.  What is your understanding of what's involved
4   with access to the house?
5       A    Your question is why the bridge needed to be
6   constructed first; right, ma'am?
7       Q    My previous question, to which you answered,
8   "Because we wanted to have access to the house;" right?
9       And then I said, "What is involved with
10  getting access to the house?"
11      A    Bridge and the driveway.
12      Q    Okay.  And so again, just to kind of circle
13  back then, if you were interested in access, why did you
14  choose to start with the bridge as opposed to starting
15  with the driveway?
16      A    So my -- again, I have to go back to my
17  conversations with Santiago.  Starting with the initial
18  conversations, ma'am, as I explained to him, the goal
19  was to basically be the entire driveway.
20      Q    I'm sorry.  The --
21      A    So as we were talking, conversing, I -- the
22  explanations we were coming together -- were that they
23  would be doing the bridge and the entire driveway.  That
24  is what I got out of our conversations.
25      Q    And what conversation was that?
```

ACCURATE STENOTYPE REPORTERS, INC.

76

```
1        A    What conversation was that?
2        Q    Yeah.  We established a first conversation
3   sometime in July of 2012.
4        A    Ma'am, it's the entire process from that date
5   to signing of the contract, ma'am.  It was a -- it's --
6   my understanding was that it would be -- it would be
7   one.
8        Q    Okay.  So just so I'm clear here, you somehow
9   developed a belief that Nature Bridges was going to be
10  doing what?
11       A    I developed a belief that they would be doing
12  the bridge, the fill, the driveway.
13       Q    Okay.
14       A    That was my belief, ma'am.
15       Q    And why did you develop that belief?  What
16  caused you to develop that belief?
17       A    What caused me to develop that belief?  So
18  conversations, ma'am, and I also received a -- a
19  confirmation on one of the e-mails that they -- where is
20  it?
21            MR. HARPER:  Is that yours?
22            MS. LUKEN:  No.  These are all my documents.
23            THE WITNESS:  Ma'am, I don't have it in front
24  of me.  There's --
25            (Short pause.)
```

ACCURATE STENOTYPE REPORTERS, INC.

78

```
1   the contract between yourself and J.D. James, Inc.,
2   doing business as Nature Bridges; correct?
3        A    Yes, ma'am.  Yes, ma'am.  It's a signed
4   contract between April and I.
5        Q    Okay.  Well, between you and the company;
6   right?
7        A    Sorry, ma'am.
8        Q    Okay.  Is that correct?
9        A    That's correct.
10       Q    Okay.  Very good.  And it says it's entered
11  into on February 3rd, 2014; is that correct?
12       A    That's correct.
13       Q    Now, I see it's got you identified there as
14  the owner.  If I'm correct, you're not actually the
15  owner of the real property; right?
16       A    Ma'am, legally the owner is my father, yes.
17       Q    Okay.  So you're not really the owner, per se;
18  is that fair?
19       A    I know this is now a legal issue.  So if
20  you're asking me who is the owner legally, ma'am, it is
21  my father.
22       Q    All right.  Do you have any sort of power of
23  attorney on your father's behalf?
24       A    Just his son.  I'm just for the help.  That's
25  all.
```

ACCURATE STENOTYPE REPORTERS, INC.

77

```
1            THE WITNESS:  I know when Matthew Parker's
2   site plan came back to me, ma'am.  I do remember
3   seeing that.  Ma'am, I'm sorry.  There's a -- let
4   me see here.
5            Ma'am, I apologize.  I remember seeing a site
6   plan from Matthew Parker that had the driveway
7   being indicated that Nature Bridges would be doing,
8   and I would be doing the paving of the driveway.  I
9   can't find it right now, ma'am.
10           MR. HARPER:  I'm not going to look for one
11  e-mail out of thousands of documents.  I'm sorry.
12  BY MS. LUKEN:
13       Q    Okay, okay.  Let's get back into here.
14           All right.  You agree with me that the
15  documents that were prepared by Mr. Parker were
16  furnished to you after you entered into the contract
17  with Nature Bridges; correct?
18       A    Yes, as best I can recollect his -- the
19  drawings came after -- after the contract, ma'am.  As
20  best I can recollect, yes.
21       Q    Okay.  I'm showing you what I'm marking as
22  Exhibit E to your deposition.
23           (Exhibit E was marked for identification.)
24  BY MS. LUKEN:
25       Q    Here's a copy for you, Counsel.  And this is
```

ACCURATE STENOTYPE REPORTERS, INC.

79

```
1        Q    Okay.  You see here where it says, "The work."
2        A    Yes.
3        Q    You agree that this is the portion of the
4   contract where we identify the work that's going to be
5   done; correct?
6        A    Ma'am, I do see the contract documents, yes.
7        Q    Okay.  So you affirmatively agree that this is
8   the section of the contract where it tells us the work
9   that's going to be performed; is that correct?
10       A    Yes, ma'am.  It lists three individual items
11  under the contract documents, yes.
12       Q    No.  I'm looking at the section that's called
13  "the work."
14       A    Oh, I apologize, ma'am.
15       Q    Right.  So you agree with me that's the
16  portion of the contract that's talking about the work
17  that's --
18       A    (Reading to himself.)  Yes, ma'am.  I see the
19  work.  I've read that portion.
20       Q    Okay.  And you agree with me that this is the
21  portion of the contract where you -- the parties are
22  agreeing that this is the work that's going to be
23  performed; correct?
24       A    Yes, ma'am.
25       Q    Okay.  Very good.
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 80**

```
 1          And this paragraph here references an
 2   Exhibit A.  Do you see that?
 3      A   Yes, ma'am.  I see Exhibit A.
 4      Q   All right.  And then let's flip to Exhibit A.
 5   And do you agree that Exhibit A also describes the scope
 6   of work?  Do you see that there?
 7      A   Yes, ma'am.  I see the scope of work.
 8      Q   Okay.  And that includes a free span bridge
 9   12 foot x 20 foot, linear feet, steel bridge with
10   concrete deck; correct?
11      A   Correct.
12      Q   Okay.  And the items that were included in
13   that are listed below.  Do you see that there?
14      A   Yes.
15      Q   Okay.  And do you agree that those are the
16   items that are included?
17      A   Yes, ma'am.  I do agree that is what is
18   included on Exhibit A.
19      Q   Okay.  And, in fact, Nature Bridges did
20   construct a free span bridge 12 feet x 20 feet with a
21   steel bridge with concrete deck on your property -- or
22   on your father's property; correct?
23      A   Yes, ma'am.
24      Q   Okay.  Now, you mentioned earlier that you had
25   some sort of belief that there was a driveway included
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 82**

```
 1      A   It says, "Modifications issued subsequent to
 2   the execution of the contract, whether before or after."
 3      Q   Okay.  Where is there a contract modification?
 4   Do you have a document that is signed by both parties
 5   that is a modification to this contract?
 6      A   Ma'am, I'm referring to Matthew Parker's site
 7   plan.  I don't recall, to the best of my ability, that
 8   it was something that we signed upon.  It was something
 9   that was there, and I also would like to mention that we
10   had a conference call regarding the fill in the driveway
11   with Brian, myself, and Santiago.  And they had accepted
12   the work at that time, and that was shortly after this
13   bridge was built.
14      Q   Okay.  Tell me -- all right.  Let's back up
15   for a minute.
16          Do you have any writing at all modifying this
17   document that you signed, Exhibit E, that is signed by
18   both of the parties to the agreement?
19      A   That is signed by both of the parties?
20      Q   Yes, sir.
21      A   To this very document?  Ma'am, I don't recall,
22   to the best of my ability, anything that was signed by
23   both parties -- I don't recall signing anything else
24   beyond this particular document with Nature Bridges.
25      Q   Okay.  And in -- so this, Exhibit E, is the
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 81**

```
 1   in this?
 2      A   Yes, ma'am.
 3      Q   Where within this contract is there any
 4   reference to a driveway?
 5      A   Okay.  Ma'am, so -- ma'am, I would say as to
 6   my understanding of the Contract No. 2, "Modifications
 7   issued subsequent to the execution of the contract,
 8   whether before or after the execution of the contract
 9   agreement.  Modifications to the contract issued after
10   execution of the contract agreement."
11          And ma'am, Paragraph 1, I would identify those
12   two portions.
13      Q   Okay.  One of the documents that we asked for
14   you to bring with you here today was a copy of all
15   documents that you contend comprise the contract between
16   yourself and Nature Bridges.  I have -- I would put in
17   that stack Exhibit E, the document you're looking at.
18      A   Okay.  I'm sorry.
19      Q   Would you agree with me that this is the
20   contract between you and Nature Bridges; correct?
21      A   No, ma'am.  If there is other documents you're
22   looking for, I would incorporate the site plan; I would
23   incorporate Matthew Parker's plan as well.
24      Q   Okay.  Where is that stated here in this
25   contract?
```

ACCURATE STENOTYPE REPORTERS, INC.

**Page 83**

```
 1   only signed agreement between the parties; correct?
 2      A   Ma'am, yes.  That is correct.  Signed -- the
 3   Exhibit E is the only signed agreement by both parties.
 4      Q   Okay.  So there is no modification to this
 5   writing that both parties have signed off on; correct?
 6          MR. HARPER:  I don't know if that was supposed
 7      to go in there or not.
 8          THE WITNESS:  Yes, ma'am.  I don't think
 9      anything was -- we've always spoken about a lot of
10      things, but we've never officially signed on -- on
11      anything, to the best of my ability.
12   BY MS. LUKEN:
13      Q   Did you ever prepare any written modification
14   to this contract?
15      A   Yes, ma'am.
16      Q   And where -- where is that?  Oh, I recall.  I
17   think I know what you're talking about.  You --
18      A   Okay.
19      Q   -- you -- you had -- Nature Bridges sent you a
20   proposed estimate --
21      A   Yes, ma'am.
22      Q   -- or, I believe, some fill material?
23      A   Yes, ma'am.
24      Q   And then you wrote back an e-mail explaining
25   that you wanted a whole bunch of other things; right?
```

ACCURATE STENOTYPE REPORTERS, INC.

84

```
1    You wanted to modify what they had provided to you?
2                    (Simultaneous cross-talk.)
3         A    Yes, ma'am.  There were a couple -- couple
4    things that I mentioned in there.
5         Q    Okay.  So just so we're clear, you did not
6    accept that proposal from Nature Bridges; right?  You
7    instead said, Okay, I received your proposal.  I want to
8    propose making some changes to it.
9         A    Not entirely the case, ma'am.  So I did accept
10   the price for the proposal.  There were some other
11   issues that were going on.  For instance, they had told
12   me they had procured fill already on the property, and
13   so that's when I had -- that's when I asked them if the
14   fill's already been accounted for, if you can just tweak
15   it a little bit more and adjust the other components.
16        Q    You never entered into a contractual agreement
17   with Nature Bridges for that additional scope of work;
18   correct?
19        A    When you say -- are you asking specifically if
20   it was signed --
21        Q    Yes, sir.
22        A    -- or whether it was agreed upon?
23        Q    Yes, sir.  You need to have a signed
24   agreement, yes.  I'm asking you --
25        A    If that's the question, ma'am -- if that is
```

                    ACCURATE STENOTYPE REPORTERS, INC.

85

```
1    the question, whether there is something signed, the
2    answer is no.
3         Q    Okay.
4         A    May I ask you a question?
5         Q    No.
6         A    Okay.
7              MS. LUKEN:  Ma'am, what time is it?
8              THE COURT REPORTER:  About 1:15.
9    BY MS. LUKEN:
10        Q    All right.  I apologize.  I wasn't trying to
11   be abrupt with you, but I'm trying to maintain my train
12   of thought.  I'm assuming at some point you would like
13   to take a break for lunch.  Is that what your question
14   was going to be?
15        A    No, ma'am.
16        Q    Oh, okay.  I'm fine with doing that.  I'd like
17   to plow through this subject, though, so maybe, like, 15
18   minutes or so, and we will take --
19        A    Oh, ma'am, that's not my question.  That's not
20   my question at all.  I'm okay.
21        Q    Okay.  Maybe in about 15 minutes we'll take a
22   break, and if people want to go -- sorry, Ms. Court
23   Reporter.
24             THE COURT REPORTER:  Hanging in there.
25             MS. LUKEN:  Lost track of time here.  So let
```

                    ACCURATE STENOTYPE REPORTERS, INC.

86

```
1    me get through what I've got here, and we'll take a
2    break in about 15 minutes, and you guys can go grab
3    a sandwich or something if you so desire.
4              All right.  Let me just get these in here.
5    All right.  I'm going to show you Exhibit F.  This
6    is Exhibit F.
7              (Exhibit F was marked for identification.)
8    BY MS. LUKEN:
9         Q    Do you recognize Exhibit F as the proposal
10   that you were just mentioning?
11        A    Oh, yes, ma'am.  This is the proposal for
12   filling in compaction.
13        Q    Okay.  And is this -- is this the proposal
14   that you were just discussing?
15        A    Proposal -- this -- the proposal -- we were
16   referring specifically the driveway; am I correct,
17   ma'am?
18             There was an e-mail sent as well to basically
19   just explore further about this proposal.
20        Q    Yes, yes.  I'm going to get to that in a
21   minute.
22        A    I apologize.
23        Q    I'm just doing this first.
24        A    Sorry, ma'am.
25        Q    So is this the proposal that you asked Nature
```

                    ACCURATE STENOTYPE REPORTERS, INC.

87

```
1    Bridges to provide to you?  Is that what this is?
2         A    Yes, ma'am.  That is what it is.
3         Q    Okay.  And what's the date on this proposal?
4         A    October 13, 2014.
5         Q    Okay.  So at this point, the bridge is
6    completed; correct?
7         A    Yes, ma'am.  I believe by then the bridge is
8    completed.
9         Q    Okay.  Very good.
10             Now, you -- and I just want to tie this back,
11   because I had asked you about the contract --
12        A    Yes.
13        Q    -- that we had.
14        A    Yes.
15        Q    And my question to you was:  Where within this
16   contract does it state or imply or anything about a
17   driveway?
18        A    Okay.  Ma'am --
19        Q    And then you mentioned to me this
20   modification, and I said, Well, was there ever an
21   actual --
22        A    Uh --
23        Q    -- modification that everybody signed -- let
24   me finish the question.
25        A    Sorry.
```

                    ACCURATE STENOTYPE REPORTERS, INC.

88

```
1      Q    Is there a modification that anybody signed?
2           And you referred to a proposal, and so I'm
3   going to that proposal.  Is this the proposal that you
4   believe modifies your contract in some way?
5      A    No, ma'am.  I'm sorry.  I was referring to
6   Matthew Parker's site plan, which --
7      Q    And I'm not sure that that's exact
8   terminology, but go ahead.  Are you talking about the
9   drawings that were prepared by Mr. Parker's company?
10     A    Yes, ma'am.
11     Q    Okay.  And you think that that is a
12  modification to the contract in some way?
13     A    Yes, ma'am.
14     Q    Okay.  And why do you think that?
15     A    Ma'am, it -- I don't have it in front of me,
16  but I believe it confirmed my understanding that the --
17  what I've conveyed to Santiago, I thought would be all
18  along, that Nature Bridges would do the fill.
19          My understanding was they would do the entire
20  driveway, and I would be doing the asphalt, I believe,
21  ma'am.  I just need to confirm that from his -- from his
22  rendering, but I believe that's what I noted from there.
23     Q    Okay.  Well, if that's the case, when did you
24  receive Mr. Parker's drawings?  They were provided to
25  you as a courtesy, I believe, prior to construction of
```

ACCURATE STENOTYPE REPORTERS, INC.

90

```
1   complete, shortly thereafter.
2      Q    Uh-huh?
3      A    And then he told me that he would speak to the
4   project manager, and I think that was the first time I
5   had actually spoken to the project manager.  And that is
6   when we spoke about the driveway and fill, and so
7   basically, they identified the issue that 55,000 would
8   not be enough to pay for it.
9           And that's when I told them that -- so we
10  identified that the -- that the money was the issue, why
11  it wasn't done.  That's what we had discussed.  And so I
12  had told them that, okay, maybe it's my misunderstanding
13  that it didn't show up on this price, and I would -- I
14  would -- if you guys honestly forgot, then I'll just --
15  I'll pay for the -- for the extra service.
16     Q    Okay.  So you realized you were wrong and that
17  the driveway and fill material was not included in your
18  contract?
19     A    No, ma'am.  I didn't realize I was wrong.  I
20  was trying to be peaceful.  I was saying, if you guys
21  honestly forgot, it's no --
22     Q    Did anybody ever indicate to you that they
23  forgot, or is that just the term that you're using?
24     A    That's a term -- I can't say for sure if
25  that's the terminology used, but there was some
```

ACCURATE STENOTYPE REPORTERS, INC.

89

```
1   the bridge?
2           MR. HARPER:  Objection to --
3           THE WITNESS:  It was after the contract, but
4      yes, ma'am, it was prior.
5   BY MS. LUKEN:
6      Q    Prior to the bridge being constructed;
7   correct?
8      A    I would check the date for sure, but I -- if
9   you're asking me from my memory, yes, I would say -- I
10  would say so.
11     Q    Yeah.  You've got to have the plans before you
12  can build it; right?
13     A    Yes, ma'am.  I just don't want to lie under
14  oath.
15     Q    Just query me this:  If your belief at the
16  time you entered into this contract and at the time you
17  got those plans from Matthew Parker was that fill
18  material and driveway was all included, why did you ask
19  Nature Bridges to provide you a proposal for an
20  additional $27,000 to do a portion of that work?
21     A    I understand the question, ma'am.
22     Q    Uh-huh.
23     A    So there was a -- I had called Santiago.
24     Q    When?
25     A    Sometime roughly after the bridge was
```

ACCURATE STENOTYPE REPORTERS, INC.

91

```
1   confusion as to who's going to do what.
2      Q    Well, whose part was the confusion on?  Was it
3   on your part?
4      A    I honestly would like to say it was all
5   around, poorly coordinated.
6      Q    Okay.  But you told me that when you first
7   spoke to Mr. Garcia, and you don't remember the details
8   of it -- that you were asking about a bridge.  And now
9   all of a sudden you're thinking that that includes a
10  driveway and fill material and all sorts of other stuff.
11     A    Yes, ma'am.
12     Q    So, I asked you if there is any writing that
13  tells you that.  You're telling me that you think the
14  plans that were -- or the documents that were developed
15  by Mr. Parker somehow indicate that, and we'll get to
16  that in a minute.  And I mean, it sounds like Nature
17  Bridges understood what they had contracted with you to
18  do and that you were the one that were confused.
19          MR. HARPER:  Objection.  Is there a question?
20  BY MS. LUKEN:
21     Q    Were you confused, sir?
22     A    No, ma'am.  I was pretty clear.
23     Q    When were you clear about what you wanted?
24     A    I was clear all along, and I believe the site
25  plan confirmed with clarity that my conversations with
```

ACCURATE STENOTYPE REPORTERS, INC.

## 92

```
 1   Nature Bridges is confirmed.
 2        Q    Okay.  Well, you told me just a few minutes
 3   ago that you felt that Matthew Parker's drawings were
 4   somehow a modification to this contract?
 5        A    Ma'am, let me rephrase.  So the site plans
 6   confirmed what I had thought all along, what I've
 7   conveyed all long.
 8        Q    Well, when did you share this information with
 9   Nature Bridges that you wanted a driveway and fill
10   material?
11        A    Ma'am, I've been speaking to Santiago --
12        Q    When did you tell him this?
13        A    Ma'am, I can't identify a particular time
14   frame.
15        Q    Okay.  So you don't have any recollection of
16   when you said it.  Your only recollection is that you
17   did; is that correct?
18        A    That is correct, ma'am, yes.
19        Q    Okay.  And so what did you specifically say?
20        A    I said the -- basically identified the goal
21   was to drive up to the property.
22        Q    Okay.  So you never -- you never said. I want
23   you to price for me a driveway?
24        A    Ma'am, I spoke to him.  I told him my goal.  I
25   had -- I mean, I thought I was pretty clear on my end,
```

ACCURATE STENOTYPE REPORTERS, INC.

## 93

```
 1   to be honest.  I know we've had some pretty -- very,
 2   very --
 3        Q    Okay.  Well, when you received this proposal
 4   from Natures Bridges, Exhibit A to your contract that's
 5   attached to the document you signed, you don't see a
 6   driveway on here at all; right?
 7        A    Yes, ma'am.
 8        Q    So why didn't you say something before you
 9   signed your contract?
10        A    Ma'am, there's a certain level of trust.  I
11   understand that -- I know it's laughable, ma'am.  I do
12   understand that.  But I took these guys into very high
13   regards when I was speaking to them, initiating with
14   them.
15        Q    Well, and that was well taken that you did
16   because they're honorable people, sir.
17             MR. HARPER:  Objection.  Is there --
18   BY MS. LUKEN:
19        Q    They wrote you a proposal that says, We're
20   going to give you a bridge.
21             And did you read this proposal before you
22   signed the contract?
23        A    Yes, ma'am.
24        Q    Okay.  And there's nothing on here that says
25   there's a driveway involved or any fill material;
```

ACCURATE STENOTYPE REPORTERS, INC.

## 94

```
 1   correct?
 2        A    Ma'am, I'm not saying it's on here, ma'am.
 3   I'm just saying we discussed it.
 4        Q    Oh, okay.  Let's look at the very first page
 5   of your contractual agreement, if we can please.  Do you
 6   see on Page 1 under Paragraph 1 that, "The contract
 7   represents the entire and integrated agreement between
 8   the parties hereto and supersedes prior negotiations,
 9   representations, or agreements, either written or oral"?
10             Do you see that there?
11        A    Ma'am, I do see that there.
12        Q    Okay.  Did you -- you did read this contract
13   before you signed it, didn't you?
14        A    Ma'am, I read it to the best of my ability,
15   ma'am.
16        Q    Okay.  And so you understood, then, that this
17   is our agreement now.  Everything that we said before is
18   now -- it's all in here.  This is what we're going to go
19   by as the rules of the road for this project.
20             Did you understand that?
21        A    Again, ma'am, there's two things.  One, I put
22   a level of trust in any kind of contract when you're
23   dealing with someone.  You hold them to a high degree,
24   that they know exactly what needs to be done, what they
25   need to do, how to do things in their -- in their
```

ACCURATE STENOTYPE REPORTERS, INC.

## 95

```
 1   professional manner.  But in here, I was stating the --
 2   the particular document was the -- was the Matthew
 3   Parker's drawing that came after the contract was
 4   signed.  That was the -- that was the -- I believe that
 5   was the document I was referring to, which confirms
 6   everything that I had been saying to them or trying to
 7   say to them all along.  So, that's my answer, ma'am.
 8        Q    Okay.  How much experience do you have in
 9   reading plans?
10        A    Reading --
11        Q    Whether it's a site development plan that's
12   developed by your engineers up in New Jersey or
13   structural design for a bridge.  How much experience do
14   you have in reading and understanding those plans?
15        A    Ma'am, I don't know how to measure.
16        Q    Any experience at all?
17        A    When you say "experience," is it --
18        Q    Have you ever read a site development plan
19   before this particular one that we have attached to one
20   of our exhibits?
21        A    Ma'am, I've looked at them.  I don't know what
22   you're asking me.  What I've --
23        Q    Do you know how to read them or what they
24   mean?
25        A    Again, ma'am, if you show me the site plan and
```

ACCURATE STENOTYPE REPORTERS, INC.

96

```
 1    ask me questions, I can tell you whether I know it or
 2    not.  I don't know --
 3        Q    Again, I'm asking you in the abstract; okay?
 4    Prior to your dealings with Nature Bridges, have you
 5    ever had occasion to look at a set of structural plans
 6    for a bridge?
 7        A    This is the only bridge project I've ever
 8    dealt with, ma'am.
 9        Q    Okay.  So Matthew Parker's structural plans
10    for this bridge, those are the first ones you ever laid
11    eyes on; is that fair?
12        A    Yes, ma'am.  I would say that's -- that would
13    be the first structural bridge drawing that I can
14    recollect at this time, ma'am, yes.
15        Q    The site development plan that we're now not
16    sure when you saw for the first time, but that was
17    developed by Lan many, many years ago, back in 2008.
18        A    Yes, ma'am.
19        Q    That's the first site development plan you
20    ever reviewed; correct?
21        A    When you say -- again, I apologize.  When you
22    say "reviewed," like what are --
23        Q    Is that the first one you've ever seen in your
24    life?  Site development plan?
25        A    Have I seen in my life?
```

ACCURATE STENOTYPE REPORTERS, INC.

97

```
 1        Q    Sure.
 2        A    Like -- including, like, books when I'm going
 3    through --
 4        Q    Okay.  Let's go back.  Let's go back to our
 5    exhibit here.  Going to Exhibit D.  Okay.  This is a
 6    site development plan; right?
 7             Can we agree that that's what that is?
 8    Exhibit D, the last page?
 9        A    Yes, ma'am.
10        Q    Okay.  And we know it's a site development
11    plan, because it says it in the lower -- right lower --
12    excuse me -- on the right-hand side of the document;
13    right?
14        A    Yes, ma'am.
15        Q    Okay.  When prior to, whenever it is that you
16    saw this for the first time, had you seen any other site
17    development plans before?
18        A    Ever, ma'am?
19        Q    Yes.
20        A    Ma'am, are you -- you're only asking if I've
21    seen them?
22        Q    Uh-huh?
23        A    Just to see?
24        Q    Sure.
25             MR. HARPER:  Can we take a break?
```

ACCURATE STENOTYPE REPORTERS, INC.

98

```
 1             MS. LUKEN:  We are.  We're going to finish
 2    this line of questioning, and then we're going to
 3    take a break; okay?
 4             MR. HARPER:  I think I might be able to help,
 5    hopefully.
 6             MS. LUKEN:  I don't think he needs your help.
 7    I'm just trying to get the answers to my questions.
 8             THE WITNESS:  Ma'am, I just don't understand
 9    what the questions really are.  Like, are you
10    asking me if I've seen site plans before?
11    BY MS. LUKEN:
12        Q    Okay.  When were talking about -- when we were
13    talking about the last page of Exhibit D, I asked you,
14    for example, what the last -- no, no, no.  Keep it
15    there.  Keep it there.
16             I asked you what the last paragraph of the
17    plan notes meant; right?
18        A    The proposed question, ma'am; right?
19        Q    Yes, sir.  Right.
20             And I asked you -- I asked what that meant.
21    And your response to me was, "I don't know.  You'd have
22    to be an engineer or a contractor to understand what
23    that means."
24             That was your testimony; right?
25        A    Oh, yes, ma'am.  I'm saying the engineer would
```

ACCURATE STENOTYPE REPORTERS, INC.

99

```
 1    interpret it how an engineer would; a contractor would
 2    interpret that how a contractor would.
 3        Q    Right.  And you had no opinion whatsoever as
 4    to how you would interpret it; right, because you're not
 5    a contractor and you're not an engineer?
 6        A    Yes, ma'am.  I would interpret it how I would
 7    interpret it.
 8        Q    Okay.  Well, I asked you what that was, and
 9    you told me you had no interpretation.  Is says right
10    here, "They are not construction plans and should not be
11    used for that purpose."
12             And I asked you what you understood that to
13    mean.  You did not have an answer.  Do have you some
14    answer to that?
15             MR. HARPER:  I, for the record, will object as
16    it being -- having been asked and answered.
17    BY MS. LUKEN:
18        Q    Do -- do you have any understanding how to
19    interpret this document, sir?
20        A    Ma'am, again, you're asking for just any
21    understanding.  I don't know.
22        Q    What's a driveway profile?
23        A    Okay.  So what is it this proposed driveway
24    profile?
25        Q    No.  What is a driveway profile?  Do you know
```

ACCURATE STENOTYPE REPORTERS, INC.

---

100

```
 1   what a driveway profile is?
 2        A    Driveway profile.  I'm not sure what the
 3   profile ...
 4        Q    Okay.
 5             All right.  Let's take that break, and we'll
 6   come back.  How long do you need, Mr. Harper?
 7        MR. HARPER:  If I can have 45 minutes, that
 8   would be great.
 9        MS. LUKEN:  I'm sorry, what?  45?
10        MR. HARPER:  Yes, ma'am.
11        MS. LUKEN:  That's fine.  That's fine.
12        (Recess from 1:33 p.m. to 2:27 p.m.)
13        MS. LUKEN:  All right.  Let's go back on.
14   BY MS. LUKEN:
15        Q    All right.  Mr. Chaudhari, you're still under
16   oath.  And we're going to continue as much as we can
17   here today.  I can tell you that we are not going to
18   complete this deposition today.
19        A    Sure, ma'am.
20        Q    I believe we've got a fair amount of other
21   things to cover, and I think that probably my plan, at
22   least right now, is to adjourn at 5 o'clock.  And we're
23   just going to have to reschedule another time to
24   complete the deposition.
25        A    Okay.
```

                    ACCURATE STENOTYPE REPORTERS, INC.

---

101

```
 1        Q    Try to get through as much as we can --
 2        A    Sure, ma'am.
 3        Q    -- here today.
 4        A    Yes.
 5        Q    And I think when we left off, we were
 6   discussing some of the aspects of the site development
 7   plan.
 8        A    Yes, ma'am.
 9        Q    And if I can get that document back in front
10   of me here ... here we go.
11             I believe I was asking you about some of the
12   aspects of this site development plan, and I guess what
13   I was really getting at is something a little different.
14   So let's -- I'm going to try this from a different
15   direction --
16        A    Okay.
17        Q    -- so we can get to the same result.
18        A    Okay.
19        Q    You indicated to me at the beginning of this
20   deposition that you were a nuclear pharmacist.
21        A    Yes, ma'am.
22        Q    Correct?
23        A    Correct.
24        Q    Have you ever had any training, education, or
25   experience with respect to engineering?
```

                    ACCURATE STENOTYPE REPORTERS, INC.

---

102

```
 1        A    Ma'am, there is an overlap of science; so
 2   there are things that I do understand.  And I can
 3   specify with my understanding of what I do understand to
 4   help interpret what I get out of it.
 5             I apologize for before.  I didn't
 6   differentiate whether you were asking me technical
 7   questions that -- that I should be worried if I was
 8   interpreting it to be wrong if I state that.  But I can
 9   tell you what I get out of it, and I'll state it as my
10   understanding for it.
11             So, yes, ma'am.  I'm a nuclear pharmacist.  I
12   do have a background in science and there is an overlap
13   in science, math, and engineering.  So I could tell you
14   what I understand out of this site plan.
15        Q    Okay.  And we'll get to that in just a moment.
16        A    Yes, ma'am.
17        Q    Have you ever taken an engineering class, for
18   example?
19        A    I've taken math and science courses, ma'am.
20   So if you're talking specific engineering designated
21   classes, then I'm going to say no.
22        Q    Okay.  And where did you receive your
23   education?
24        A    Rutgers, ma'am.  Pharmacy school.
25        Q    Okay.  And was that for just the pharmacy
```

                    ACCURATE STENOTYPE REPORTERS, INC.

---

103

```
 1   school program?  Where did you go to undergraduate?
 2        A    Yes, ma'am.  It's a combined six-year program.
 3        Q    Okay.  So you went to Rutgers, and you did an
 4   undergraduate program in what?
 5        A    Pharmacy, ma'am.  Pharmacy.
 6        Q    And then the combined version of that, I
 7   guess, would be the equivalent of, like, your master's
 8   degree; is that correct?
 9        A    That is correct.  It's a direct RMD program.
10        Q    Okay.  When you were at Rutgers, did -- have
11   you obtained post high school education anywhere other
12   than Rutgers?
13        A    Post high school?  I did calculus III in -- my
14   senior year in high school through CCM.
15        Q    Okay.  Post high school.  I meant after high
16   school.
17        A    I apologize.  Community college.
18        Q    Okay.  That's fine.  That's fine.  So -- but
19   the answer to my question, with respect to any post high
20   school education would have been had at Rutgers?
21        A    I understand that, yes.  It went directly from
22   high school to Rutgers pharmacy course.
23        Q    And a very fine campus, Rutgers.  It's a good,
24   good school.
25        A    Thank you.
```

                    ACCURATE STENOTYPE REPORTERS, INC.

104

```
 1      Q    And when you were at Rutgers, did you take any
 2  engineering classes?
 3      A    No, ma'am.  Nothing that specified engineering
 4  directly.
 5      Q    Okay.  Did you take any classes in
 6  construction?
 7      A    No, ma'am.
 8      Q    Did you take any classes in construction
 9  management?
10      A    No, ma'am.
11      Q    Have you ever had occasion in any capacity to
12  be involved in a construction project?
13      A    In any capacity construction project?  Again,
14  ma'am, I'm sorry.  It's again, one of those questions I
15  tend to overthink.  Nothing of the skill, if that's --
16  if that's the version of it.  If you're asking for any
17  capacity, little details around the house, are we
18  calling that construction projects or not?
19      Q    Sure.  We can call that --
20      A    Okay.  Sure, ma'am.  Then, yes.  I've been
21  involved with construction around the home --
22      Q    Okay.  And what type of construction around
23  your own home have you done?
24      A    Have I hired someone to do or have I done?
25      Q    Let's focus on what you have hired somebody to
```

ACCURATE STENOTYPE REPORTERS, INC.

105

```
 1  do.
 2      A    All kinds of things, ma'am, bathrooms,
 3  kitchens, bedrooms.
 4      Q    Did any of those involve the preparation of
 5  plans?
 6      A    Involve preparation of plans?  Yes, ma'am.
 7      Q    And were those plans prepared by an engineer
 8  or an architect?
 9      A    Yes, ma'am.  For instance, I'm thinking right
10  now is like the kitchen cabinets.  Like, if someone from
11  Lowe's were to do that, I don't know if he's an
12  engineer, architect, but he's qualified to do it.
13      Q    Okay.  So this would just be like cabinet
14  replacement?
15      A    That's one example of it, ma'am.
16      Q    Okay.  And you mentioned bathrooms.  What
17  would have -- is this a remodel of a bathroom or --
18      A    Yes, ma'am.  Just a remodel.
19      Q    Okay.  And who did you hire to do that?
20      A    My friend.
21      Q    Okay.  Was he a contractor?
22      A    Yes, ma'am.
23      Q    Okay.  And did he develop any plans, or did he
24  hire someone to develop any plans?
25      A    No, ma'am.
```

ACCURATE STENOTYPE REPORTERS, INC.

106

```
 1      Q    There were no plans that were required for
 2  that?
 3      A    That's correct, ma'am, just simple.
 4      Q    And so with respect to the kitchen project,
 5  the cabinetry issue is that you did get that from
 6  Lowe's; is that correct?
 7      A    Yes, ma'am.
 8      Q    Okay.  And so Lowe's basically sent a man over
 9  and they looked at what you said and they explained to
10  you what they were going to do?
11      A    To that's correct, ma'am.  He came over; we
12  spoke in person, and we developed what we needed to do.
13      Q    Okay.  So there were no, let's just say for
14  the moment, signed and sealed drawings that were
15  prepared relative to your kitchen cabinet project?
16      A    Signed and sealed drawings?  No, ma'am.  It
17  wasn't signed and sealed.  It was just a normal kitchen
18  project renovation.  I don't think they were quite
19  signed and sealed.
20      Q    Right.  So it was basically then just a
21  drawing showing what the cabinets were going to look
22  like?
23      A    With the dimensions, ma'am, yes.
24      Q    Okay, okay.
25           And then, just for reference, you have a site
```

ACCURATE STENOTYPE REPORTERS, INC.

107

```
 1  development plan in front of you; correct?
 2      A    That's correct, ma'am, yes.
 3      Q    Is this is part of our Exhibit D?
 4      A    Correct, ma'am.
 5      Q    And the last page of Exhibit D.  Do you see in
 6  the upper right-hand corner there is a signature by a
 7  Richard A. Westbrook?
 8      A    Yes.
 9      Q    Do you see that there?
10      A    I see them, ma'am.
11      Q    And so that's the professional engineer that
12  prepared this drawing; correct?
13      A    Understood, ma'am.  Yes.
14      Q    Okay.  And do you understand that this is
15  what's meant by a signed and a sealed drawing?
16      A    I understand that, ma'am, yes.
17      Q    Okay.  And so my question is:  For either of
18  these projects that we were discussing, your bathroom
19  project or your kitchen project, did you have any signed
20  and sealed drawings?
21      A    No, ma'am.
22      Q    Okay.  Other than the bathroom and the kitchen
23  project, any other projects where you might have had
24  signed and sealed drawings that were involved?
25      A    No, ma'am.  Everything I've done that I can
```

ACCURATE STENOTYPE REPORTERS, INC.

108

1   recall would be just these sorts of tasks.
2   Q    Okay.  Very good.
3        All right.  You were mentioning to me your
4   belief with respect to some drawings that you had
5   received -- and let me get those out here.  Well, maybe
6   let's -- since I've numbered this this way, we'll tie
7   this one up first.  The proposal that you received from
8   Nature Bridges after the bridge was constructed.
9   A    Yes, ma'am.
10  Q    This is Exhibit F; right?
11  A    Yes, ma'am, it's Exhibit F.
12  Q    Okay.  Very good.
13       With respect to this -- and I want to make
14  sure we're clear here.  You did not accept this proposal
15  as written; is that correct?
16  A    Did I accept the proposal as written?  No,
17  ma'am.  There's a lot more work detail.  I did not
18  accept that proposal as written.
19  Q    Okay.  Very good.
20       Let me show you Exhibit G to your deposition.
21  And I'm sorry, what are the numberings on the lower hand
22  corner of that?
23  A    Lower left-hand corner, ma'am?
24  A    Yes.
25  A    The right-hand corner?

109

1   Q    Or, I'm sorry.  The right-hand corner.
2   A    134 and 135.
3   Q    Very good.  I just want to get to where you
4   are.
5        All right.  So is -- this is an e-mail from
6   you amending or proposing amendments to the proposal; is
7   that correct?
8   A    Yes, ma'am, and there is also conversation
9   that I recall about this project as well.
10  Q    Okay.  I'm just asking about this e-mail.
11  A    Sorry, ma'am.  Yes.
12  Q    That's fine.  That's fine.
13       You -- you are -- and I don't want to put
14  words in your mouth, but I believe these are the words
15  that you used.  You are sending to Nature Bridges a
16  request to amend their proposal that is Exhibit F; is
17  that correct?
18  A    That is correct, ma'am, yes.
19  Q    All right.  Very good.
20       And then within this e-mail, you are
21  essentially proposing some additional items of work; is
22  that correct?
23  A    Yes, ma'am.
24  Q    Okay.  And Nature Bridges did not ever accept
25  your amendments; correct?

110

1   A    No, ma'am.  They've never signed the
2   amendments, but, yes, they accepted the work.
3   Q    I'm sorry.  You're going to have to explain
4   that to me a little bit more.
5   A    So we had a conference call immediately after
6   discussing the project.  We had many more conference
7   calls that became more and more involved, and they
8   became more and more involved because the location
9   changed.  The entire traffic profile changed.  And this
10  is where the issues have been from 2014 to date, how did
11  the location get changed.
12  Q    Uh-huh.  So the location got changed?
13  A    Yes, ma'am.
14  Q    Very good.  Let's direct our attention to this
15  e-mail right here.
16  A    Understood.
17  Q    Where you're making a proposed amendment to
18  the proposal that is Exhibit F?
19  A    Yes, ma'am.
20  Q    Okay?
21  A    Uh-huh.
22  Q    Did you have a phone conversation about your
23  proposed amendment to that proposal?
24  A    Ma'am, I have had many conversations about
25  many times.  So one of the conversations is going back

111

1   to Santiago saying, are you still interested in doing
2   the backfill because I've already acknowledged to do the
3   backfill and the work?
4   Q    Sir, my question is very specific.  Please
5   listen to exactly what I'm asking you.
6        Did you have a phone conversation with Nature
7   Bridges about your e-mail dated October 15th, 2014?
8   A    Ma'am, again, with these dates, I can't
9   differentiate what conversations I have had when.  For
10  the purposes of this, ma'am, I'm trying to give you as
11  much information as possible to assist, but if you're
12  asking me specific dates, ma'am, I just can't commit to
13  it.  I can't tell you exactly what we spoke then
14  October 15, 2014.
15  Q    Okay.  So you do not, as we sit here, have any
16  recollection of a conversation that you had with Nature
17  Bridges about your e-mail dated October 15th, 2014,
18  wherein you proposed multiple amendments to Exhibit F?
19  A    As I'm sitting here, I remember multiple
20  conversations I've had with multiple individuals at
21  Nature Bridges.  I can't differentiate the time frame,
22  but this has been an ongoing issue until the point I was
23  sued.
24  Q    Okay.  Again, I just want an answer to my
25  question.

112

1      A    Ma'am, your question is very specific.  I'm
2   trying to give you as much information.  I don't know
3   the specific time frames, ma'am.  I don't know how it is
4   possible to differentiate.
5      Q    It is really a yes or no question.  My
6   question is this:  As we here right now today, in this
7   room, in the deposition of you in this case, do you have
8   a recollection of a phone conversation that you may have
9   had with Nature Bridges with respect to your e-mail
10  dated October 15th, 2014, wherein you list out various
11  additional amendments that you would like to make to
12  this proposal?
13     A    Ma'am, the issues is complicated.  It cannot
14  be identified with a yes or no answer.  I will tell you
15  that this has been ongoing issue for quite some time.
16  There are many, many conversations and many, many
17  e-mails we've had to address this problem.
18     Q    Sir --
19     A    And I can't -- if you're --
20     Q    It's a yes or no question.
21     A    Ma'am, I cannot commit to a yes or no answer.
22     Q    Ms. Court reporter, will you please read back
23  my question?  We're going to try this one more time.
24     A    I understand, ma'am.
25     Q    And I do not want to have to go and take

ACCURATE STENOTYPE REPORTERS, INC.

113

1   further action on this, but I want to you listen to the
2   question as she reads it.  And I believe this is a yes
3   or no question.
4      A    Okay, ma'am.  Let me -- let me -- let me hear
5   it, please.
6      Q    Listen very carefully.
7          (Record read.)
8          THE WITNESS:  Ma'am, to the best of my
9      ability, I will say, yes, I did.  I had called to
10     follow up on this proposal.
11  BY MS. LUKEN:
12     Q    Okay.  And what was the substance of that
13  conversation?
14     A    Of this particular conversation?
15     Q    This -- this particular one that we're asking
16  about.
17     A    The particular subject matter was the entire
18  driveway profile and top scope of work being changed.
19  We would need driveway plans to proceed forward.  I was
20  waiting on those plans from Matthew Parker, who would be
21  responsible for designing the plans, and I was waiting
22  to see -- I was waiting to get the exact amount of the
23  fill that was also at issue.  We didn't identify how
24  much fill I exactly needed for this completion.  So --
25  and a date.  When are they actually going to come back

ACCURATE STENOTYPE REPORTERS, INC.

114

1   to do what they committed to do?
2      Q    And none of that is addressed in your e-mail?
3      A    None of this is addressed in this particular
4   e-mail, ma'am, yes.
5      Q    Okay.  So my question was:  With respect to
6   the items that are identified in e-mail, did you
7   have any conversations with Nature Bridges, and if so,
8   with whom and what was the substance of them?
9      A    Ma'am, so the main substance was speaking with
10  Santiago and Brian is when they would be coming back to
11  finish it up.
12     Q    Okay.  And they did not agree to it; correct?
13     A    They did not give me a date.  They agreed to
14  the scope of the work.
15     Q    I didn't catch the last part of what you said.
16     A    They did not give me a date, but they agreed
17  to come back and do the fill.  Furthermore, I would like
18  to add a statement.  Brian Green told me he would shake
19  my hand in person when he comes back to complete the
20  project.
21     Q    Okay.  And when was that phone conversation?
22     A    Ma'am, again, I cannot commit to a time frame,
23  but I will tell you that has been an ongoing issue for
24  quite some time, until the point that I was sued.
25     Q    You've said that several times now, and I

ACCURATE STENOTYPE REPORTERS, INC.

115

1   understand what you're saying.  But if you would just
2   listen to my question and just answer the question, this
3   whole process will go a lot quicker.
4      A    Please repeat?
5          MS. LUKEN:  Can you repeat my question?
6          THE WITNESS:  Sorry, ma'am.
7          (Record read.)
8          THE WITNESS:  Ma'am, if you're asking me to
9      commit, I will say, yes, there is a phone
10     conversation.  I cannot remember the date, but if
11     it's a yes or no answer you want, I'm going to have
12     to say yes.
13  BY MS. LUKEN:
14     Q    Okay.  And what is your contention that was
15  said on this phone call by Mr. Green?
16     A    Again, many phone calls.  So going back to the
17  conference call between Santiago, Brian, and I.
18     Q    No, no, no, no.  I just want this call.
19     A    Sorry.  Yes, ma'am.  And so he had said that
20  he would come back in person and shake my hand when this
21  project was complete, and by "completion" I mean the
22  entire driveway.
23     Q    Okay.  And did you make any contemporaneous
24  notes of this discussion anywhere?
25     A    No, ma'am.  I made no notes.  Many

ACCURATE STENOTYPE REPORTERS, INC.

116

```
1    conversations like these.
2        Q    Did you have any recording of this phone
3    conversation?
4        A    No, ma'am.  I have no recordings.
5        Q    Okay.  And you did not ever receive from
6    Nature Bridges any written agreement that they would
7    perform any of the work identified here in Exhibit F?
8        A    Ma'am, I have not received from Nature Bridges
9    anything that I've had asked, which included why my
10   location was changed.  They have not agreed, besides the
11   part on phone -- phone calls that they've accepted this
12   work.  And they have been very limited in terms of
13   including me on what happened with my project.
14       Q    There is no modification to your contract that
15   includes the scope of work that is identified in Exhibit
16   F or the additional issues that you are requesting in
17   Exhibit G; correct?
18            MR. HARPER:  Objection.  Calls for legal
19       conclusion.
20            THE WITNESS:  Ma'am, my entire project has
21       been modified; so I'm not sure how you want me to
22       handle that question.
23   BY MS. LUKEN:
24       Q    Okay.  I am asking you about a matter of
25   contract.  We went through -- we have a written
```

ACCURATE STENOTYPE REPORTERS, INC.

117

```
1    contract; right?  Exhibit E; correct?
2        A    Yes, ma'am.  We do have a contract.
3        Q    Right.  And my question is:  Is there any
4    written modification of that contract which includes
5    either the scope of work that is set forth in Exhibit F
6    or the additional items that you were requesting as an
7    amendment in Exhibit G?
8        A    Ma'am, I --
9        Q    That's a yes or no question also.
10       A    Could you please repeat that one more time?
11   I'm sorry.  Sorry.
12            MS. LUKEN:  I'm sorry Ms. Court reporter.
13       Could you do that one again?
14            THE COURT REPORTER:  Sure.
15            (Record read.)
16            THE WITNESS:  And I have to answer yes or no?
17   BY MS. LUKEN:
18       Q    Yes.
19       A    I answer yes.
20       Q    Okay.  Where is that written document that
21   makes that modification?
22       A    The rendering I'm considering to be a written
23   document.
24       Q    Which rendering are you referring to, sir?
25       A    The rendering I'm referring to is Matthew
```

ACCURATE STENOTYPE REPORTERS, INC.

118

```
1    Parker's site plan which confirmed what I've been
2    telling Nature Bridges all along, that they were
3    responsible to do further work which never got
4    completed.
5        Q    Okay.  Why would you agree to pay an extra
6    $27,000 for work that you believe was already included?
7        A    Exactly, ma'am.  Why would they not come back
8    to finish it?
9        Q    Why did you want to agree to that, I guess is
10   my question.
11       A    Trusting.
12       Q    I don't understand what you're referring to.
13       A    I'm referring to trust, ma'am.
14       Q    Okay.  Sir, it's either included in your
15   contractor or it's not.
16       A    No, ma'am.  I'm afraid this project or this
17   case is not that simple.  Yes or no answers are limiting
18   my ability to defend myself in this deposition, and I'm
19   trying to convey to you as much information as possible
20   to -- I can tell you from my side what is happening, and
21   hoping that you can see some things from my point of
22   view as well.
23            I understand you are their attorney, ma'am,
24   but I come here to fully cooperate and provide you
25   information as best of my ability as I can to resolve
```

ACCURATE STENOTYPE REPORTERS, INC.

119

```
1    these matters which have been pending for three, four
2    years.  And please keep in mind, I was the one that was
3    sued.  And yes, I was the --
4        Q    Because you failed to pay.
5        A    And I was the one who gave them $27,000 when
6    they asked.
7        Q    I'm sorry.  You are claiming that you --
8        A    I'm sorry --
9        Q    -- gave them $27,000 as set forth in Exhibit
10   F?
11       A    My apologies, ma'am.  I did not -- I did not
12   identify that as a part of Exhibit F, but I will like
13   to, just to convey to you some of the things that were
14   ongoing.
15            First of all, I asked for permission from
16   April to withhold money.  I've always met their demands,
17   and she has not contacted me at any point for this
18   lawsuit.  It was inflicted upon me, and I have yet to
19   receive any information regarding why my location got
20   changed and what is the real reason the size has been
21   changed.
22       Q    Well, you asked for a 20 x 12 bridge.
23       A    That is not correct, ma'am.  I asked Santiago
24   about -- we spoke -- I spoke to Santiago, and he has
25   answered my questions.  And there is a big issue that
```

ACCURATE STENOTYPE REPORTERS, INC.

120

1   needs to be identified with the process.
2       Q    Sir, your prior testimony was fairly clear on
3   this topic.  Are you changing your testimony?
4       A    Ma'am, it depends on the type of questions
5   you're asking.  Some of these questions are a yes or no
6   matter, which I just don't think I can fully include.
7   I'm trying to identify that there is a lot of
8   communication gaps.  We needed to -- I requested a
9   specific site visit.  I requested a specific review of
10  my process, which never happened.  It left things
11  pending.  There's obvious communication gaps and there's
12  obvious matters that need to be addressed.
13      Q    Okay.  Sir, do you recall I showed you
14  Exhibit 1 from Mr. Garcia's deposition?  Do you recall
15  that?
16      A    Ma'am, I recall this.
17      Q    Okay.  And I asked you:  Why did you ask for a
18  20 x 12 foot bridge.  And you explained to me that
19  12 feet was based on horses or something like that.  And
20  then I asked you about the 20, and you said you did not
21  know.  So -- so -- I'm sensing from your responses that
22  you are now having second thoughts about that answer.
23      A    Yes, ma'am.
24      Q    Are you trying to change your testimony?
25      A    I am having second, third, and fourth thoughts

ACCURATE STENOTYPE REPORTERS, INC.

122

1   project when you have no experience managing a project
2   of this size and scope?
3       A    I did that, ma'am.  I hired Nature Bridges.
4   They are general contractors.  If you look at the
5   website, they identify themself as general contractors.
6   That's how I picked them up.  That's how they market
7   themselves.
8       Q    Well, they have a general contractor's
9   license, to be sure.
10      A    Ma'am, to be sure --
11      Q    Right?  You agree with that?
12      A    To be sure, ma'am.  I described this project
13  to the best of my ability.  I know we missed a very
14  critical step which is the site visit where we sit down
15  and go over these plans, discuss and confirm we are on
16  the same page.  And that did not happen.  I confirmed --
17      Q    Sir, you have a contract for a bridge; okay?
18  You do not have a contract for construction management.
19  You do not have a contract for a driveway.  You do not
20  have a contract for fill material.  You have a contract
21  for a bridge that you requested to be a specific size.
22           MR. HARPER:  Objection.
23  BY MS. LUKEN:
24      Q    So I am trying to determine why you believe
25  there is a whole bunch of other stuff included in it.

ACCURATE STENOTYPE REPORTERS, INC.

121

1   about a lot of answers, and they're being influenced
2   because of the deposition I heard yesterday where I can
3   say I was blatantly lied to, and I have no idea what the
4   truth is at any point.  I'm receiving responses that
5   only an engineer would be able to handle, and I have no
6   idea what to make out of any of these e-mails because
7   they just don't make sense anymore.  You're holding me
8   accountable for all this literature here, and I have no
9   idea who I'm actually speaking to and what they're
10  actually doing.  I have 70 pages of e-mails from Contech
11  Engineering and R & R Construction, ma'am, and I have
12  300 pages of this.
13      Q    Uh-huh.
14      A    Why is there a difference, is my -- what I
15  keep asking myself.  And that's when I realize what the
16  issue is, and that's what I've been explaining to
17  myself.  How this actually happened.  Why is something
18  so seamless, so technical, so routine, get botched up
19  like this when they're the experts who perform all this
20  set of standard operating procedures on all these dates?
21  How can this project get botched?
22      Q    Sir, when you were approaching this -- this
23  inquiry with Nature Bridges, and your decision that you
24  wanted to build the bridge first, why did you not hire a
25  general contractor to manage or, you know, conduct this

ACCURATE STENOTYPE REPORTERS, INC.

123

1   Because you're not able to point me to anything in the
2   contract that says that, and I'm trying to understand
3   what the basis for your belief is.
4       A    There's a lot of information in the contract,
5   ma'am.  I'll do my best of my ability to recite some of
6   the contract.  And I'll -- again, ma'am, I'm a nuclear
7   pharmacist.  I'm not an attorney, but I will do my best
8   to try.  So I apologize if I come off incoherent, but
9   let me at least attempt to answer that question as to
10  the best of my ability.
11      Q    Okay.
12      A    If I asked them to build a 20-foot by 12 -- 20
13  x 12 dimension bridge, who chose the location and why
14  was it changed?  If those were that instructions --
15      Q    Okay.  Now, hold on for one second here.
16  Nobody instructed you anything.  You sent an e-mail to
17  Nature Bridges saying, I want a 12 x 20 bridge; correct?
18      A    Ma'am, this is regarding -- this is a
19  discussion matter that I'm speaking with Santiago.  He's
20  fielding my questions.  I'm looking at him as a guide
21  from their website as to how standardized and how
22  complete of a company they are, all the projects they've
23  completed, everything they have achieved.  And I'm
24  looking for him to be the guide and look further on this
25  process.  He's answering questions that are very

ACCURATE STENOTYPE REPORTERS, INC.

124

```
 1   technical.  There's obviously a gap in the things that
 2   need cleared up, both from my end and from their end.
 3            I have the same set of conversations with
 4   another company from Contech Engineering with the stated
 5   size, ma'am, and those two conversations have gone in a
 6   completely different path.
 7        Q    Okay.  And again, I don't -- I don't know that
 8   that gets us any further to, I think, any of my
 9   questions answered.
10        A    Okay, ma'am.  So, please --
11        Q    Let's -- let's -- I tell you what.  I'm -- I
12   going to -- I'm going to address a couple of other
13   things.  I think the contracts speaks for itself, and I
14   think that you're bound by a written agreement that you
15   signed that sets forth various things that are going to
16   be done, and it also provides for exclusions as well.
17            Let me just ask --
18        MR. HARPER:  Objection to the --
19        MS. LUKEN:  I'm having a conversation first,
20   sir.
21        MR. HARPER:  Yes, ma'am.
22        MS. LUKEN:  Just the same way that you're
23   client is doing this entire deposition.
24        MR. HARPER:  Yes, ma'am, but he's not an
25   officer of the court.
```
ACCURATE STENOTYPE REPORTERS, INC.

125

```
 1   BY MS. LUKEN:
 2        Q    On Exhibit F -- let me just let you look at
 3   that again.  Actually, this is a different -- hold on.
 4   Hold on.  Let's go back to our original contract.
 5   You've got it in your hand.
 6        A    Yes, ma'am.
 7        Q    Wonderful.  Let's look at Exhibit A for just
 8   one moment.
 9        A    Okay.
10        Q    To -- That's Exhibit A to our Exhibit E.
11        A    Yes, ma'am.
12        Q    Very good.
13            Okay.  Now, if you go to this proposal, do you
14   see the part that says "General exclusions"?
15        A    Sorry, ma'am.  I --
16        Q    It's the very last page of Exhibit -- or the
17   last two pages of Exhibit A.
18        A    Yes, ma'am.  I see the Exhibit A.
19        Q    Okay.  And as we can see at the top, we've got
20   a bridge, 12 x 20; correct?
21        A    That is correct.
22        Q    And that was the bridge that you asked
23   Mr. Garcia to price in that e-mail that we just looked
24   at; correct?
25        A    Yes, ma'am.
```
ACCURATE STENOTYPE REPORTERS, INC.

126

```
 1        Q    And then it's got a listing of what's
 2   included.  Do you see that there?
 3        A    Yes, ma'am.
 4        Q    Okay.  There's no driveway identified there;
 5   correct?
 6        A    There's no driveway identified there, ma'am.
 7        Q    Okay.  And there's no -- there's no fill
 8   material identified there either?
 9        A    That's right, ma'am.
10        Q    Okay.  Do you know what a concrete abutment
11   is?
12        A    Yes, ma'am.
13        Q    Okay.  And do you know what bridge engineering
14   is?
15        A    Absolutely, ma'am.
16        Q    Okay.  Very good.
17            Now, go to the section that says, "General
18   exclusions."  This is the same -- on the same page, sir.
19        A    I'm sorry?
20        Q    General exclusions.
21        A    Uh-huh.
22        Q    Okay.  At the very bottom it says, "Any work
23   not specified in this proposal."
24            Do you see that there?
25        A    I see that, ma'am.
```
ACCURATE STENOTYPE REPORTERS, INC.

127

```
 1        Q    Okay.  That is -- you agree with me that this
 2   exclusion is saying, anything that's not listed here is
 3   not part of our proposal to you?
 4        A    I understand that, ma'am.
 5        Q    Okay.  So again, there's no driveway listed in
 6   this scope and there's no fill material; correct?
 7        A    Correct.
 8        Q    Okay.  So what we're trying to get to why you
 9   think those are included, and I think you mentioned
10   some -- some drawings that you received from Mr. Parker.
11   So I'm going -- I'm going to bring those out, and we're
12   going to look at those, okay?
13        A    Sure, ma'am.  Yes, ma'am.
14        Q    I'm going to show you what's marked as
15   Exhibit H.
16            (Exhibit H was marked for identification.)
17   BY MS. LUKEN:
18        Q    And that's 98.
19            Now, do you recognize Exhibit H as an e-mail
20   from Mr. Garcia to you dated July 16th, 2014?
21        A    Yes, ma'am.  I recognize it.
22        Q    Okay.  And I'm sorry -- H?  Okay.  All right.
23            And are these the -- well, hold on.  Let's
24   look at the first page.
25        A    Uh-huh.
```
ACCURATE STENOTYPE REPORTERS, INC.

128

```
 1    Q    What -- how are these identified?
 2    A    They're identified as the, "Final engineering
 3  drawings for your bridge."
 4    Q    Oh, yes.  You're right.  The e-mail states
 5  that.  So the e-mail does not state anything about a
 6  driveway or fill material; correct?
 7    A    Yes, ma'am.  The e-mail only states that --
 8  what I just read.
 9    Q    Okay.  And then on the first page of the
10  plans --
11    A    Uh-huh.
12    Q    There's a date on the bottom, March 2014.
13    A    Uh-huh.
14    Q    And then there's a statement at the top.
15    A    Uh-huh.
16    Q    These are identified as "bridge construction
17  plans"; correct?
18    A    Ma'am, I'm sorry.  Where are you looking at
19  again?
20    Q    I'm on the first -- the first page of the plan
21  set.
22    A    Okay.
23    Q    You got that there?
24    A    I got that now, ma'am, yes.
25    Q    Okay.  So these are bridge construction plans;
```

ACCURATE STENOTYPE REPORTERS, INC.

129

```
 1  correct?
 2    A    Uh-huh.
 3    Q    I'm sorry?
 4    A    Yes, ma'am.  That is correct.
 5    Q    Very good.  Very good.
 6         Okay.  And on page F1 --
 7    A    Uh-huh.
 8    Q    -- this is providing for a bridge elevation
 9  view, a bridge plan view, and an abutment wall section.
10    A    That's correct.
11    Q    Do you know what a bridge elevation view is?
12    A    Yes, ma'am.  I can tell you what my
13  understanding is.
14    Q    Sure.  Go ahead.
15    A    So this is stating the elevation of the
16  abutments.  It is showing us the bridge.  It is showing
17  us the proposed driveway.  It is showing us the -- where
18  is the -- I'm sorry, ma'am.  I just lost my train of
19  thought.  Give me one second, please.
20         The approach slab plan.  It's showing us the
21  approach slab with the filling instructions underneath
22  it.  It's also showing us the slope, which is consistent
23  with the slope on my site plans.  It is showing locate
24  the center of the bridge per approved environmental
25  plans, which is something I would like to know.
```

ACCURATE STENOTYPE REPORTERS, INC.

130

```
 1    Q    Uh-huh.  Okay.
 2         And do you understand what a helical pile
 3  cable -- pile table is?
 4    A    I know what a pile is.  I am looking at the
 5  here -- the pile table right now to see if I can make
 6  out what I can make out.  It has the wall thickness, the
 7  shaft diameter, the anticipated installation depth, yes,
 8  and the minimum torque capacity.  I -- I'm able to -- I
 9  have an understanding of it, ma'am, and that's ...
10    Q    Okay.  And then if we go to Page F2.
11    A    Yes, ma'am.
12    Q    All right.  And this is showing a number of
13  things.  We've got a bridge and deck plan, the helical
14  footer and layout plan.  We've also got some joint
15  details that are provided, some plank bearings.  I mean,
16  do you have any understanding of what this plan sheet is
17  showing or what it means?
18    A    Ma'am, I have an understanding.  I'm not sure
19  exactly what detail you're asking me for, but, yes, I
20  can at least be able to see and gather some information.
21    Q    Okay.  And you stated to me previously that
22  you believed that this e-mail from Mr. Garcia to you,
23  attaching these plans somehow modifies your contract.
24  Can you explain that to me, please?
25    A    Well, ma'am, first off, I'm not sure why is it
```

ACCURATE STENOTYPE REPORTERS, INC.

131

```
 1  there if it wasn't intended for me to see.  I see it
 2  very clearly stating it has, "Identify asphalt drive by
 3  other," and everything else is instructing.
 4         "The -- the general contractor to perform the
 5  functions they need to perform."  It's a site plan,
 6  ma'am.
 7    Q    Okay.  What specifically, sir?  You're going
 8  to have to be a little more specific.
 9    A    Okay.  Ma'am, all I'm seeing at this time is
10  just the asphalt part being identified as "by other."
11    Q    Okay.  And you had an understanding that "by
12  other" means somebody else?
13    A    Yes, ma'am.  Not Nature Bridges, ma'am.
14    Q    Okay.  And so I mean, again, you're
15  understanding of that is that driveway will be provided
16  by other -- someone other than Nature Bridges.
17    A    The asphalt part, ma'am.
18    Q    Okay.  What else are you seeing in here that
19  leads you to believe that this is somehow a modification
20  of your written contract to have a bridge?
21    A    Ma'am, I'm seeing here the compact as in fill
22  under the approach slabs -- slabs, specifically, if
23  that's what you're asking.
24    Q    Yes.  And I need you to explain that to me,
25  please, whatever it is your interpretation of that is.
```

ACCURATE STENOTYPE REPORTERS, INC.

132

```
 1      A    It means the -- ma'am, is your question what
 2   is an approach slab?
 3      Q    Okay.  Tell me specifically what you are
 4   seeing here that you believe somehow modifies your
 5   contractual arrangement entered into with Nature
 6   Bridges.
 7      A    What I specifically see this time standing out
 8   is the, "Asphalt drive by other," and I see instructions
 9   notes, "If these other set of functions weren't needed
10   to be completed" -- and I don't know why else he would
11   leave it for me to see.
12      Q    Okay.  And what specifically are these other
13   functions that you -- you are wondering why you are
14   seeing them?
15      A    The approach slab with the fill.  Also, I
16   would like to note the slope on the approach slab is
17   consistent with the slope on the driveway profile.
18      Q    Okay.  And again, you have not hired anybody
19   to do that work?
20      A    To do which work, ma'am?
21      Q    The work that you're talking about?
22      A    I'm talking about both the approach slab and
23   the asphalt, ma'am.
24      Q    Right.
25      A    You're asking me specifically the approach
```

ACCURATE STENOTYPE REPORTERS, INC.

133

```
 1   slab?
 2      Q    Yeah.
 3      A    Ma'am, this has been -- my understanding,
 4   Nature Bridges will complete this before they leave.
 5      Q    And again, the only basis for your belief in
 6   that is it this drawing?
 7      A    No, ma'am.  I have plenty to believe.  It
 8   starts off by the notion that Matt Parker is going to be
 9   giving me an entire new driveway profile because the
10   location was changed under his direction, ma'am.  That
11   is the information that I was told.
12      Q    By whom?
13      A    Matthew -- no, Brian Green.  Brian Green,
14   ma'am.
15      Q    Okay.  And you say that you've never met Brian
16   Green in person?
17      A    That is correct, ma'am, until this --
18      Q    And so when -- when do you believe that this
19   conversation took place?
20      A    After November of 2014, if I to recollect at
21   this time, ma'am.  That's when I e-mailed him that
22   there's a location discrepancy.  And at some point
23   thereafter, he justified it that Matthew Parker has
24   something in writing.
25      Q    And what is that?
```

ACCURATE STENOTYPE REPORTERS, INC.

134

```
 1      A    That's what I was waiting to see.  What does
 2   Matthew Parker actually have that caused Nature Bridges
 3   to make all these deviations, and that's what I've been
 4   waiting for, for the last three years.
 5      Q    And did you listen to Brian Green's testimony
 6   yesterday?
 7      A    Absolutely, ma'am.
 8      Q    And are you saying that he was lying about his
 9   interactions with you?
10      A    He was lying about a lot of things.
11      Q    Okay.
12      A    First of all, why is there discrepancy between
13   him and Matthew Parker in terms of his presence on-site?
14   He has --
15      Q    Whose presence on-site?
16      A    Brian Green, in his deposition yesterday
17   stated Matthew Parker has been to the site many times --
18      Q    Uh-huh.
19      A    -- which is consistent with what he's been
20   telling me -- feeding me all along, that he's the one
21   that's been responsible and in charge for a lot of
22   things.  So what I'm trying to point out here is, he's
23   in a room under oath with two attorneys, looking at me,
24   telling everyone that this is what he's going under oath
25   on.
```

ACCURATE STENOTYPE REPORTERS, INC.

135

```
 1          What do you possibly think -- I apologize.
 2   I'm not ---
 3      Q    You seem like you're getting upset, sir.
 4      A    I am.
 5      Q    Why don't you finish you answer and then we
 6   can maybe take a break?
 7      A    Sorry, ma'am.  I apologize.
 8      Q    That's fine.  Go ahead.
 9      A    I do apologize.
10      Q    It's all right.  You don't need to apologize.
11   Do you want to finish your response, or do you want to
12   take a quick break?
13      A    Yeah, sorry.  Sorry.  Sorry.  I apologize.
14   I'll finish my response and take a break.  I do
15   apologize.
16      Q    Sure.  That's fine.
17      A    If he's under oath stating these things, what
18   can I possibly trust and expect out of a project lead?
19   What kind of information do you think -- I'm sorry.  I
20   don't mean to question again, but if this is what he's
21   saying here under oath, then this entire three years of
22   what he's been feeding me, what he's been telling me has
23   been just a bunch of lies.  There was no oversight on my
24   project.
25      Q    Okay.  Why don't we do this?  Let's take,
```

ACCURATE STENOTYPE REPORTERS, INC.

136

```
 1    like, a five minutes break and we'll just kind of --
 2         A    I apologize --
 3         Q    -- notch this down?  That's fine, sir.  Don't
 4    worry about it.
 5              (Recess from 3:07 p.m.to 3:15 p.m.)
 6    BY MS. LUKEN:
 7         Q    All right.  Let's go back -- let's go back to
 8    Exhibit D, the last page, which is where I think -- I
 9    think you are.  Let me ask you this, sir:  The proposed
10    locations on the site development plan shows a
11    proposed -- proposed bridge.  Do you see that there?
12         A    Yes, ma'am.
13         Q    That bridge is how big?
14         A    Ma'am, I know through the process of the
15    lawsuit that it needs to span the floodway boundaries,
16    the configuration needs to span the floodway boundaries.
17    I don't think necessarily that there is a size
18    associated with the proposed bridge.
19         Q    Okay.  In that location, how big does the
20    bridge need to be in order to span the floodway?
21         A    That's a technical question, ma'am.  It's more
22    to it than just a size of the bridge.  I -- I don't want
23    to get into other subject matters, ma'am.  I'm not --
24    what I'm trying to say, ma'am, is the -- what I've --
25    it's more about the hydraulic openings than the bridge
```

138

```
 1    would be the agency to review.  So whatever we do, we
 2    would need to ask them before if this is something that
 3    we can do or not do.  Perhaps it may, perhaps it may
 4    not.  I am not sure.  It would be up to the New Jersey
 5    DEP, ma'am.  I would not know otherwise.
 6         Q    Okay.  You indicated that to me that your
 7    understanding is that the bridge needs to span the
 8    floodwaters; correct?
 9         A    My understanding of what I've come to know is
10    the abutments need to be outside the floodway
11    boundaries, and that was the reason why this location
12    was chosen because of -- because of that matter.
13         Q    Okay.  And you do understand that in order for
14    the abutments to be outside of the floodway boundaries,
15    the bridge has to be a certain size for that location;
16    correct?
17              MR. HARPER:  Objection to the -- could you
18         please rephrase?
19              MS. LUKEN:  No.  The court reporter can reread
20         the question if she wants to or if the witness
21         needs it.
22              MR. HARPER:  I'm sorry.  I thought I
23         understood the question to ask:  It needs to be a
24         certain size without any predicate for, you know,
25         what the size is or that sort of thing.
```

137

```
 1    length in order to dictate what a configuration should
 2    be and not be.  You can have a bridge that is of same
 3    proportions still be incorrect and -- you're asking me
 4    for the bridge length; right?
 5         Q    Yes, sir.
 6         A    Ma'am, I've been notified that the bridge
 7    length is -- to keep it simple, is about 30 to 34 feet,
 8    if I recollect.
 9         Q    Okay.  And is it your understanding that a
10    20-foot bridge in this location would violate your
11    permit?
12         A    Ma'am, it is something that the New Jersey DEP
13    would be the only ones to advise on.  I would not know
14    one way or another.
15         Q    Okay.  So as we sit here, you have no
16    knowledge of that topic?
17         A    No knowledge of what?
18         Q    Of whether or not a 20-foot bridge in this
19    location would be consistent with your permit?
20         A    Ma'am, it's not just about the bridge size.
21    It's a lot about configurations that need to be talked
22    about, and the only qualifying agency in the subject
23    matter -- because it also is not about the stream flow.
24    It's also about the environmental components, which I am
25    not consistently -- which I'm not sure of.  But they
```

139

```
 1              MS. LUKEN:  I'm sorry.  Excuse me.
 2              (Short interruption.)
 3              THE WITNESS:  Ma'am, what I recognize, this is
 4         a technical question.  And the reason why I am
 5         going to recognize it as a technical question is
 6         because what I've come to learn from my
 7         interactions through Contech -- my interactions
 8         through Contech Engineering and my interactions
 9         through Nature Bridges.  So the difference is,
10         ma'am, when treating a project, you basically look
11         at the entire scope of the stream.  So you can have
12         different configurations on the stream, but you
13         need to choose a location first and then dictate
14         the other components.
15    BY MS. LUKEN:
16         Q    Okay.  Your --
17         A    I understand, ma'am.  There is -- okay.  So
18    let me rephrase.  The length and hydraulic openings are
19    not one in the same.  You can technically,
20    theoretically, have a shorter ledge and meet the
21    hydraulic openings.  Whether that's relevant or not,
22    ma'am, I am not sure.
23         Q    Okay.  This drawing that was prepared by
24    Mr. Westbrook back in 2008 showing proposed locations
25    for various items shows a proposed location for a bridge
```

---

140

1   and a proposed size for a bridge.  Do you agree with me
2   on that?
3       A    Yes, ma'am.  I've come to learn that this is
4   actually indicated for both.
5       Q    I'm sorry.  What?
6       A    Yes, ma'am.  I've come to learn that it's
7   actually indicated for both.  That there is a -- that
8   the size and location considerations need to be --
9           MR. HARPER:  That is a yes or no question.
10          THE WITNESS:  I apologize.  Yes, ma'am.
11  BY MS. LUKEN:
12      Q    Okay.  So would you -- would you agree with me
13  that, if somebody put a bridge that is a smaller size in
14  that location, that would be different than what's shown
15  in these plans?
16      A    Yes, ma'am.
17      Q    Okay.  And you contracted for a bridge that
18  was smaller than this bridge that's shown on this plan;
19  correct?
20      A    I signed the contract with those dimensions,
21  ma'am, yes.
22      Q    What evidence do you have that the current
23  location of the bridge is not in compliance with the
24  permit?
25      A    Ma'am, so there's a couple issues that is -- I

ACCURATE STENOTYPE REPORTERS, INC.

---

142

1   into it.  I --
2       Q    Who were the specialists?
3       A    R & R Constructions and the Contech
4   Engineering.
5       Q    And what -- let's take one at a time.  What
6   did R & R Construction tell you that goes to the issue
7   that I asked about, which is, what evidence do you have
8   that the current location of the bridge is not in
9   compliance with your permit?
10      A    Current location of the bridge?  Ma'am, I
11  apologize.  I didn't hear the question correctly.  The
12  current location actually came from a site visit done
13  in 2013.
14      Q    Okay.  By whom?
15      A    By Chris Guddemi.
16      Q    Okay.  And what did Mr. Guddemi tell you?
17      A    He asked that -- why the location was changed.
18  And that's when I was prompted to ask Brian the same,
19  why the location was changed?  And that is when he
20  indicated that Matthew Parker has written documentation
21  that was needed to do the change.
22      Q    Okay.  I don't -- I don't understand that.
23  How does that go to the issue of whether or not the
24  current location is in compliance with your permit?
25      A    Why the current location isn't compliant?

ACCURATE STENOTYPE REPORTERS, INC.

---

141

1   wanted to mention.  So as you can see, ma'am, the
2   floodway -- but I understand in Brian's testimony
3   yesterday that he took a tape measurer to basically
4   cover the length of the visible water, if I can
5   recollect his statement, correctly.  But as you actually
6   go further up, the floodway boundary actually expands.
7   So we're already in a deficit here.  We've actually
8   magnified what the location -- what the length
9   requirement would be on the current location.  So we've
10  actually taken a situation that was bad to begin with,
11  and we've actually made it worse by changing the
12  location.
13      Q    Okay.  And from where have you derived this
14  knowledge?  As you've indicated to me, you know, you're
15  not an engineer; you're not a contractor; you're not an
16  environmental designer.
17          From where have you gotten this information?
18      A    I have brought specialists on-site.  I was
19  in -- so my -- and again, it goes back to my attorney as
20  well.
21      Q    I don't want to hear about --
22      A    Okay.  Sorry.
23      Q    -- what your attorney has to say it, because
24  he's not going to be a witness in this case.
25      A    Okay.  So I brought specialists.  I looked

ACCURATE STENOTYPE REPORTERS, INC.

---

143

1   Ma'am, the location has always been in compliant.  I --
2   I'm trying to see how I can best address the question.
3           Ma'am, I can't explain it further than that.
4   So that's the information that I acquired, that the
5   location was not where it was supposed to be, and that
6   is why my understanding came to be, initially.  And then
7   I was -- retained the information through Brian Green
8   that the location was changed for a purpose by Matthew
9   Parker.  So that is -- those are the conversations I can
10  recall about the location; that the location has been
11  changed; it has been acknowledged by Nature Bridges;
12  Nature Bridges has acknowledged that Matthew Parker was
13  the one who had changed the location.
14          MR. HARPER:  She asked you:  What evidence do
15      you have to suggest or to lead you to believe that
16      the location where it ended up being built is not
17      compliant with the permit?  Why do you think that?
18          THE WITNESS:  Ma'am, I think that because
19      that's the initial -- I think the location is an
20      issue because of the discussions that we've had
21      with DEP to address matters further regarding
22      passing standards and any other information that
23      was noted.  There is other qualifying factors we
24      needed.
25

ACCURATE STENOTYPE REPORTERS, INC.

---

144

BY MS. LUKEN:

Q   Okay.  And what discussions are you
referencing, sir?

A   There was an e-mail speaking about the
location.

(Short pause.)

A   Ma'am?

Q   Yes?

A   Here.

Q   Okay.  And this is -- okay.  Hold on one
second.  Let me see if I can find this one.

MR. HARPER:  Saket, for what it's worth I
think perhaps when she's asking a question such as,
What evidence do you have, it's not always the
presumption of there's no specific document or
discussion --

THE WITNESS:  Oh okay.

MR. HARPER:  If that's what's -- maybe that's
what's been bogging you down.  I just want to you
help move ...

THE WITNESS:  Okay.

BY MS. LUKEN:

Q   Okay.  I tell you what.  I'm going to find
this.  It's 165.  I need 162, 163, 164.  Let's find
that.

ACCURATE STENOTYPE REPORTERS, INC.

---

145

(Short pause.)

MS. LUKEN:  I'm just trying to make sure so
that we're looking at the same page here; okay?

THE WITNESS:  Okay.  So give me one second.
Let me get that together.

BY MS. LUKEN:

Q   All right.  This will be faster than any of
this.  All right.  Success.

This is your copy; right?

A   Yes, ma'am.

Q   Okay.  I'm going to see -- let me just -- I'm
going to get a photocopy of this so we can mark it;
okay?  And I'm going to give it back to you and then you
can keep it back in your notebook.

(Recess from 3:32 p.m. to 3:43 p.m.)

BY MS. LUKEN:

Q   And let's try to address a couple of other
things, kind of adjust ourselves here.  All right.
Let's talk about the actual construction of this bridge
on your property; okay?  Do you have a recollection of
when -- when the construction activities took place?

A   Ma'am, I'd like to say, if I can recall just
off the top of my memory it, sometime maybe July, August
of 2014.

Q   And if I said it was probably the last week of

ACCURATE STENOTYPE REPORTERS, INC.

---

146

August and the first two weeks of September of 2014,
would that sound about right?

A   Okay, ma'am.  Possibly, yes.

Q   All right.  Were you on-site at all during the
construction activities?

A   No, ma'am.

Q   Okay.  Did you speak with anybody who was
on-site at the time of the construction activities?

A   Not to the best of my recollection, ma'am.

Q   Mr. Green testified that he went up to the
project site to do a stakeout location of where the
bridge would be.  Now, did you -- did you see any of
those flags that were placed there at any point?  I
think he referred to them as ribbons.

A   Yes, ma'am.  I don't recall seeing any
ribbons.

Q   Okay.  And so, I guess, when was the first
time that you saw the results of the construction
activities?

A   If I recall, I think I, myself, went there the
last day.

Q   The last day -- was the crew still on-site?

A   Trying to recall if they had just left or if
they left.

MR. HARPER:  If they had just left or if they

ACCURATE STENOTYPE REPORTERS, INC.

---

147

left, isn't that the same thing?

THE WITNESS:  I was trying it catch them, I
think.  No, ma'am.  I don't think they were still
on-site.

BY MS. LUKEN:

Q   But you don't -- you don't think -- it was
your understanding that they had left very in close time
to when you were arriving or you just missed them kind
of thing?

A   Yes, ma'am.

Q   Okay.

All right.  And so at that point, what -- what
did you -- what did you do?  Did you do anything to
close out this permit?

A   No, ma'am.  We did not close out the permit.

Q   Okay.  And then I understand -- so what was
the next step that you were taking with respect to your
project?

A   Ma'am, the next step was to, I believe, call
Nature Bridges and find out what's -- what exactly
happened.  To me, the project was never really closed.
It's always been open.

Q   Okay.  Did you have anybody else come out and
take a look at it?

A   Yes, ma'am.  My father looked at it, and I

ACCURATE STENOTYPE REPORTERS, INC.

### Page 148

```
 1    know he's spoken to Lou as well, the neighbor.
 2         Q    The neighbor?
 3         A    Yes, ma'am.
 4         Q    What about anybody from Lan?  Were they --
 5    were they asked to come out after the construction of
 6    the bridge was completed?
 7         A    Ma'am, I did not ask.  I'm sorry.
 8              Can you repeat that question one more time,
 9    please?
10         Q    Was anybody from Lan asked to come out after
11    the bridge was completed?
12         A    Yes, ma'am.
13         Q    And who asked for Lan to come out?
14         A    I had asked Lan to come out.
15         Q    Okay.  And why?
16         A    We were in the process of moving forward with
17    our agreement of completing the rest of the project, the
18    fill in the driveway, and that is when I had asked Lan
19    to come out to take a look to assist with what I think
20    was a road opening permit.
21         Q    Okay.  And what -- and what -- and what did Lan do
22    when they came out?
23         A    That's when I noticed that was -- that's when
24    they told me that it was in a different location, and
25    that is when I went to Brian to see what had happened.
```

ACCURATE STENOTYPE REPORTERS, INC.

### Page 149

```
 1         Q    All right.  Let's put a little bit of
 2    substance on this.  I'm going to show you what's
 3    Exhibit I.
 4              MR. HARPER:  Wasn't that out of the -- was
 5         that out of the box?
 6              MS. LUKEN:  No, no.  These are just my -- I
 7         had these made --
 8              MR. HARPER:  Oh, okay.
 9              MS. LUKEN:  -- from my office.  These are
10         items that you all provided.
11              MR. HARPER:  I understand.
12              MS. LUKEN:  Yeah, I'm deviating from the box.
13         I'm sorry.  Here.  And actually --
14              MR. HARPER:  When I heard the stapler, that's
15         what scared me.
16              MS. LUKEN:  No, no, no.  I wasn't stapling
17         your stuff.  Here.  Here's a copy for you,
18         Mr. Harper, as well.
19              MR. HARPER:  Thank you.
20              (Exhibit I was marked for identification.)
21              MS. LUKEN:  So here you go.  And then here's
22         Exhibit I.  All right.
23    BY MS. LUKEN:
24         Q    Have you seen these photographs before,
25    Mr. Chaudhari?
```

ACCURATE STENOTYPE REPORTERS, INC.

### Page 150

```
 1         A    Yes, ma'am.  I believe I have.
 2         Q    Okay.  And are these photographs that were
 3    taken by Mr. Guddemi when he came out there on
 4    September 23rd of 2014?
 5         A    Yes, ma'am.  I see the date there.
 6         Q    Okay.  I mean, did he provide you with these
 7    photographs?
 8         A    Right.  Ma'am, I don't recall, to be honest at
 9    this time.
10         Q    Okay.  He's got a note there "flood hazard."
11    Do you see up in the right-hand corner it's got, I
12    guess, their number for this?  And then they have
13    "Chaudhari flood hazard area calculations and
14    permitting."
15              Do you see up there in the upper right?
16         A    Yes, ma'am.
17         Q    Okay.  And is that part of what you had asked
18    Lan to do when you asked them to come out?
19         A    Ma'am, I don't recall at this time.
20         Q    Okay.  But it -- would -- okay.  And let me
21    just make sure that this is consistent.  Would this time
22    frame right here, September 23rd, 2014, did you -- did
23    you meet with Mr. Guddemi out at the site at this time?
24         A    It's possible that was the time frame, ma'am.
25         Q    And is this when Mr. Guddemi advised you that
```

ACCURATE STENOTYPE REPORTERS, INC.

### Page 151

```
 1    the bridge was not in the proposed location --
 2         A    Yes, ma'am --
 3         Q    -- as set forth in the site development plan?
 4         A    It was right around this time frame, ma'am.
 5         Q    Okay.  What -- what else did Mr. Guddemi say
 6    about that?
 7         A    There's nothing that he said, ma'am.  I -- I
 8    contacted Brian and found out that Matthew Parker had a
 9    reason for the change.  Then I just told him that the
10    other engineer had changed the location, and that was
11    pretty much how we left it, ma'am.  I accepted that the
12    location was changed for a reason at that time.
13         Q    Okay.  And what -- what was your understanding
14    of the reason why the bridge was placed where it was?
15         A    Why the as-built bridge was put where it is?
16    I'm sorry, ma'am.  Can you repeat that one more time,
17    please?
18         Q    Sure.  What is your understanding of why the
19    bridge was placed in the location where it was placed on
20    your property?
21         A    Ma'am, a location was never given.  It was
22    just mentioned that there was some written documentation
23    that Matthew Parker had.
24         Q    Okay.  And again, this was something that you
25    believe that Brian Green said to you?
```

ACCURATE STENOTYPE REPORTERS, INC.

152

```
1     A     Yes, ma'am.
2     Q     Okay.  Quick question.  Did -- were you the
3  one that asked Mr. Guddemi to come out for this?
4     A     Yes, ma'am.
5     Q     Okay.
6     A     I had asked him to come out to -- to take a
7  look at the location, ma'am.
8     Q     The location?
9     A     I had asked him to come out to take a -- to
10  help me with the road opening permit, ma'am.
11    Q     Okay.  And I mean, was -- and again, I'm not
12  trying to put words in your mouth here, but did -- were
13  you asking him to come out to look at the location or
14  you were requesting him to come out because you needed
15  to get your road permit completed?
16    A     If I remember correctly, I believe I asked him
17  to come out for a road opening permit.
18    Q     And how -- if I understood our prior
19  conversations about Lan, it didn't sound like you were
20  super-involved, at least in the process that was going
21  on back in 2008, 2009, 2010.  Remember, we went through
22  those invoices?
23    A     Yes, ma'am.
24    Q     How -- I mean, how did you happen to know that
25  Mr. Guddemi was the gentleman that you should call from
```

ACCURATE STENOTYPE REPORTERS, INC.

153

```
1  Lan?
2     A     Perhaps, my father, ma'am.  I'm not entirely
3  sure.  But I called -- ma'am.  I may have asked my
4  father.  I'm not entirely sure.
5     Q     One of the things that I'm noticing -- and we
6  can kind of drag out the documents on this if we need
7  to, but I'd rather not if we don't have to -- but I'm
8  not seeing any invoicing from Lan from the period of
9  2010 through, I believe, it's 2015.  Did Lan bill you
10  for this particular site visit?
11    A     No, ma'am.  The bills I submitted are the
12  bills that I have.  I did take matters further at that
13  time because that's when we realized the location was
14  different, and I just needed to follow up with that
15  matter.  So that's where things have gotten -- things
16  were getting more and more involved with Nature Bridges
17  in terms of how the location got moved and how we're
18  going to proceed with that whole setup.
19    Q     Okay.  And it's your testimony here today,
20  sir, under oath, that you had no involvement in where
21  the location of this bridge was placed on this property?
22    A     Yes, ma'am.  It is my testimony today that I
23  did not ask this bridge to be put in this location.
24    Q     Okay.  And again, my -- I just want to make
25  sure my question is clear here.  Is it your testimony
```

ACCURATE STENOTYPE REPORTERS, INC.

154

```
1  that you had no involvement whatsoever in the location
2  where this bridge was ultimately placed on your father's
3  property?
4     A     Ma'am, I'm sorry.  Can you say that one more
5  time, please?
6     Q     Sure.  You had no involvement in where the
7  bridge was ultimately placed on your property.  Is that
8  your testimony?
9     A     No, ma'am.  Where this bridge was placed --
10  ma'am, I do -- I do have -- trying to answer the
11  question.  I'm sorry.  Can you repeat that one more
12  time?  I apologize.
13         MS. LUKEN:  I'm sorry.  Can you just read
14      that, please?
15         (Record read.)
16         THE WITNESS:  Ma'am, I'm going to say, yes, I
17      had involvement.  I'm not sure exactly what you're
18      looking for specifically, ma'am, but, yes, I was a
19      part of the process.
20  BY MS. LUKEN:
21    Q     Okay.  And what was your involvement with
22  respect to location and where this bridge was placed on
23  your father's property?
24    A     In getting the -- what was my involvement with
25  this process?  In terms of obtaining the permits, ma'am?
```

ACCURATE STENOTYPE REPORTERS, INC.

155

```
1         Is that the question?  Was I involved in
2  obtaining the permits?
3     Q     Well, I think we kind of covered that, and you
4  told me that you did not have any involvement in that;
5  am I correct?
6     A     No, ma'am.  I -- I was I wouldn't say I didn't
7  have any involvement in it, ma'am.  I potentially --
8  ma'am, unfortunately the time frame and this --
9         MR. HARPER:  Did you have any involvement in
10      the determination of the location for the bridge?
11         THE WITNESS:  Location for the bridge?  Yes,
12      ma'am.  I had involvement in location for the
13      bridge.
14  BY MS. LUKEN:
15    Q     Okay.  And what was that involvement?
16    A     We obtained the permits, ma'am.
17    Q     Okay.  So during -- during the period, you
18  were involved in the obtaining of the permit?
19    A     Yes, ma'am.  I would say I was involved in
20  obtaining the permits, ma'am.
21    Q     And what was your involvement?
22    A     I can't recollect exactly what -- I'm not sure
23  I understand the question right, ma'am.
24         MR. HARPER:  You don't understand what she's
25      asking when she says "what is your involvement?"
```

ACCURATE STENOTYPE REPORTERS, INC.

156

1    THE WITNESS:  No.
2    MR. HARPER:  Do you not understand what the
3    word "involvement" means?
4    (Simultaneous speaking.)
5    THE WITNESS:  I understand "involvement."
6  BY MS. LUKEN:
7    Q    Did you talk to anybody?  Did you read
8  anything?  Did you --
9    A    Yes, ma'am.  Yes.
10   Q    -- discuss with someone?  And I'm just asking,
11 what was that?
12   A    I apologize, ma'am.  I --
13   Q    What was -- what was the -- I don't know what
14 other word to use other than "involvement."  What --
15   MR. HARPER:  Participate.
16 BY MS. LUKEN:
17   Q    What was your role or your function or things
18 that your heard or said or did?
19   A    Okay, ma'am.  So no -- okay, I understand
20 those a little bit better, ma'am, now.  I apologize.
21   Q    Okay.  Very good.  Go ahead.
22   A    Yes, I do -- yeah.  I was part of the process,
23 ma'am.  Then in terms of involvement, yes.  I can't
24 state for sure exactly what I remember, what I've heard,
25 what I've -- but, yes, ma'am.  I say if you're asking me

ACCURATE STENOTYPE REPORTERS, INC.

157

1  a yes or no question, then I'll --
2    MR. HARPER:  No.  She didn't.  She said, at
3  what time --
4  BY MS. LUKEN:
5    Q    I'm just trying to find out what you did.  Did
6  you talk to anybody?  Did you read any documents?  Did
7  you have phone conversations?  Did you read e-mails?
8  Did you, you know, what did you -- did you talk to
9  anybody?  Did you talk at Lan?  I'm.
10   Just trying to find out where you come into
11 this whole thing.
12   A    Yes, ma'am.  So as --
13   MR. HARPER:  As it relates to the location of
14 the as-built?
15   THE WITNESS:  As-built.
16   MR. HARPER:  That's why she handed you
17 Exhibit T.  That's what she's asking you about,
18 yes.  Did you have any involvement or participation
19 or play any role in the determination of that -- is
20 that fair?
21   (simultaneous cross-talk.)
22   MS. LUKEN:  It's close.  It's close
23   MR. HARPER:  I've just had more practice with
24 this process with him?
25   MS. LUKEN:  I understand.  I understand.

ACCURATE STENOTYPE REPORTERS, INC.

158

1    THE WITNESS:  Just this particular -- I'm
2  sorry, ma'am.  May I ask him -- may I ask a
3  question?
4    MS. LUKEN:  Sure.  Go ahead.  Go ahead.
5    THE WITNESS:  Did I have involvement with this
6  particular location of this particular bridge; is
7  that the question?
8    MR. HARPER:  That's my understanding.
9  BY MS. LUKEN:
10   Q    Sure.  Go ahead.  Answer that question.
11   A    Sorry, ma'am.  I'm a little bit nervous.
12   Q    That's okay.  That's okay.
13   A    Yes, ma'am.  I did not have involvement with
14 this -- with this location that is on Exhibit I.
15   Q    Okay.  So is it your testimony here -- again,
16 you're under oath -- that the -- okay.  Let me strike
17 that.
18   When was the first time you found out of the
19 location of the bridge as it was actually placed?
20   A    Ma'am, the recollection is I found that out
21 after I was trying to obtain the -- I found out from a
22 site visit from Chris Guddemi.
23   Q    Okay.  And so your testimony is you never had
24 any discussions with Brian Green about the location?
25   A    If terms of determining the location or how

ACCURATE STENOTYPE REPORTERS, INC.

159

1  that --
2    Q    Yes.  I'm talking about prior to
3  September 23rd, 2014, which is the date that
4  Mr. Guddemi went out here and looked, you never had any
5  discussions with Mr. Green prior to that date about the
6  location where your bridge was going to be placed?
7    A    Ma'am, that is my testimony, yes.
8    Q    Okay.  That's fine.
9    You do not recall having any discussions with
10 anybody at Nature Bridges about the fact that the
11 20-foot bridge that you were requesting would not work
12 in the location that's shown here on the site
13 development plan?
14   A    Yes, ma'am.  I did not have any discussion
15 with a Nature Bridges member that would suggest that the
16 original location would not work.
17   Q    Okay.  And you -- you do not have any
18 knowledge about -- well -- and again, I guess I just
19 keep coming -- I keep coming back to this question,
20 which is something that I think that's we're going to
21 hold off on.  So maybe that's just where we are on this.
22   MR. HARPER:  You want to try it one more time?
23   MS. LUKEN:  Well, no, 'cause I want -- I want
24 us to have whatever documents you guys are going to
25 rely on for that; okay?

ACCURATE STENOTYPE REPORTERS, INC.

160

1          MR. HARPER:  All right.

2          MS. LUKEN:  So we'll just -- we'll hold off on

3     that.  And I -- I keep coming back to that point,

4     but that's okay.  So we'll do another couple of

5     things here.

6 BY MS. LUKEN:

7    Q   All right.  Let's talk for a minute about the

8 notice of violation that you received from the DEP.  And

9 I'm just going to locate that real quick here in my

10 documents.  So just give me one moment.

11       And before we get to that -- and we will get

12 to that document, let me just ask you a question.  So

13 you have this discussion with Nature Bridges in October

14 of 2014 where they provided you proposals, you provided

15 an e-mail back saying, I want these other things.

16       I am making a presumption here, but it appears

17 to me that conversations about this topic, you know,

18 whether or not Nature Bridges was going to agree to do

19 this additional work that's identified here or your

20 other thing, that basically was not going to happen, you

21 know, as of November 2014; is that a fair statement?

22    A   That it's not going to happen?

23    Q   Yes.

24    A   No, ma'am.  They never indicated that they

25 wouldn't do the project.  They've never indicated,

ACCURATE STENOTYPE REPORTERS, INC.

---

161

1 especially to my recollection -- they've always given me

2 dates that they would give me a proposal, come back.

3    Q   And then I think -- I mean, I guess, after

4 this point, right, October 13th, 2014, in your e-mail

5 back, whatever date that was, Nature Bridges did not

6 give you any dates when they were planning on come back;

7 correct?

8    A   Yes, ma'am.

9       I e-mailed Brian, I believe, in November of

10 2014 about asking for the location discrepancy.  I think

11 it was November 2014.  And then there was months that

12 were gapped.  There was no response as to how location

13 got changed in terms of direct communication.  And then

14 we had just the notice of violation issue around that

15 time, so ...

16    Q   Well, let's nail down that date here so that

17 we can be talking about the same thing.  Hold on just

18 one second.

19       Did you ever provide to Nature Bridges any

20 other plan sheets other than this site development plan

21 that's the last page of Exhibit D?

22    A   Any other plan sheets?  No, ma'am.  To the

23 best of my knowledge, that's the only one that I

24 provided.

25    Q   Okay.  Do you have any knowledge about anybody

ACCURATE STENOTYPE REPORTERS, INC.

---

162

1 else providing any other plan sheets to Nature Bridges?

2    A   No, ma'am.  Not that I'm aware of, to the best

3 of my ability.

4    Q   Okay, okay.  What -- I'm trying to get a hold

5 of our notice here, and I'm having a little bit of

6 difficulty.  I should be able to find that in just a

7 moment.  But let me ask you --

8         MR. HARPER:  The notice?

9         MS. LUKEN:  No, no, no.  Not that notice

10 because -- hold on one second.  Let me just grab it

11 because it will make our lives a little easier, I

12 think.

13     All right.  Is this the same thing as that?

14 Hold on.

15     (Short pause.)

16     MS. LUKEN:  That's funny.  Just one second,

17 guys.  We're going to get this right.

18     (Short pause.)

19     (Exhibit J was marked for identification.)

20 BY MS. LUKEN:

21    Q   Okay.  Here you go.  Exhibit J.

22    A   Yes, ma'am.

23    Q   All right.  Exhibit J.  What is Exhibit J?

24    A   It is the notice of violation.

25    Q   Okay.  And what are the particular items that

ACCURATE STENOTYPE REPORTERS, INC.

---

163

1 are -- well, okay.  First off, what's the date of this

2 notice of violation, if you know?

3    A   March 2nd of 2015.

4    Q   Very good.  In between the time when

5 Natures Bridges left the site in, you know,

6 September 2014 --

7    A   Yes, ma'am.

8    Q   -- until the date of this notice of violation

9 that you received -- you know, and actually, if we want

10 to make this complete, let's make it complete.

11       Hold on one second.  I just want to make sure

12 we've got all the pieces of this together.  Let's add

13 this, 'cause I think there is a cover letter that was

14 associated with this document.  All right.  Let's go

15 back.  All right.  Let's try this again.

16       We've amended Exhibit J.  What is Exhibit J?

17    A   It is the notice of violation.

18    Q   All right.  And this was received -- it's

19 actually directed to your father, it appears; is that

20 correct?

21    A   Yes, ma'am.

22    Q   All right.  And this was provided by the State

23 of New Jersey Department of Environmental Protection on

24 or about March 2nd 2015?

25    A   Yes, ma'am.

ACCURATE STENOTYPE REPORTERS, INC.

---

164

```
 1      Q    Okay.  So if we go to the next page, what is
 2  your understanding -- well, let me strike that.
 3      "This notice of violation indicates that there
 4  was a compliance evaluation at the above location on
 5  January 15th of 2015."
 6      Do you see that there on the first page?
 7      A    January 15th of 2015?  Yes, ma'am.
 8      Q    Now, who requested that the DEP come out for a
 9  compliance evaluation on that date?
10      A    I'm not sure, ma'am, if anyone did request it.
11      Q    I'm sorry, what?
12      A    I'm not sure if anyone did request it, ma'am.
13      Q    Okay.  Did you request it?
14      A    No, ma'am.
15      Q    Does Lan request it?
16      A    Not that I know of, ma'am.
17      Q    Okay.  So they came on out.  Now, at this
18  point January 15th, 2015, Nature Bridges had been off
19  the site since September of the preceding year; correct?
20      A    Yes, ma'am.
21      Q    Okay.  And what did you do to maintain any of
22  the silt fence or other temporary items that were there
23  when they left?
24      A    When they had fallen down, I had asked Louis
25  Reddi [ph] to erect the fencing when it was noticed on
```

ACCURATE STENOTYPE REPORTERS, INC.

---

165

```
 1  the notice of violation.  And --
 2      Q    Okay.
 3      A    -- that was the measures that I had taken when
 4  there was notice that they had fallen.
 5      Q    And what about in between the period of --
 6  well, let's just clarify this.  From the middle of
 7  September 2014, you know, at least whenever Mr. Guddemi
 8  came out and took these photographs on September 23rd,
 9  Nature Bridges had not been on-site as of at least
10  September 23rd through the date of this evaluation on
11  January 15th, 2015; correct?
12      A    Yes, ma'am.
13      Q    Okay.  In between that time period, what, if
14  anything, did you do to maintain the silt fence that was
15  there?
16      A    Ma'am, theres' nothing that I did directly.  I
17  was anticipating Nature Bridges to take a while to come
18  back to finish up the work that we were discussing at
19  the time to make the bridge useable.
20      Q    Okay.  But -- so you -- you did not do -- do
21  anything during that time frame with respect to the silt
22  fence; correct?
23      A    No, ma'am.  If I -- I remember -- the specific
24  silt fence?  No, ma'am.
25      Q    Okay.  All right.  And then what about with
```

ACCURATE STENOTYPE REPORTERS, INC.

---

166

```
 1  respect to this Item 1 that's identified here.  What did
 2  you do, well let me ask -- let me ask maybe another
 3  question too.  This is directed to your father, as I
 4  noted.
 5      A    Yes, ma'am.
 6      Q    Was your father handling this matter?
 7      A    No, ma'am.  I was handling the matter.
 8      Q    You were handling the matter.  Okay.
 9      And you had his authority or agreement to do
10  that?
11      A    Yes, ma'am.
12      Q    Okay.  That's fine.
13      What did you do with respect to -- and the
14  notice of violation is directed towards your father as
15  the permit holder; correct?
16      A    Yes, ma'am.
17      Q    Okay.  Now, what -- what did you do with
18  respect to Item No. 1 here that indicates that the
19  applicant, which would be your father, "Failed to record
20  the permit in the office of the county clerk and submit
21  proof of the recording."  What, if anything, did you do
22  relative to this aspect of the notice of noncompliance?
23      A    When I received this notice, ma'am, I -- I
24  believe I sent it to Brian Green and he had contacted
25  Matt Parker, and they began to address these issues of
```

ACCURATE STENOTYPE REPORTERS, INC.

---

167

```
 1  notice of violation.  So they started handling this
 2  matter, ma'am.
 3      Q    Okay.  When you say, "They started handling
 4  this matter," I'm not -- I'm not quite sure what you
 5  mean by that.
 6      A    Okay.
 7      Q    And did you hire Mr. Parker to do that?
 8      A    I saw e-mails from Matthew Parker looking into
 9  recording of the permit, ma'am.  So he was looking into
10  that process, ma'am.
11      Q    Okay.  And did you hire Mr. Parker to do that?
12      A    No, ma'am.  I did not hire Matthew Parker to
13  do that.
14      Q    Okay.  And so, I mean, this notice is pretty
15  clear on it's face that the recording needs to be done
16  by the applicant.
17      A    Right, ma'am.
18      Q    Would you agree with me?
19      A    Yes, ma'am.  That's what it says.
20      Q    Okay.  So I mean, if you did not hire
21  Mr. Parker to do that, I mean, how did you anticipate
22  that that was going to be accomplished?
23      A    Ma'am, they -- I e-mailed Brian and they
24  started to discuss the issue on their own.  They tried
25  to coordinate what they wanted me to do.  Whatever
```

ACCURATE STENOTYPE REPORTERS, INC.

168

1  instructions I had, I did.  And that was the process,
2  ma'am.  They needed me to record the permit and
3  [indiscernible], but they investigated it on their own.
4  I think I saw an e-mail saying the permits were already
5  recorded, if that's the same subject matter.
6       Q    Okay.  Did you ever -- did your father ever
7  record the permit?
8       A    No, ma'am.
9       Q    Okay.  So to this day, the permit is not
10  recorded?
11      A    No, ma'am.
12      Q    Why not?
13      A    Ma'am, you realize that the bridge we have is
14  different from the bridge that was supposed to be, and
15  there's issues with that bridge.  So the function of
16  this process has changed.  It's not a reflection of what
17  needed to be done.  What is done needs to be
18  investigated.  It needs to be looked -- looked into
19  more.
20      Q    Okay.  So I mean, you agree with me that the
21  permit, according to this notice of violation, was
22  supposed to have been recorded with the county clerk;
23  correct?
24      A    Yes, ma'am.  I agree with you that's what it
25  says in the notice of violation.

ACCURATE STENOTYPE REPORTERS, INC.

---

170

1  yes.
2       Q    Yes.  Okay.  And so my question is:  Why did
3  the permit holder, your father, not record it in the
4  county records as you were required to do under the
5  permit?
6       A    Yes, ma'am.  So I'm not sure why Santiago
7  agreed to that responsibility.  That is something I
8  communicated with him on.  It is something he
9  acknowledged back, not putting it in one of the
10  proposals.
11      Q    But not the proposal that was incorporated
12  into your contract.
13      A    Ma'am, I -- you're right, ma'am.  There's
14  several proposals, which is also an issue, which also
15  goes back to level of trust, but it is something we
16  clearly discussed.  And he clearly acknowledged that
17  this is something they were going to do, and they did
18  inform me --
19      Q    Okay.  I want to make sure that you're being
20  abundantly clear here.  You're testimony is that Mr.--
21  Mr. Garcia agreed to record your father's permit with
22  the office of the county clerk and submit proof of
23  recording to the department?
24      A    Ma'am, my testimony is, I have spoken to
25  Santiago about the permitting activities, and he had

ACCURATE STENOTYPE REPORTERS, INC.

---

169

1       Q    Okay.  And this permit was issued in February
2  of 2010.  Why was it not recorded at that time?
3       A    Ma'am, there is a lot of communication gap
4  between Nature Bridges and I.  In terms of my
5  conversations with Santiago, Nature Bridges would be
6  addressing the permitting activities.  That's one of the
7  things that was on the -- one of the invoices is
8  something that he said they would do.
9       Q    Well, okay.  We're going to have to go through
10  that a little bit.  But the proposal that was
11  incorporated into the contract that you signed, it
12  indicates that environmental permits are your
13  responsibility; correct?
14      A    Obtaining the environmental permits were my
15  responsibility, ma'am, yes.
16      Q    Yes.  As well as the costs of any inspections
17  or other things associated with it; correct?
18      A    Ma'am, I remember the cost of the inspections
19  as well.
20      Q    Okay.  So the permit, if I understand it
21  correctly, was obtained, in fact, by your father; right?
22      A    Uh-huh.  Yes, ma'am.
23      Q    And the permit itself directs the applicant to
24  go and record it; correct?
25      A    Yes, ma'am.  That is what the permit says,

ACCURATE STENOTYPE REPORTERS, INC.

---

171

1  told me that they were -- this was something that they
2  were going to be handling.
3       Q    Okay.
4       A    I understand.
5       Q    But your contract says that you're going to
6  handle environmental permits?
7       A    Yes, ma'am.  I understand there's discrepancy,
8  yes.
9           MR. HARPER:  Objection to the counsel
10  testifying to --
11  BY MS. LUKEN:
12      Q    Okay.  So your -- just in reference to your
13  counsel's -- do you have the contract in front of you
14  there, Exhibit N?
15      A    Yes, ma'am.
16      Q    You can keep that one.  I just would like you
17  to refer to it.  Paragraph 16, which is on Page 4 of 8;
18  okay?
19           And do you see there that responsibility for
20  permitting -- for environmental permits is placed on
21  the, which is what you were identified as in this
22  contract?
23      A    Ma'am, I believe it states, "Owner shall be
24  responsible for the costs of any environmental
25  inspections or certifications required for the work."

ACCURATE STENOTYPE REPORTERS, INC.

172

```
 1   I'm sorry, ma'am.  I read the wrong line.
 2        Q    Yeah.  It's just the preceding sentence.
 3        A    Yes, I apologize.  "Owner shall obtain, at his
 4   own expense, all environmental permits and licenses
 5   required for the work."
 6             Ma'am, that's all it states.
 7        Q    Yes.
 8        A    Yes, ma'am.  "Owner shall obtain, at his
 9   expense, all environmental permits and licenses," ma'am.
10        Q    Right.
11        A    Yes.
12        Q    And so what about that does not require you to
13   record your permit in the office of the county clerk and
14   submit proof of recording to the department?
15        A    My conversation with Santiago, ma'am, is my
16   understanding is they'll be -- I understand it's --
17        Q    And when was that conversation?
18        A    It's made its way on to one of the -- one of
19   the invoices, ma'am.
20        Q    Not the invoice.
21        A    I apologize, ma'am.  It's on one of the
22   invoices which is not the invoice that we're --
23             MR. HARPER:  Estimate.
24             THE WITNESS:  It's on one of the -- yes,
25        ma'am.  Sorry.  It is one of the estimates.  I
```

ACCURATE STENOTYPE REPORTERS, INC.

173

```
 1        apologize.
 2   BY MS. LUKEN:
 3        Q    Yeah.  And let's just make sure we've got our
 4   terminology straight.  If we look at Exhibit F, just as
 5   an example, would you agree with me that this is a
 6   proposal?
 7        A    Yes, ma'am.
 8        Q    Okay.  Very good.
 9        A    Yes.  Sorry.
10        Q    So let's take a look at that proposal that
11   you're referencing 'cause I think that might maybe help
12   us a little bit here.  Let's do that.
13             (Short pause.)
14             (Recess from 4:26 p.m. to 4:39 p.m.)
15             (Exhibit K was marked for identification.)
16   BY MS. LUKEN:
17        Q    All right.  On Exhibit K that you've got in
18   front of you there, do you recognize this as another
19   proposal that you had received from Nature Bridges on
20   December -- on or about December 20th, 2012?
21        A    Yes, ma'am.  I do recognize it.
22        Q    Okay.  And this one, again, is for a 12 x 20
23   bridge; correct?
24        A    Yes, ma'am.
25        Q    Okay.  And I know we were looking for some
```

ACCURATE STENOTYPE REPORTERS, INC.

174

```
 1   things during the break, but do you agree with me that
 2   this one does not specifically call out permitting?
 3        A    Ma'am, this one does not have permitting
 4   listed on it.
 5        Q    Okay.  Very good.
 6             All right.  So going back to our notice of
 7   violation.  And I'm still interested in this first.  Do
 8   you even have that?
 9             I don't want to talk about it unless you've
10   got it in front of you.  I think that's -- is that it
11   right there?  Right there.  Is that it?
12        A    Yes.
13        Q    Yes.  There you go.  And that's our Exhibit J.
14             So we're back to Exhibit J, and I guess my
15   other question is this:  I mean, given that you did not
16   enter into a contract with Nature Bridges until February
17   of 2014 and the permit was obtained, I believe, in
18   February of 2010, why was the recording not accomplished
19   from 2010 all the way through to the time when you
20   contracted with Nature Bridges?
21        A    Ma'am, so in between, we had listed property.
22        Q    Right.  Okay.
23        A    And so we were just internally trying to
24   figure out what we wanted to do with all the things that
25   were ongoing with my mother and just everything in
```

ACCURATE STENOTYPE REPORTERS, INC.

175

```
 1   general.  And so it's around the time when I started
 2   speaking with Santiago and I'm just trying to learn
 3   about the company.
 4             In one of our discussions, that was something
 5   that we had discussed.  It was something that he had
 6   told me they would very easily do.  And I was -- I was
 7   entirely expecting them to be fulfilled.  I didn't hear
 8   otherwise.  We didn't speak about it any other way.
 9        Q    Yeah.  And my -- just so you understand what
10   my question is; okay?  My question was:  The permit was
11   obtained in February of 2010.  You certainly didn't
12   expect Nature Bridges to do anything until you had
13   entered into a contract; right?
14        A    Now I understand, ma'am, yes.
15        Q    So there's a four-year period of time where,
16   you know, I believe the permit indicates it's supposed
17   to be recorded, you know, when you receive it.  So I
18   guess my question is:  What happened during that
19   four-year period of time?  Why was it not recorded by
20   the applicant as the permit requires?
21        A    Ma'am, I was having just things within our
22   family; so we really -- yes.
23        Q    Okay.  All right.
24             Okay.  Let me go make a photocopy of this, and
25   I think that will probably be one of the last things
```

ACCURATE STENOTYPE REPORTERS, INC.

**176**

1   that we cover. Let me just see what time it is.
2        MR. HARPER: By the way, I pulled that out of
3   the box, Exhibit B, I think.
4        MS. LUKEN: Yes. This is part of our Exhibit
5   B. Let me go make a photocopy of it and all of the
6   B ...
7        MR. HARPER: Okay.
8        (Short pause.)
9        MS. LUKEN: Actually, I don't think we need to
10  do that 'cause what we're going to do -- I think
11  you -- I think with what we're going to do is we're
12  just going to photocopy the box anyway, so --
13       MR. HARPER: So that's why I mention ...
14       MS. LUKEN: Yeah, you're right. So I don't
15  need to make a copy of this. I'm just going to put
16  a sheet on the front of it, though.
17       THE COURT REPORTER: You did a B1.
18       MS. LUKEN: I did a B1 and I think I did a B2,
19  I think, so I'm going to call this B3.
20       (Exhibit B3 was marked for
21  identification.)
22  BY MS. LUKEN:
23       Q   If I'm wrong, I'm wrong.
24       MR. HARPER: There's B1 and B2.
25       MS. LUKEN: I thought I had a B2 -- I'll go

ACCURATE STENOTYPE REPORTERS, INC.

**177**

1   check. There's B2, yeah, right there.
2        MR. HARPER: And then should I put that back
3   in this box?
4        MS. LUKEN: Yeah, sure. Going right ahead.
5   We're going to call this one B3. All right. All
6   right. We're ready.
7   BY MS. LUKEN:
8        Q   I've put in front of you now Exhibit B3 to
9   your deposition. And what is that? That's a proposal
10  from Nature Bridges. What's the date?
11       A   August 27, 2012.
12       Q   Okay. So does this perhaps -- and what is the
13  indication on here? This is indicating that certain
14  permitting would be included?
15       A   Yes, ma'am. I am trying to figure -- trying
16  to find out more about the company, their entire
17  processes as we're discussing. And so we're discussing
18  what they will be providing, more about how their
19  comprised, and -- yes, ma'am. This is reflective of our
20  discussion.
21       Q   All right. So that's a proposal from
22  August 27th, 2012. And you did not enter into a
23  contract with Nature Bridges until about a
24  year-and-a-half later February 2014; correct?
25       A   That is correct, ma'am. The dates are

ACCURATE STENOTYPE REPORTERS, INC.

**178**

1   matching up.
2        Q   Okay. And just for comparison, when we go --
3   well, okay. When you received this subsequent proposal
4   from them dated December 20th of 2012, Exhibit K, you
5   did see that the permitting aspect and the testing was
6   not included on the included portion; correct?
7        A   Ma'am, I am seeing that it's included here,
8   not included there. I am not sure that I interpreted
9   those to be taken out for a reason or not to be taken
10  out for a reason. The engineer was requested to be
11  on-site, and I was always told throughout that the
12  engineer will be on-site. I'm not sure why this was
13  miscommunication is. I was never told otherwise.
14  Because they were agreeing to everything I was asking,
15  made me gravitate more towards them. It made me see how
16  qualified they were, how diverse they were, that they
17  were able to fulfill everything that I was requesting.
18  And they agreed to everything I was saying, ma'am. I
19  never was told that they would be taking things off as
20  we go along.
21       Q   Okay. Well, I mean, sitting that aside for a
22  moment, did you -- did you read these proposals when
23  they came in? Did you read Exhibit B3, Exhibit K,
24  exhibit -- the exhibit that was attached to the
25  contract? Did you read those things when they came in?

ACCURATE STENOTYPE REPORTERS, INC.

**179**

1        A   Ma'am, I've read these things, and I have had
2   conversations with these things as well. So I'm not
3   sure what to believe or not to believe anymore, ma'am.
4   It's a little bit difficult.
5        Q   All right. But just suffice to say, I think,
6   to kind of close out this loop here, we've now looked
7   at -- and do you agree with me, we've looked at all of
8   the proposals that you've received from Natures Bridges?
9        A   Yes, ma'am. I am. To the best of my ability,
10  seeing all these proposals. I do know that I've had a
11  conversation with Santiago at the end. It was at the
12  time the site visit was canceled, ma'am. That was
13  the -- before the contract was signed and the site visit
14  was canceled. I had asked Santiago, "Now are we going
15  to do this? How is it possible for this project to be
16  complete without having to sit down and gone through
17  this entire process?"
18       So again, ma'am, that's right after the site
19  was canceled and the contract being signed. And in the
20  discussion we had gone through, I had asked him -- okay.
21  So I asked him, "How is it possible to do this," ma'am.
22       And then that's what he says -- that's when he
23  identified satellite imagery as a part of his standard
24  operating procedures. He had identified that they do
25  this all the time through satellite. At which point I

ACCURATE STENOTYPE REPORTERS, INC.

180

```
1   was very impressed that they were able to coordinate
2   this large project without having to come to the site,
3   without having to sit down with me to go through the
4   plans.  They've accepted all these responsibilities and
5   I had -- furthermore, I had asked them what they wanted
6   me to do, and he told me that he needed to go to the
7   site.
8       Q   I'm sorry.  What was the last part?
9       A   He told me that I didn't even need to go to
10  the site.
11      Q   Okay.  And these discussions, you're citing --
12  you claim that those occurred --
13      A   They occurred after the site visit was
14  canceled.
15      Q   And do you recall -- all right.  What was
16  ths --
17      A   It never happened, ma'am.  It never happened.
18  Let me put it that way.
19      Q   Okay.  And do you recall when that was?
20      A   Ma'am, I'm not sure exactly what date that
21  was.  I think it is in one of the Bates-numbered.
22      Q   Okay.
23      A   And so -- ma'am.  So the steps, as I
24  remember it, is the site visits.  That plan just didn't
25  happen.  And then I had called to follow up with, how is
```

ACCURATE STENOTYPE REPORTERS, INC.

181

```
1   it possible to do this project?
2           And when we had that conversation and he
3   basically explained that they'd be -- they had a full
4   understanding of everything that I was asking and just
5   verbally having gone through everything.  That's really
6   what prompted me to do the contract in the first plan,
7   ma'am.  Otherwise, I was not comfortable in doing the
8   contract without having a site visit and having sat down
9   to go through my plans.  His response at that time about
10  satellite imagery and about everything else we discussed
11  was really what prompted me to go into the contract in
12  the first place.
13      Q   Okay.  Let me ask you a question.  Have --
14  have you submitted to the New Jersey Department of
15  Environmental Protection the as-built drawing that you
16  ultimately obtained from Lan?
17      A   Yes, ma'am.  I believe it was a part of the
18  notice of the a violation, if I remember correctly.  It
19  is -- it is something I know we had to do.  I am not
20  entirely sure.
21      Q   And I'm talking about -- I'm talking about the
22  as-built drawing.  An as-built drawing is a term of art
23  within the industry that is to reflect the actual
24  conditions --
25      A   Yes, ma'am.
```

ACCURATE STENOTYPE REPORTERS, INC.

182

```
1       Q   -- that are present at this site?
2       A   I understand the as-built.
3       Q   Yeah.
4       A   I'm just --
5       Q   It's typically submitted to the permitting
6   agency after the project is completed.  So my question
7   to you was:  Was that ever done?
8       A   I need to see my e-mail to see who else was
9   copied in on it.  I'm not sure.  Reason why I'm saying
10  I'm not sure is there were e-mails that I was getting,
11  there were e-mails that I wasn't getting.  I wasn't sure
12  why that was.  So I was a little confused -- and if I
13  have some gaps.  I can verify that in my e-mail, ma'am,
14  if it was for sure or not.
15      Q   Okay.  But you didn't obtain -- the as-built
16  drawing was not obtained until 2016?
17      A   Yes, ma'am.  It was much later on, ma'am.
18      Q   Right.  And so my question is -- and I'm not
19  talking about the notice of violation --
20      A   Okay.  Yes, ma'am.
21      Q   -- 'cause the notice of violation was back in
22  2015, early 2015.
23      A   Yes.
24      Q   I'm talking about once you got the as-built
25  drawing, was that ever submitted to the New Jersey
```

ACCURATE STENOTYPE REPORTERS, INC.

183

```
1   Department of Environmental Protection for their review?
2       A   When you say -- ma'am, you just said the
3   Department of Environmental Protection.  There's a lot
4   of divisions in the DEP.  I'm not sure who viewed the
5   permit there and who didn't.  I know there is some
6   confusion with what the notice of violence is and
7   exactly what is going with the situation.  But I am --
8           MR. HARPER:  To try to help, would you take a
9       look at the -- do not read these because they
10      are -- they've got my information on them.  These
11      are your e-mails.  If that helps -- but it does
12      help.
13          MS. LUKEN:  Okay, okay.  Then go right ahead.
14      That's fine.  Normally, I would want to look, but
15      I'll tell you what --
16          MR. HARPER:  If you want to look, I don't
17      mind.
18          MS. LUKEN:  No, I don't.
19          MR. HARPER:  What that is, is the stuff that
20      you already identified as being attorney-client
21      privilege.
22          MS. LUKEN:  I don't want to know.
23          MR. HARPER:  No.  You don't.
24  BY MS. LUKEN:
25      Q   Okay.
```

ACCURATE STENOTYPE REPORTERS, INC.

184

1           All right.  So I can't remember if the
2   question is pending or what.
3           (Record read.)
4   BY MS. LUKEN:
5       Q    Let me re-ask that question.  The as-built
6   drawing that was prepared by Lan in 2016 or thereabouts,
7   was that ever submitted to the New Jersey Department of
8   Environmental Protection?
9       A    Ma'am, as best as I know, Matthew Parker was
10  dealing with that information; so I'm not sure if -- if
11  that was done or not.
12      Q    Okay.  So if Matthew Parker didn't do it, you
13  don't have any knowledge of anybody else that did?
14      A    No, ma'am.  All right.  How much time do we have
15      Q    Okay.  All right.  How much time do we have
16  before ...
17          THE COURT REPORTER:  It's 57.
18          MS. LUKEN:  All right.  Well, let's -- let's
19  do this real quick and then we'll cut this off.
20          Let me at least touch on this, and then we'll
21  adjourn and we will live to fight another day.
22  BY MS. LUKEN:
23      Q    Okay.  Actually, let's do this.  I just
24  thought the better of it.  Transcript -- okay.  I can
25  see that.

ACCURATE STENOTYPE REPORTERS, INC.

---

185

1           (Exhibit L was marked for identification.)
2   BY MS. LUKEN:
3       Q    Let me show you Exhibit L.  And the lower
4   right-hand corner of that, what does that say?  What
5   number is that?
6       A    000251.
7       Q    Let me get that pulled up.  All right.  I have
8   this somewhere else.  Hold on.
9           All right.  So what -- what is exhibit -- what
10  is Exhibit L?
11      A    It is I -- R & R Construction preliminary
12  budget.
13      Q    Okay.  So what -- what is this?
14      A    This is the proposal, the preliminary budget
15  that R & R Construction provided.  This is from R & R
16  Construction, and this is what -- their pricing
17  information about removal and disposal of the bridge,
18  and basically just carrying it forward to completion.
19      Q    Okay.  Let's walk through a couple of these --
20  these line -- line items here.  I believe I understand
21  55 or -- okay.
22          Well, first off, who is R & R, and how did you
23  become acquainted with them?
24      A    I had e-mailed Contech Engineering to discuss
25  some aspects of the bridge.  That was Jerry Scheider.

ACCURATE STENOTYPE REPORTERS, INC.

---

186

1           Yes, ma'am.  That's the one.  And then he
2   relayed me to R & R Construction for the actual physical
3   components that are required to fulfill those
4   obligations and these obligations in terms of removing
5   the bridge.
6       Q    Okay.  Well, let's do -- let's do the Contech
7   first, then.  Okay.  Who contacted -- Mr. Jerry Scheider
8   provided you with a document that's dated April 4th,
9   2017, and that's Bates-labeled as Chaudhari 253 --
10      A    Yes, ma'am.
11      Q    -- correct?  Okay.
12          So what -- what did you -- how did you become
13  acquainted with Contech?
14      A    I had asked Jerry if it's possible to do
15  something with this bridge in terms expanding the
16  length, and also I had e-mailed Jerry.  His feedback was
17  he doesn't deal with these types of bridges, but based
18  on his field of expertise, that was not a possibility.
19  And then I had e-mailed Jerry the dimensions of a bridge
20  that I wanted.  And that is when he said that that is--
21  insufficient information to provide an estimate.  That
22  the estimate of a bridge is not based on size, it's
23  actually based on hydraulic openings, hydraulic open
24  requirement, I believe was his -- was what he said when
25  he mentioned --

ACCURATE STENOTYPE REPORTERS, INC.

---

187

1       Q    Okay.  What dimensions did you send to him?
2       A    I had sent him the dimensions that were on
3   the -- let me get the e-mail to be specific.
4       Q    Sure.
5       A    Ma'am, I don't have that e-mail in front of
6   me, but it was the dimensions that the bridge needed to
7   be as per -- as per the rendering.
8       Q    The site development plan?
9       A    Yes, ma'am.  Yes, ma'am.  That's what I sent
10  him.
11      Q    Okay.  And I think we've previously identified
12  that as being a 39 x 12 foot bridge --
13      A    Okay, ma'am.
14      Q    -- is that correct?
15      A    Yes, ma'am.  That's what was mentioned.
16      Q    Okay.  So you asked Contech to provide you
17  with a quotes for a 32 x 12-foot bridge; is that correct?
18      A    It was -- yes.  I gave him the dimensions,
19  32 x 12, 34, whatever it is, yes, and that's what I had
20  sent him to give me a proposal on.  And the feedback
21  that I got was, was that it was insufficient information
22  to get an estimate.  You need to send me the site plans.
23      Q    Okay.  And so did you send him -- what did you
24  send him?
25      A    I sent him this one, which is Exhibit --

ACCURATE STENOTYPE REPORTERS, INC.

188

```
1    Q    D?
2    A    Yes, ma'am, Exhibit D.
3    Q    The last page?
4    A    Yes, ma'am.
5    Q    The site development plan?
6    A    Site development plan.
7    Q    Okay.  And what -- what happened then?
8    A    Well -- so he identified as hydraulic opening
9    requirements is how you determine what a bridge needs to
10   be; so that is one information that I obtained from him.
11   And then through whatever his interpretation was, he had
12   provided me with what bridge would suit this particular
13   project in his expertise.  And that is what came back
14   with the -- with the quote.
15   Q    Okay.  So what -- what is this document here?
16   A    So this document here --
17   Q    And we're looking at the Contech of April 4th,
18   2017.
19   A    Yes, ma'am.  This document is Jerry having
20   a -- taking a look at the site plan, making a
21   determination that the CON/SPAN O-series is what he
22   recommends based off the hydraulic opening requirements
23   of the stream.
24   Q    And what size is this bridge?
25   A    This bridge is 41 x 10 feet.  No, wait.
```

190

```
1         So this estimate includes the driveway as
2    well?
3    A    No, ma'am.  This is just for what is mentioned
4    in the supplied materials.  It's the -- it says exactly
5    what the costs do not include, and it is reflected to
6    the contractor to perform the set of requirements.  And
7    then he relayed me to the contractor to have a site
8    visit, go over the details, and come up with a proposal.
9    Q    Okay.  So this is just for a prefabricated
10   bridge --
11   A    Yes, ma'am.
12   Q    -- correct?
13   A    Yes.
14   Q    Okay.  So this is not -- not going to be
15   installed.  It's not going to include your driveway;
16   it's not going to include any backfill; it's not going
17   to include sealing material, excavation, anything like
18   that, this bridge?
19   A    That is correct, ma'am.  That is --
20   Q    It's going to be sent to your site; right?
21   A    Yes, ma'am.
22   Q    Where is this bridge going to go?
23   A    At the proposed location.
24   Q    Okay.  And what about the retaining walls that
25   are required under the site development plan?
```

189

```
1    Sorry.  41 feet span -- I believe it's 41 x 11, ma'am.
2    Q    Yes, it's 41 feet by about 11.  A little bit
3    less than 11.
4    A    Yes, ma'am.
5    Q    Okay.  So that's basically double the size of
6    the bridge that you had requested from --
7    A    Yes, ma'am.  Yes.
8    Q    -- Nature Bridges?
9    A    That's correct, ma'am.
10   Q    All right.  And what is your understanding of
11   this $122,000?  What is that going to buy for you?
12   A    Well, ma'am, the price is what he had
13   mentioned for this particular bridge.  That's what I get
14   out of this.  And what I have acquired is the
15   understanding of how a bridge estimate is supposed to
16   work.
17   Q    What do you mean "how a bridge estimate is
18   supposed to work"?
19   A    Right.  Basically, he has stated that you
20   can't just take a size in determine -- and determine the
21   qualities of a bridge.  That is insufficient
22   information.
23   Q    Well, I mean, did you -- all right.
24   Let's -- strike that.  I'm not going to worry about that
25   right now.
```

191

```
1    A    What about the retaining walls?  Ma'am, I'm
2    not sure.  It would -- yeah, I'm not sure exactly how
3    this bridge is identified to have structurally.  I ...
4    Q    Okay.  Let's go to the preceding page on that
5    exhibit, Exhibit 4.  Sure.  And this is something else
6    from R & R Construction.
7         Who is R & R Construction?
8    A    They are a company recommended by Contech
9    Engineerings.  I spoke with Elvin Lopez.  He's the one
10   who did the estimate.  And they performed, what I recall
11   from the website, a number of tasks and bridge
12   installation and things of that sort are amongst them.
13   Q    Okay.  Before we -- before we leave -- and I'm
14   sorry.  I directed you away from if, but let's come back
15   to it.  For this Contech $122,000 for a delivered
16   precast concrete bridge --
17   A    Yes, ma'am.
18   Q    -- why do you believe that Nature Bridges
19   should pay for this?
20   A    This is the compliant bridge that was
21   provided.  This is the only estimate I have.
22   Q    I mean, you're claiming this is an item of
23   damage against Nature Bridges; right?
24   A    Yes, ma'am.
25   Q    Okay.  And why -- why is this something that
```

192

```
 1   Nature Bridges is responsible for?
 2        A     This is the correct bridge for the project,
 3   ma'am.
 4        Q     Okay.  But you did not order a 41-foot x
 5   11-foot bridge from Nature Bridges, did you?
 6        A     No, ma'am.  I did not order a 41 x 11 feet
 7   bridge with Nature Bridges.
 8        Q     Okay.  So -- I mean, I guess my question is:
 9   If indeed, which I don't agree with, but if I were to
10   take your position that there is something wrong with
11   this bridge, which I don't think there is, but just
12   assuming for the sake of argument for the moment --
13        A     Sure ma'am.
14        Q     -- why -- why would Nature Bridges ever be
15   responsible for providing you with a new bridge?
16        A     Ma'am, first of all, I don't understand the
17   cost of bridges, themselves.  I don't know if this
18   bridge is -- if a bridge is expensive because of size or
19   what makes it's expensive.  I'm not sure what the
20   breakdown is.
21        Q     Right.
22        A     So I can't really comment on the cost of it
23   all.  I'm not sure if it's because it's twice the size
24   or what other factors there may be.
25        Q     Yeah, 'cause this is just the bridge, this is
```

ACCURATE STENOTYPE REPORTERS, INC.

193

```
 1   not installation or anything else.
 2        A     This is just a bridge, but I'm not sure if you
 3   can draw the conclusion that because it's twice the
 4   size, it's this cost.  I'm not sure if we can -- at
 5   least, I'm not sure if that's -- if that is the case.
 6        Q     Right.  And I guess my question is just a
 7   little different here.  If you're saying that the bridge
 8   is in the wrong location and it needs to be removed;
 9   right?  Which appears to be your position, which I'm not
10   sure why that's your position, but that is your
11   position; right?
12        A     I -- ma'am, after yesterday, I'm not sure.
13   After speaking with these guys and hearing the
14   deposition yesterday, I'm not sure what the underlying
15   factor is.  I was promised that the engineer would be
16   on-site to do a lot of the key inspections that were
17   needing to be done.
18        Q     Uh-huh.
19        A     I was promised that from the project manager,
20   and I heard otherwise from their engineer.  There are
21   issues that I just -- has lead me to -- I just don't
22   know what has happened the last three or four years,
23   ma'am.  I --
24        Q     Okay.  Just kind of setting that whole issue
25   aside for a moment, I'm -- I'm now kind of in a -- I'm
```

ACCURATE STENOTYPE REPORTERS, INC.

194

```
 1   in a different area right now.  What I'm trying to
 2   figure out is why -- and I'm just trying to figure out
 3   the reasoning here; okay?  If you are correct, which
 4   again, I don't agree with.
 5        A     No, ma'am.
 6        Q     Please do not take my statements as me
 7   agreeing with you.
 8        A     I understand, ma'am.
 9        Q     But just hypothetically, if somebody were to
10   agree with your position, why would you be entitled to
11   anything other than your money back and maybe the cost
12   of removal, if indeed there were requirements for
13   removal?  Why do you think that Nature Bridges is
14   responsible for redoing your entire project?
15        A     Ma'am, I would go back to the contract that we
16   were speaking about before.
17        Q     Sure.  The one that says that Nature Bridges
18   is going to provide you with a 20 x 12-foot bridge,
19   which is what they did; is that the contract?
20        A     That is the contract.
21        Q     Okay.  So please explain to me why the
22   contracts supports your view, if you could please?
23        A     I'm sorry, this does not look right.
24        Q     Yeah, the contract is Exhibit E, if I remember
25   correctly.  We've got a lot of paper here.  Here you go.
```

ACCURATE STENOTYPE REPORTERS, INC.

195

```
 1   It's right here.  Let me staple this before -- oh, wait.
 2   This is something different.  So I don't know what that
 3   is.
 4             MR. HARPER:  I don't care.  I just wanted you
 5   to -- I don't care one way or another -- the time.
 6             MS. LUKEN:  No, I saw your child.
 7             THE WITNESS:  I'm sorry, that's --
 8             MS. LUKEN:  I have a picture like that of my
 9   children too.  We did that for Halloween one year.
10   We're going to finish now.  We'll finish right now.
11             MR. HARPER:  I'm not worried about --
12             MS. LUKEN:  We'll finish now.  Don't worry
13   about it.  We'll finish this up.
14             THE WITNESS:  And what section is the warranty
15   section?
16   BY MS. LUKEN:
17        Q     Okay.  And what paragraph number are you
18   looking at, sir?
19        A     This is 14.
20        Q     All right.  And what is that?
21        A     "If any part of the work is determined to be
22   defective or otherwise the cause of breach of any
23   contractor warranties, contractor, at his own expense,
24   shall promptly correct or replace the same as directed
25   by [indiscernible] owner, and shall repair or replace
```

ACCURATE STENOTYPE REPORTERS, INC.

196

1  any of the work materials or property damaged or are
2  required to be redone as a result of such correction or
3  replacement.  Nothing in this paragraph may be
4  interpreted with strict owner's remedies or the
5  liabilities of contractor for any breach of contract or
6  warranties.  Contractor shall comply with all warranty,
7  repair, and replacement obligations in a timely manner."
8      Q    Okay.  So we're -- we're not really dealing
9  with a warranty issue here, are we?  Because the work is
10 being warranted for one year; right?
11     A    Yes, ma'am.  The warranty applies for one
12 year.
13     Q    Uh-huh.
14     A    So far I have obtained opinions as to this
15 bridge as to it's usability, ability to be remedied into
16 something usable, and that has led me to the conclusion
17 at this point.  And I will have other issues to address
18 when I get back to New Jersey, but everything so far has
19 pointed to me that it's going to be difficult for this
20 bridge to meet all the requirements.  And that is my
21 understanding at this point.  And that is --
22     Q    Right.  But, I mean, let's just make sure --
23 make sure that you understand.  You're -- yeah.  Let's
24 stop.
25          MR. HARPER:  You asked him why -- he thought

197

1  that --
2          MS. LUKEN:  No.  And I got it.  I got it.
3          MR. HARPER:  We'll suggest that what he thinks
4  is right --
5          MS. LUKEN:  No.  I understand.  I understand.
6  All right.  Let's -- I'm going to let you go in
7  just one minute.  Let me just go back to R & R here
8  for one second.
9  BY MS. LUKEN:
10     Q    Okay.  So if I'm -- if I'm reading this
11 correctly, you've gotten an estimate from R & R
12 Construction, or there is a preliminary budget --
13     A    Yes, ma'am.
14     Q    -- of some sort.  They have approximately
15 55,000 for what appears to be removal of the existing
16 structure.  Is that you're understanding?
17     A    Yes, ma'am.
18     Q    Okay.  What is the remainder of this -- of
19 this for your -- this 78 -- I'm looking at Item No. 105,
20 110, 120, 125, 130.  What is that for?
21     A    My understanding is, ma'am, a lot of these
22 things were needed as part of a civil engineering tree
23 protection, fence, stream crossing protection,
24 implementation of a coffer dam, I think is something
25 that they -- they use for -- as part of the processes

198

1  for the install.
2      Q    Yeah, it's basically a -- an area where you
3  create a water freeze zone --
4      A    Yes, ma'am.
5      Q    -- so you can perform work.
6      A    Correct, ma'am.  Correct.  And so that's
7  basically what it is.  It's based on a lot of the
8  components that should have been done as part of the
9  engineering plans.
10     Q    Okay.  And who told you that a coffer dam is
11 necessary for this installation?
12     A    Who told me it is necessary?
13     Q    Yes.
14     A    Ma'am, no one told me it was necessary.  I had
15 only spoke with Elvin.  I did not follow up with him
16 about the pricing.
17     Q    I'm sorry, what was the gentleman's name?
18 Alvin?
19     A    E-L-V-I-N.
20     Q    Okay.  And he's the gentlemen from R & R
21 Construction?
22     A    Correct.  And this is what he has mentioned as
23 part of -- I don't know if it's their standard operating
24 procedures or what it is, but that's something that only
25 he can comment on or someone else that is familiar with

199

1  this type of bridge.
2      Q    Okay.  And what did you ask R & R to give to
3  you here?
4      A    I brought him over to the site.  I had him
5  take a look at the bridge to have him take a look at the
6  project as entailed where -- so we did a site visit,
7  ma'am, and I then showed him the bridge to be moved.
8  And he analyzed whatever he needed to analyze and just
9  came up with the proposal.
10     Q    Okay.  But this proposal is for more than just
11 the removal of the bridge; right?
12     A    Yes, ma'am.
13     Q    Okay.  So what's the other -- what are the
14 other things that you asked for him to do -- or give you
15 a price on?
16     A    Ma'am, he followed through on his own and just
17 did the rest.  I didn't prompt him on anything.  I
18 explained to him, and he did the entire -- I asked for
19 just the bridge removal and bridge installation, and
20 then he came back with this, ma'am.
21     Q    No.  That was my question.  Bridge removal and
22 bridge installation --
23     A    Yes, ma'am.
24     Q    -- right?
25     A    Yes, ma'am.

200

```
 1    Q    Okay, I'm seeing here there's some paving?
 2    A    Uh-huh.
 3    Q    $25,000 worth of paving?
 4    A    Yes, ma'am, for the bridge approach.
 5    Q    So I think even under your view, you agree
 6  with me that asphalt paving was not included under any
 7  circumstance in your contract with Nature Bridges;
 8  correct?
 9    A    Yes, ma'am.
10    Q    Okay.  So this $25,000, this would not be
11  Nature Bridges' responsibility under any circumstances
12  instance; would you agree with me?
13    A    Sure, ma'am.
14    Q    Okay.  What about this constructing bridge
15  deck.  I thought you were having Contech make your
16  bridge for you?
17    A    I'm not too familiar with the -- I haven't
18  gone through any sort of detail with what is entailed in
19  one of their designed bridges.
20    Q    Uh-huh.
21    A    So I'm not sure exactly -- I'm not sure of the
22  exact structural components that are needed.  I haven't
23  looked at anything else that I can recall at this time.
24  So I'm not sure -- I'm not sure what the difference is.
25  I am not familiar with their plan.
```

ACCURATE STENOTYPE REPORTERS, INC.

202

```
 1  been doing, as of late, having gone through this process
 2  with two different teams, is to prepare a consumer fraud
 3  suit.  And I'm looking more and more closely into this
 4  process because I believe that this is what's happened.
 5    Q    Okay.
 6    A    So I'm not sure what the -- what the exact
 7  remedies are through -- under a consumer fraud suit, but
 8  that is something that I have started to look into.
 9    Q    Okay.  Well, that's very interesting.  Okay.
10  Let's -- here's what we're going to do.  We're going to
11  adjourn this deposition for now.  This is a temporary
12  suspension.  We are going to come back at some point to
13  complete this, and I'll schedule that with your
14  attorney.  Oh, shoot.
15         Before I do that, there was several questions
16  about testing of structure of the bridge.  Is there any
17  information that you have obtained since the time that
18  Nature Bridges left the site in September of 2014 that
19  indicates any structural problems with your bridge
20  that's currently on this property?
21    A    Ma'am, I have not had the bridge tested at
22  this time.
23    Q    I'm sorry?
24    A    I have not -- the bridge, I have not hired
25  someone to do a bridge testing at this time.
```

ACCURATE STENOTYPE REPORTERS, INC.

201

```
 1    Q    Okay.  Let me ask you a question.  If you had
 2  received this -- say you had received both of these two
 3  quotes back in 2014?
 4    A    Yes, ma'am.
 5    Q    Would you have gone forward with this project
 6  for 400,000 -- no, $520,000?  Somewhere around there?
 7    A    Ma'am, at that time, if I knew that this
 8  project would end up like this and this project would
 9  cost that much, I think I probably would have walked
10  away from both.
11    Q    Uh-huh.  Well, this -- the Nature Bridges
12  project, at this point, has only cost you what you paid
13  to Nature Bridges; correct?
14    A    It's cost me three years and counting.  It's
15  cost me valuable family time.  It has -- it's cost a lot
16  more than it seems.
17    Q    Yeah, and I recognize those things.
18  Unfortunately, our laws do not compensate for lost time,
19  so to speak, and I'm talking about dollars.  The dollars
20  that you've actually paid anybody is the 50 -- 47,500
21  that you paid to Nature Bridges; right?
22    A    Uh-huh.
23    Q    And I'm not sure what else, what other -- what
24  other money you have out of pocket.
25    A    Ma'am -- I'm not an attorney, but what I have
```

ACCURATE STENOTYPE REPORTERS, INC.

203

```
 1    Q    Okay.  But I mean, have you seen anything?
 2  Have you heard anything?  Has anybody told you
 3  something?
 4    A    I have, yes, come across a lot of literature
 5  regarding scouring --
 6    Q    Uh-huh.
 7    A    -- and protection scouring.  And the official
 8  bridge testing has not been done, ma'am.
 9    Q    Okay.  So other than your perusal of
10  literature --
11    A    That is it.  It's only limited to perusal.
12  I've been just trying to -- just trying to get an
13  understanding of what I need to do is -- what I was
14  missing up until this point is why these changes
15  happened.  They were never disclosed to as the process
16  of when they were happening.
17    Q    Uh-huh.
18    A    They were never disclosed to me in the process
19  of this lawsuit.
20    Q    Uh-huh.
21    A    So I've never realized exactly why these
22  changes were made.  And now that I've identified through
23  the deposition yesterday, I will sit down and try to
24  figure what needs to be done next.
25    Q    Okay.
```

ACCURATE STENOTYPE REPORTERS, INC.

---

**204**

1    All right.  Like I said, we're going to
2  suspend this deposition and we're going to have to come
3  back and finish it another time.
4    A    Yes, ma'am.
5    Q    But I do appreciate your time here today, and
6  so that's where we're going to end it.  And we'll close
7  off with our court reporter, and we will reconvene at a
8  later time.
9         (Deposition adjourned at 5:25 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ACCURATE STENOTYPE REPORTERS, INC.

---

**205**

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA        )
4  COUNTY OF LEON          )
5
6
7
8         I, the undersigned authority, certify that
9  the above-named witness personally appeared before me
10  and was duly sworn.
11
12         WITNESS my hand and official seal this
13  27th day of September, 2018.
14
15
16
17
18
19         KAIRISA J. MAGEE
20         kjmcourtreporter@gmail.com
         Notary Public
21         Commission #FF 971623
         EXPIRES: March, 2020
22
23
24
25

ACCURATE STENOTYPE REPORTERS, INC.

---

**206**

1
2              CERTIFICATE OF REPORTER
3  STATE OF FLORIDA        )
4  COUNTY OF LEON          )
5         I, KAIRISA J. MAGEE, PROFESSIONAL COURT
6  REPORTER , certify that the foregoing proceedings were
7  taken before me at the time and place therein
8  designated; that my shorthand notes were thereafter
9  translated under my supervision; and the foregoing pages
10  numbered 1 through 205 are a true and correct record of
11  the aforesaid proceedings.
12         I further certify that I am not a relative,
13  employee, attorney or counsel of any of the parties, nor
14  am I a relative or employee of any of the parties'
15  attorney or counsel connected with the action, nor am I
16  financially interested in the action.
17         DATED this 27th day of September, 2018.
18
19
20         KAIRISA J. MAGEE, COURT REPORTER
21         kjmcourtreporter@gmail.com
         Notary Public
22         Commission #FF 971623
         EXPIRES: March 15, 2020
23
24
25

ACCURATE STENOTYPE REPORTERS, INC.

---

Accurate Stenotype Reporters, Inc.
2894-A Remington Green Lane
Tallahassee, FL 32308
850.878.2221
Accuratestenotype.com

September 27, 2018

MR. SAKET CHAUDHARI
c/o MR. GUS HARPER, ESQUIRE
1725 Capital Circle, NE, Ste 304
Tallahassee, FL 32108-0596

In Re:  2/22/18 deposition of SAKET CHAUDHARI
        NATURE BRIDGES vs SAKET CHAUDHARI

Dear Mr. Chaudhari:

         This letter is to advise that the transcript
for the above-referenced deposition has been
completed and is available for your review and
signature through GUS HARPER, ESQUIRE, or if you
wish, you may sign below to waive review of this
transcript.

         The original of this transcript has been
forwarded to the ordering party and your errata,
once received, will be forwarded to all ordering
parties for inclusion in the transcript.

         Sincerely,


         Kairisa J. Magee
         Court Reporter

Cc:  MS. S. ELYSHA LUKEN, ESQUIRE

Waiver:

I,_____, hereby waive the reading
and signing of my deposition transcript.

_____        _____
Deponent Signature                 Date

ERRATA SHEET

I have read the transcript of my deposition, pages 1
through 208 and hereby subscribe to same, including any
corrections and/or amendments listed below.

DATE:_____          _____

                                        SAKET CHAUDHARI

PAGE/LINE   CORRECTION or AMENDMENT   REASON FOR CHANGE

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

DATE OF DEPOSITION: 2/22/18   REPORTER:  Kairisa J. Magee